## The United States District Court for the District of Columbia

| | |
|---|---|
| FAYE ZHENGXING ) <br><br> **Plaintiff** ) <br> 20 Chesapeake Street, SE ) <br> Apt. 33 ) <br> Washington, DC 20032 ) <br> 646-826-9930 ) <br><br> V. ) <br><br> THE US PATENT OFFICE ) <br><br> **Defendant** ) <br> Commissioner for Patents ) <br> P.O. Box. 1450 ) <br> Alexandria, VA 22323-1450 ) <br> 571-272-0620 ) | Case: 1:07-cv-01918 <br> Assigned To : Roberts, Richard W. <br> Assign. Date : 10/24/2007 <br> Description: Pro Se General Civil |

## COMPLAINT

Pursuant to Patent Law (An Overview): "Patents grant an inventor the right to exclude others from producing or using the inventor's discovery or invention for a limited period of time. U.S. patent laws were enacted by Congress under its Constitutional grant of authority to protect the discoveries of inventors. See U.S. Constitution, Article I, Section 8," inventors Dehou Fei, et al, file this complaint at the US District Court for District of Columbia for the tremendous damages caused by US Patent and Trademark Office, who, manipulated by Department of Justice, abandoned and then further delayed their patent application (application No: 10/681,103) after their invention was published in March 2005 and then passed the examination by this

1

office in 2005. This unlawful abandonment and the uncharacteristic or unprofessional further delay prevented the invention from benefiting the American people through enhancing their immunity and reducing the national health cost and thus ruined the value of their 20 odd years of extensive research and intensive experiment, because 1) the value of an invention lies mainly in its novelty; 2) the 87-year-old major inventor, whose petition for speedy process was granted by this office, was diagnosed with lung cancer. His loss of the ability to promote and sell the patent or his death will ruin the value of the invention completely;[1]  3) the abandonment of this application happened after the invention was published in 2005, which might have provoked infringement of right and the further delay was intentional since the application actually passed the examination in 2005.

Applicants, therefore, urge this Court to thoroughly review their application and allegations, assess their loss, and eventually render them justice by ordering Defendant to pay applicants $ 450 million in damages to cover their tremendous mental anguish and psychological trauma and justified high punitive damages caused by Defendant's outrageous violation of patent law, in addition to the real sale value of the invention. Applicants, in light of 37 CFR 1.181 (b), thus specify the factual background, present their argument on related law and facts, and illustrate the reasons for their requested damages as follows:

## I.    FACTS:

This patent application was filed on Oct. 9, 2003. *See att. 1*. This invention, aimed at enhancing the health of smokers through reducing tobacco toxins, strengthening smokers' immunity and eliminating smokers' addiction, is based on applicants' extensive research and intensive experiments over the past 20-odd years. It will benefit 45 million smokers in the United States and 1.3 billion smokers worldwide[2].

---

[1] Note: At the moment of preparing this complaint, the major inventor is still hospitalized at New York Presbyterian Hospital;

[2] See "Tobacco's Stigma Aside, Wall Street Finds a Lot to Like" in The New York Times on Jan. 31, 2007.

The health pills could also benefit 9.7 million users of other tobacco products[3] and 29-43 percent of the US population who are second-hand smokers[4].

After submitting their application, the major inventor Dehou Fei filed a petition for speedy processing based on his age (then 82 years old) and this office granted his petition, though it was later than expected. *See att. 2.* This invention was published on March 17, 2005. *See att. 3.*

After receiving the restriction requirements on claims from this office in June 2005, applicants revised their claims in accordance with the suggestions of this office in July 2005. *See att. 4, 5.*[5] One of the applicants Faye Zhengxing asked the examiner a few questions on the phone to make sure the restriction requirements were fully understood and meticulously followed. *See att. 6.* The amended version on claims was sent around July 20, 2005.

While respecting the examiner's suggestions to elect one of the invention groups and submit new claims directed to the elected invention, applicants did not change their fundamental stance on their claims — all the claims on biochemical ingredients and methods are scientific discoveries interrelated to each other and inseparable from each other to achieve the designed beneficial effect on human body, because, even according to Patent Office's categorization, the liquid additive and health pills, as well as the two methods "were classified in multiple subclasses in classes 424 and 514, depending on the chemical structure of the component ingredients." *See att. 4, p. 2.* The interview summary written by the examiner proves that the applicants were modest and open-minded enough to fully understand and follow examiner's advise,

---

[3] See "Institute Urges Extensive Smoking Deterrents," in The Washington Post on May 25, 2007. The data are from Institute of Medicine, a branch of the National Academies, a scientific organization chartered by Congress to advise the government on scientific and technical issues.

[4] See "Researchers: Heart deaths would plunge without passive smoking" from National Health and Nutrition Examination Survey published by Reuters on May 11, 2006.

[5] The applicants can only present the faxed version of the restriction requirement of 2005. Though there are errors caused by fax machine, the text on the whole is still clear.

but at the same time, they kept their scientific belief grounded on their long time research and experiments.

A few weeks after submitting their amended claims, applicant Faye Zhengxing called this office to ask the status quo of the application. A woman examiner took a few minutes to check the record and informed Faye Zhengxing that this application had passed the examination. More specifically, she said (to the effect), "To say your application did not pass the examination is a mistake." Patent office's phone recording should have proved the truth. Delighted by the success, Faye Zhengxing told the good news to the major inventor (her father) and others. They all cheered and Faye Zhengxing celebrated the success with her friends. By the way, the same patent application was also filed in China about one month earlier and was approved in September 2005, about the same time it passed the examination by this office in the United States. *See att. 8.*

Up to that point, the patent office handled this application properly though the petition for speedy process was granted later than expected, but this office apologized by stating "The delay in acting upon this petition is regretted." *See att. 2.* This apology further proved that this patent office was fully aware of the age of the major inventor and would not have abandoned the application if there had not been any abused power to manipulate its process. After that, however, applicants never heard of anything beyond the remarks "It is going through the process" when they made phone inquires.

Though this scientific case should have nothing to do with the lawsuit applicant Faye Zhengxing filed against a federal agency for discrimination, Department of Justice's manipulation, more specifically the destructive role played by the US attorney David Cohen, should alert the Court to the historic case (02-10717 filed at US Supreme Court) in which applicant Faye Zhengxing bravely defended the US Constitution and won the US Supreme Court's ruling in 2005.

As applicant Faye Zhengxing stated in her letter to NY senators, "It was definitely not a coincident that abandoning the process of our patent application took place exactly in the same period of time when I informed all the justices of the US Supreme Court that Department of Justice falsified the high court ruling on my case and US Supreme Court later reversed the lower court's ruling to protect my legal rights and to prove the top legal fraud. Since the illegal surveillance on my family and me has been going on for years, Department of Justice knew our patent application from the very beginning. Of course, it was the real high court ruling issued in 2005 that posed a prosecution threat and triggered deep embarrassment and strong determination to retaliate against me by all means and in all ways." *See att. 9, p. 2.* The damaged patent application is only one dimension of the loss and sufferings the applicants have experienced. The chronicle of the crimes gives a full picture of the destructive force and all-dimensional damages. Note: All the allegations in this chronicle are uncontested facts either presented at courts or at Senate/House Judiciary Committee.

More specifically, the US attorney David Cohen started working on Zhengxing's case in 2005 after the high court issued its true ruling and the value of this case greatly increased. Cohen has been trying to control the financial life of Faye Zhengxing's family and has been retaliating against her since she could not violate the law to satisfy his financial needs. Impatient with his failure to force Zhengxing to promise him a commission from the compensation decided by the US Supreme Court (02-10717) and approved by President Bush (for cases 04-119 & 05-532 at US Court of Federal Claims), Cohen sent $7 million from Zhengxing's approved relief to China with other fund in 2006 to open his own bank account. Faye Zhengxing thus reported this crime to Inspector General in Department of Justice, NY senators, and Senate/House Judiciary Committee, as well as House Committee on Oversight and Government Reform.

After 5 months of silence, DOJ's Special Agent in Charge Special Operations Investigations Division rather than Inspector General himself informed Zhengxing

that this office "does not have jurisdiction to investigate allegations that a Department of Justice attorney has committed misconduct while exercising his or her litigation authority." *See att. 10*. This office, in addition to shifting the responsibility to others, in fact also tried to mitigate the severe nature of the crime by informing Zhengxing to bring this matter to the attention of DOJ's Office of Professional Responsibility. A criminal investigation thus became an ethical issue. But on the whole, this office did not deny that the allegation is a fact proved by the record at Dept. of Treasury and by witnesses in the government.

Recently, Mr. Cohen, after directing toxic gas pumped into applicants' homes to cause pain and diseases, has been using high tech such as laser beam and electric fields (the specific term is not known to applicants) to harm and harass applicants. Since the electric waves or beams are invisible, Cohen manipulated hospitals and the police to label Zhengxing as a "mental patient" when she contacted the police or hospital to complain about her illness and pain caused by the electric waves.

On Oct. 16, 2007 when applicant Zhengxing was hit by laser beams at home and felt her chest stuffy and short of breath, she went to the emergency room of Elmhurst Hospital. A policeman (last name Louden) of the hospital (badge number 1623) violently pushed Zhengxing into the psych department of the hospital. Since this policeman did not know Zhengxing personally, it was obvious that he was instructed to illegally detain Zhengxing. Fortunately, the psychiatrist on duty did not evaluate Zhengxing as a mentally ill patient and referred her back to emergency room for physical treatment.

If applicants were not misinformed, NYPD at 34 Precinct discovered the equipment producing laser beams upstairs in Apt. 3H at 3736 10th Ave. in New York City on Oct. 12, 2007 after Zhengxing informed the police of the laser beam attack. According to officer Diaz at 34th Precinct, the police was applying for a search warranty to capture the criminal evidence and to convict the criminals. In her letter to NYC Mayor

Bloomberg and NYPD, Zhengxing stated the reasons why the witness or the accomplice, the resident in Apt. 3H, should be interrogated to find out the truth. Elmhurst Hospital staff should also testify to prove how they were manipulated to illegally detain Faye Zhengxing when the medical examination showed she could be discharged. Fortunately, the staff at the hospital upheld their professional standards and Zhengxing was discharged in two days, but Elmhurst Hospital did not know that she was still attacked by laser beams even when she was hospitalized. On the morning of October 17, 2007, after the laser beam attack, Zhengxing vomited to tears and had wrenching pain in her stomach. Her weak legs could hardly carry her around. She did not sleep on bed for the next night. To deprive a patient of her sleep is another torture in addition to suffering caused by the laser beam attack.

After describing Mr. Cohen's financial motive and coercive means against applicant Zhengxing to prove that the damages on applicants' patent is only one dimension of their suffering and loss, plaintiffs need to switch back to the patent examination procedure. On March 19, 2007, applicant Faye Zhengxing sent a letter to this Office to protest the abandonment. *See att. 11.* When Examiner Jon Pak said on the phone that he was only a small government employee and he could not explain the time wasted, applicant Faye Zhengxing immediately perceived the abused power behind, which had damaged her life in every way such as her career, her property, her health and her family.

This time, instead of apologizing to applicants for its unlawful abandonment of this application and promptly issuing the certification of this patent to reduce the damages, the patent office responded by making some unacceptable, uncharacteristic, and self-contradictory restriction requirements on claims and on other minor issues of the application, further delaying the approval of the patent which should have benefited the American smokers on a large scale. This further delay also greatly increased the pressure and mental anguish on applicants. *See att. 12.* When applicant Zhengxing pointed out that the woman examiner informed her that this application had passed the

7

examination, Mr. Pak said (to the effect), "She did not make the final decision. I do." This remarks proved that there are two contradictory decisions and Mr. Pak did not deny the fact that this application passed the examination in 2005. The phone record in this office should have supported the truth on applicants' side.

As applicants pointed out in the letter to this Office dated June 8, 2007, "Your record and your internal investigation should have proved the truth. If we had not passed the examination, you would not have waited for two years to repeatedly give us more opportunities to modify our claims and specifications." This assumption is based on 37 CFR **1.105** governed by 37 CFR **1.135** and **1.136**. *See MPEP § 710 et seq.* "Requirements for information under 37 CFR **1.105** made without an action on the merits should set a shortened statutory period of two months for reply. Applicant may extend the time period for reply up to six months in accordance with 37 CFR **1.136(a)**." Applicants further stated, "Our application deserves speedy processing, especially after you granted the petition of my father, the 86-year-old major inventor, "to make special" under the provision set forth in M. P. E. P. 708.02, IV." *See Att. 13, p. 1.*

Applicants' current position on their claims is consistent with their amendment in 2005. In her letter dated June 8, 2007, the major inventor pointed out that if they made some changes in the claims and other minor issues, it did not mean this office could deny that this application passed the examination in 2005; and it did not mean they would not pursue the damages caused by the unlawful abandonment. More specifically, applicants insisted that they refused to cancel claim 7, 8 and 9 to reduce the value of the invention. *See att. 13, p.1-2.*

In their amended claims, applicants insisted that the central claim on the health pills is to enhance the health of smokers. Therefore, in addition to the claims on two health pills, the liquid additive to reduce the toxins in tobacco is a supplemental claim, because the effect to strengthen the immunity of smokers and gradually eliminate

smokers' addiction can be achieved only when the use of liquid additive in tobacco by the manufacturer is combined with taking the health pills by smokers. The two methods to resume the activity of glut athione peroxidase and to eliminate smoker's addiction are inventors' inseparable designs and discoveries, which must be protected by the US patent law in the same invention.

The uncharacteristic or unprofessional uncertainty and self-contradiction of this patent office can also be seen in its decisions. Examiner Jon Pak recently said on the phone that this office would take final action to reject this application if applicants refuse to make changes on claims. Later in its letter dated June 12, 2007, this office said: "Upon reconsideration, in view of the restriction requirement of record, it is believed that Finality would have been premature." See Att. 14, p. 2.

Not only did the abandonment of the application tremendously damage the value of this invention, the further unjustified restriction requirements also took a heavy toll on the applicants, especially on the old, sick and weak major inventor (non-smoker) who was diagnosed with lung cancer caused by a federal poison (dioxin). Even applicant Zhengxing has to bear the pain all over her body since she had to work in a highly polluted home where the water was poisoned and the air was polluted. The letters she sent to NYC Mayor give more details. See Att. 15. It is a torture to work in such an environment for an application, which actually passed the examination two years ago.

On July 31, 2007, applicants submitted a petition to Director in hope that Director would investigate this case and render them justice. However, this petition was denied on September 28, 2007. See att. 16. This denial was filled with Defendant's cover-up strategies such as the changed subject, made-up or distorted facts, and the misinterpreted patent examination procedure. This denial further indicates that Defendant did not have any sincerity to respect the law and resolve this case. For instance, the Director changed the focus of argument from its unlawful abandonment of this application to the restriction requirement when the Director summarizes the

petition as "requesting withdrawal of an improper restriction requirement." *See att. 16, p.1.* Since the jurisdiction of the Board of Patent Appeals and Interferences is basically to review and resolve the disputes in patent application and the argument on infringement of patent rights, applicants were advised to take this case to the Court for damages.

## II.   ARGUMENT:

In the following argument, Applicants will present the related laws and facts to 1) challenge Defendant's self-contradictory restriction requirements; 2) prove Defendant's unlawful abandonment of their application and further delay; 3) criticize Defendant's faultfinding attitude in order to shift the responsibility to applicants:

### 1. Defendant's self-contradictory restriction requirements:

While this patent office is making more restriction requirements in 2007 to contradict its own decision in 2005, which made the amended claims of this application allowable, applicants have not changed their position on claims. Comparing the 2005 amended claims and the 2007 modified version, this Court will find they are almost the same: two claims on health pills, one supplemental claim for the liquid additive, and two supplemental claims on methods. *See att. 5, 17.*

On the whole, these claims are inseparable patentable discoveries working together to achieve the designed beneficial effect on smokers and to form an organic unity to enhance smokers' health through reducing the toxins in tobacco, strengthening the immunity of smokers and eliminating smokers' addiction. The applicants listed these claims in one application because a) they "set forth the best mode contemplated by the inventor of carrying out his invention" *See the first paragraph of 35 U.S.C. 112.* The best mode in this invention is to use the two health pills when smokers consume the toxin reduced tobacco; b) one application or specification can "conclude with one or more claims, particularly pointing out and distinctly claiming the subject matter which

the applicant regards as his invention." *See Second paragraph of 35 U.S.C. 112.* Accordingly, the inventors concluded more than one claim in this invention and these five claims are the subject matters, which the applicants regard as their discoveries or invention.

In addition to the legal ground for their claims as stated above, applicants also set forth their scientific ground as follows:

a. The health pill and liquid additive are inseparable from each other and interactive with each other to exert the beneficial effect on smokers. In response to applicants' recently amended claims, this office stated, "The health pill and liquid additive are claimed separately. See claims 5-6 (health pill) and claim 7 (liquid additive). There is nothing indicated in those claims that require a combination of the health pill and liquid additive." *See Att. 14, p. 3.* Applicants' answer: Though the health pills and the liquid additive are two claims because of their different patentable preparations and functions, the designed beneficial effect on smokers depends on the chemical interaction between the two.

Moreover, in this office's restriction requirement of 6/21/2005, the examiner clearly and repeatedly admitted, "This invention is classified in multiple subclasses in classes 424 and 514, depending on the chemical structure of the component ingredients." *See Att. 4, p.2, 3; att. 14, p.2.* Of the four types of utility patents, this invention falls in the category of compositions of matter and processing methods defined by the patent law: "Such 'utility' patents are issued for four general types of inventions/discoveries: machines, human made products, compositions of matter, and processing methods." *See* § 101 of Title 35. "The term 'composition of matter' relates to chemical compositions and may include mixtures of ingredients as well as new chemical compounds." *See www.uspto.gov--General Information Concerning Patent.*

An example in the Specification to prove that the value of this invention hinges on the chemical structure of the component ingredients reads, "These ingredients, within the

scope of United States Recommended Dietary Allowance (RDA), will protect the structure and functions of cells and cell membranes to keep smokers in good health (10)." *See Att. 18, p. 8.* Again it is the effect of chemical reaction of the component ingredients of the health pill and liquid additive on human body that fundamentally repairs the damages in human cells and cell membranes and strengthens the immunity of smokers.

The following paragraph in Specification describes why reducing toxins in tobacco must be combined with taking health pills. "We started detoxicating the major seven chemicals in tobacco smoke mainly through full oxidization. We found it easy to oxidize tar, carbon monoxide and nicotine effectively. It is also a cost-effective way to oxidize nicotine and transforming it into one type of vitamin B (nicotinic acid). With sufficient oxygen, tar will greatly lower its content, and the cancer-causing polycyclic aromatic hydrocarbons represented by 3, 4 benzo(a)prene in tar will also decrease. The rest of polycyclic aromatic hydrocarbons in tar will lose its carcinogenicity when it combines with our anti-oxidants in our health pills; carbon monoxide, after oxidization, also loses its toxicity after it is changed into carbon dioxide. *See Att. 18, p. 6.* In other words, only by reducing the toxins in tobacco will the health pills benefit smokers as designed. By the same token, smokers still need to take health pills to eliminate the rest of harm from carcinogenicity even after the toxins in tobacco were greatly reduced by the liquid additive.

The examiner's suggestion that the health pills and the liquid additive, with their different ingredients, "are directed to independent and distinct inventions" *(See Att.14, p.4)* will prevent this invention from achieving its designed beneficial effect on smokers and from realizing its value, especially the value to gradually eliminate smokers' addiction, which can be achieved only through using the ingredients in the health pills and the liquid additive at the same time. There is not a group of independent ingredients to eliminate smokers' addiction. That is why some ingredients in the preparation of the liquid additive and some in that of the health pills

are marked by sign *, which indicates that this ingredient is also for eliminating smokers' addiction. *See att. 1118, p. 19, 21.*

The inseparable relationship between the health pills and the liquid additive can also be proved by the key word "supplemental "in applicant's claim on the liquid additive. *See Att. 5, p.2; Att. 17, p. 2.* In short, the liquid additive is supplemental to health pills and the claim on the liquid additive is an inseparable supplemental claim.

The examiner's analogy comparing a novel and unobvious car engine and brake system with this invention's liquid additive and health pills is not analogous here, because the presumption that "there is nothing preventing the engine and brake system from being separately used" (*See Att. 12, p. 4*) does not exist in this application.

Moreover, though "the health pill and the liquid additive contain materially different ingredients," as Defendant argued (*See att. 14, p.3; att. 16, p.2*), they are still not two independent inventions, because the liquid additive is needed to reduce the toxins in tobacco to the extent that the health pills will achieve the designed beneficial effect on smokers – to strengthen smokers' immunity and to eliminate smokers' addiction.

: b. Claim 8 and claim 9 are inventors' methods for the biochemical reactions designed to achieve the beneficial effect on smokers. They are scientific discoveries and inseparable part of the value of the invention. Claim 8 and claim 9 form the most creative part of this invention. While claim 8 is a method for resuming the activity of glutathione peroxidase (GSH-PX) by applying a co-enzyme to guarantee its unfailing effect, claim 9 is a method for eliminating smoker's addiction by reducing dopamine and glutamic acid in the human brain. Both claims play an essential role in the biochemical reactions to achieve the beneficial effect on the smoker and both are breakthroughs in this field. They are one of the patentable "new and useful process" defined "by law as a process, act or method, and primarily includes industrial or technical processes". *See www.uspto.gov – General Information Concerning Patents.*

Though applicants admit that "any new and useful process" could be an independent invention (*See 35 U.S.C. 101*), in this particular invention, however, the applicants could achieve their designed effect only by processing the special ingredients through special methods. A simple analogy is that an effective teacher will teach students with various IQs with different teaching material and different teaching methods, because different teaching material demands different teaching methods. To serve a certain group of students well, the teacher needs to consider both the material and the methods at the same time. Defendant's view to only emphasize the separation of material from the method is one-sided and thus is unconvincing. *See att.16, p. 3.* The law 35 U.S.C. 101 stating, "Whoever invents of discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore" is open to interpretation in deciding the number of invention. When the relationship between the composition of matter and the processing methods is unique and inseparable, they should be claims in one invention, because 35 U.S.C. 112 states, "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention."

In claim 8, the inventors describe why the method was an inseparable part of the biochemical reaction: "After a long search and study, we finally found a co-enzyme to reduce GSSG back to GSH. We were greatly encouraged by this finding. With this co-enzyme, we could resume the activity of GSH in every way. Moreover, in case GSSG-R is insufficient, the two components in riboflavin in the health pill – flavin mononucleotide (FMN) and flavin adenine dinucleotide (FAD) – will resume the activity of GSSG-R to the normal level. We believe this is a breakthrough in generating an unfailing effect to prevent smokers from getting various smoking related diseases." *See Att. 18, p. 14.*

Similarly, in claim 9 the method to eliminate smokers' addiction through three channels also fully presents itself as part of the biochemical reactions in human body or part of the invention. "To eliminate the addiction to nicotine, therefore, we must appropriately reduce dopamine, glutamic acid, and at the same time reduce the excessive iron in the human body." Applicants illustrated the following three methods: a) strengthening MAO's activity with copper compound and enhancing copper's function with manganese compound; b) use vitamin B6 (changed into pyridoxal 5 –phosphate in the human body) as the co-Enzyme for glutamic acid's decarboxylation (GAD); c) control the iron taken-in and stored. *See Att. 18, p. 15-17.*

Another analogy: The same amount of the ingredients such as salt, sugar, water or flour could be made into different kinds of food if the order in which ingredients put into the frying pan is different, or the combination of the ingredients is different, or the temperature of the oven is different. In short, the methods must be carefully designed and applied for the ingredients of chemical compound to interact with each other to achieve the designed beneficial effect. Since these methods are unprecedented and creative, they must be regarded as part of the invention.

In sum, the legal and scientific ground to include all the five claims, both the major and the supplemental claims, in one invention defeated Defendant's assertion that "The examiner expressed a number if reasons for requiring restriction including distinctness of each invention from the other and burden on the Office to examine all inventions in the same application. (That is to say that the inventions, while somewhat related to each other, would require different searches, search techniques and patentability considerations.)" *See att. 16, p. 1.*

## 2. **Defendant's unlawful practice in its patent examination procedure**:

The strategies Defendant used to cover up its unlawful abandonment of this application include but not limited to a) changing the subject of argument from unlawful abandonment to restriction requirements; b) making up or distorting facts to

cover up the abandonment; c) misinterpreting the patent examination procedure to shift the responsibility to applicants. Applicants thus rebut Defendant's argument and strategies one by one as follows:

a. Changing the subject of argument: After applicants pointed out in their letter dated June 8, 2007 that they would pursue the damages caused by the intentional and "illegal" abandonment of this application (*See att. 13, p.10*), Defendant has been trying to make the argument a dispute over restriction requirements. In his letter dated May 31, 2007, the examiner laid out a big picture of changing applicants' claims again as if he suddenly woke up after two years to find out he needed to continue his original restriction requirements. More specially the examiner asked applicants to "authorize the changes to the claims and changes to the specification, as set forth in this communication" *See att. 12, p. 2;* he even wrote up a claim list for applicants to imitate. *See att. 12, p.3.*

On June 7, 2007, the examiner was patient enough to change the Office action from "final" to "non-final." *See att. 14, p.2*; then the examiner repeated his opinion why the health pill and the liquid additive should be two inventions rather than two claims in one invention and why the two methods should be dropped from this application. *See att. 14, p. 3-5.*

The Director declared that the focus of the dispute is the restriction requirement from the beginning of his decision ("requesting withdrawal of an improper restriction requirement" to the conclusion of his decision ("For the above reasons, the restriction requirement is considered proper and will not be withdrawn") *See att. 16, p. 1-4.*

Ironically, in his letter on restriction requirement dated June 7, 2007, the examiner cited the laws and regulations on "chemical structure of the component ingredients (See "classes 424 and 524,"), "one or more claims in specification (See 35 U.S. C. 112), and "the best mode contemplated by the inventor of carrying out his invention" (See 35 U. S. C. 112) to support applicants' view rather than Defendant's. More

contradictions can be cited to see Defendant's chaos in argument. While the Director stated "Applicants then submitted an acceptable amendment on April 20, 2007 (*See att. 16, p.2*), but his denial of applicants' petition is based on applicants' petition "requesting withdrawal of an improper restriction requirement." How could the applicant's amended claims be accepted in April 2007 when they did not change their claims fundamentally as the examiner directed and later applicants filed a petition to argue against the examiner's restriction requirement in July 31, 2007?

b.<u>Making up or distorting facts to cover up the abandonment of application</u>: In his decision on application's petition, not only did the Director dodge the facts, he even made up some facts or he distorted facts to the extent that it is almost beyond applicants' apprehension. In short, this Director's decision is full of mistakes, contradictions and logical problems.

While on the first page of his decision on the petition, the filing date of this application was October 9, 2003, however, the date was changed to "September 29, 2004" in the text. *See att. 16, p. 1*; applicants' amended claims in 2005 were not "five new claims" as he stated (*See att. 16, p.1*). They are major claims and supplemental claims to form the organic entity of the invention. *See att. 5*.

Furthermore, applicants have no knowledge about the second Notice of Non-Compliant amendment "mailed to applicants on August 31, 2005" (*See att. 16, p. 2*., This imagined document is used to bridge the gap in application procedure between 2005 and 2007 when applicants' application was abandoned. In fact, after a woman examiner informed applicants that their application passed the examination in 2005, there had been no formal contact or communication between applicants and Defendants till 2007.

Defendant's phone recording should have proved the 2-year abandonment, because 37 CFR 1.105 governed by 37 CFR 1.135 and 1.136 See MPEP § 710 et seq. states, "Requirements for information under 37 CFR 1.105 made without an action on the

merits should be set a shortened statutory period of two months for reply. Applicants may extend the time period for reply up to six months in accordance with 37 CRT 1.136(a)." In other words, this Office should have rejected this application after six months as maximum if applicants had failed to respond to Defendant's any requirement for information or action.

Since applicants filed a petition for speedy process and Defendant granted this petition and both sides did not delay any action after the application was filed in 2003, it is obvious that there was a third force which interfered with the application process and ordered this Office to abandon this application for some reason. However, Defendant should have upheld its professional standards and the rule of law to report the abandonment to the authority and should have informed applicants of the change in procedure. The Director was not respecting the truth when he said, "Applicants also make allegations that the actions of this agency have or can be influenced by other agencies (such as Department of Justice) or "the agency is independent of any other agency of the government." Only a formal federal investigation will prove the truth and may prevent perjuries.

No matter how the Director used the telephone interviews and letters between this Office and applicants as the on-going communication between parties, it cannot cover up the 2-year wide gap caused by the unlawful abandonment during which the application process was stopped. When applicants called to find out the status quo of their application, the answer was nothing beyond "It is going through the process."

It was until March 2007 did applicants take new actions to remind Defendant that their application was abandoned and this Office suddenly became very patient and attentive to continue the restriction requirement dialogue and repeatedly allow applicants to change their claims. The extensive phone interviews and office actions in 2007 all proved Defendant's knowledge that this application was abandoned and this Office needed to take defensive strategies to cover up the gap left by the unlawful abandonment.

c. Misinterpreting patent examination procedure: Both the examiner and the Director repeatedly mentioned that applicants should find legal help by hiring a patent attorney to file their application. *See att. 4, p. 2; att. 16, p. 3.* Applicants, of course, admit that a quality patent attorney can enhance the quality of their application and can speed up their process. However, as applicant Faye Zhengxing stated before, she was unlawfully terminated in 2001 and have had no income whatsoever for over 6 whole years. In addition, the major inventor, a retired pharmacist, lost his Supplemental Security Income since Jan. 2007 after he was hospitalized abroad and could not come back to the United States as he had planned. In the crisis of survival, applicants simply could not afford the attorney.

Though hiring a patent attorney could help applicants in every way, it is not legally required as part of the procedure. Even without a legal counsel, applicants, being open-minded and modest, learned a great deal in the process and successfully passed the examination in 2005 as the women examiner informed them.

If applicant Faye Zhengxing was not misinformed, President Bush, in light of the real ruling by the US Supreme Court, approved millions of dollars of compensation in 2005 and 2006 to settle Zhengxing's civil right case as a non-prosecution plea deal, but the US attorney David Cohen has been depriving her of her relief and has been harming her family and her in his hope to force Zhengxing to promise him a financial gain. Applicants believe it was David Cohen who ordered this Office to abandon their application, because only Cohen, who has been working intensively on her case (mainly in surveillance and finance), had both the motive and means to harm them as he has done so much over the past two years. Of course, the most compelling evidence of his motive is the $ 7 million Cohen sent to China with other fund in 2006 to open his own bank account.

Anther example of misinterpreting the patent examination procedure is the Director's description of the woman examiner who informed applicants that their application had passed the examination. According the Director, "applicants appear to be of the belief

that a telephone conversation with an unnamed Office employee shortly after the application was filed was an indication that the application would issue as a patent." *See att. 16, p. 3.* Though applicants are not patent professionals, but they had the knowledge about the patent examination procedure and would never ask any employee of this Office to issue the patent certification soon after the application was filed. It was weeks after applicants sent out their amended claims did they call to find out the status quo of their application or if their application had passed the examination.

It is more ridiculous to say "What in all likelihood happened is that after filing the application applicants talked with an individual who indicated that the application had been received and had been initially reviewed for compliance with the applicable filing requirements and had met them and that the application was, therefore, ready for examination by a qualified examiner." *See att. 16, p. 3.* As soon as applicants received the receipt of application from this Office in 2003, applicants knew the examination process would start and they never would find it necessary to make such an inquiry. This is another misinterpretation of the procedure and applicant's intelligence.

The Director must be as much amused as the applicants when he mentioned the Notice of Abandonment. "Applicants appear to believe that this application was at some time abandoned. No Notice of Abandonment was ever mailed to applicants, thus no abandonment of the application has ever take place." *See att. 16, p. 3.* While applicants described Zhengxing's litigation and the frauds committed by Department of Justice as the context or background which caused the unlawful, secret and damaging abandonment of their application, they never expect or believe there is such a Notice of Abandonment in the procedure as the Director "joked." If the Notice of Abandonment is laughable, the cost and consequence of the abandonment are serious and tragic.

Contrary to the Director's belief that "Prosecution of this application, which was advanced out of turn due the granting of a petition to make special, has proceeded in a normal manner along with the prosecution of approximately 1,000,000 other pending applications. Unfortunately, due to the large number of active applications, prosecution within the Office is sometimes slowed by this and other factors," the process of this application was deliberately slowed and abandoned. Even the granting of the petition to make special was much slower than expected and this Office gracefully apologized, because it took ironically more than one year. *See att. 2.*

No matter how many active applications this Office has, the truth is that this application was abandoned after it passed this office's examination in 2005. Around the same time their application in China was approved. *See att. 8.*

### 3. Defendant's faultfinding attitude to shift the responsibility to applicants:

In addition to the restriction requirements, this office also made suggestions on some insignificant issues, which were not mentioned in its previous restriction requirement in 2005 in order to shift the responsibility or liability to applicants.

While applications agreed to make some corrections in Specification, applicants pointed out some changes are not acceptable. For instance, this office should use the name Dehou Fei of the major inventor to contact applicants, because the major inventor is the mastermind of this invention and it was based on the major inventor's age that Defendant granted the petition to "make it special" in 2003. Furthermore, inventors are different in their contribution to this project and in the distribution of patent sale value." *See Att. 13, p. 2.* Obviously this office used the name of applicant Faye Zhengxing rather than the major inventor's to mitigate its guilt caused by the unlawful abandonment.

Another faultfinding request is Director's assertion that "Applicants remain under obligation to reply to the office action mailed June 15, 2007, within the time period

set therein or as extended under 37 CFR 1.136(a). The filing of a petition is not considered a reply to the Office action." *See att. 16, p. 3*. In fact, applicants did send a reply to examiner's restriction requirements on August 2, 2007. The cover letter is an introduction for this Office to understand applicants' positions and attitude toward the related issues as stated above. *See att. 21*.

Reviewing Title 35, Part 2, Chapter 10, sec. 101 which states, "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title," applicants found the assertion of this office groundless when it said, "The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention." *See att. 12, p. 3*. Not only do the claims belong to "new and useful process" and "composition of matter" as defined by the law above on patentable inventions, applicants have actually used the similar health pills on themselves and proved their high value in strengthening the human immunity.

In her letter to NY senators, applicants described the effect of their health pills on themselves, "In terms of the quality of our invention, the federal poisons, which injured my family, unexpectedly proved the power or effect of our health pills in strengthening human immunity. Taking the medicines similar to our health pills, my 86-year-old father, is still alive after being diagnosed with lung cancer two years ago while the average survival period for male lung cancer patients is only 8 months. Moreover, after being repeatedly poisoned by dioxin over the past two and half years, I have pain in my back, muscle and lymph nodes and my dioxin level has reached nearly 80,000 as opposed to the normal range 10-20, but our health pills prevented me from immediate death caused by cancers." *See Att. 9, p.3*.

It is not true that the name such as ACA-1-4 2A, of the health pill was "never before described in the originally filed disclosure." It is not true again when this office said, "In view of the fact that applicant seems to associate certain meanings behind such product names, the new terminology is deemed to constitute new matter, which fails to find adequate written descriptive support from the originally filed disclosure." *See Att. 14, p.6.* Applicants used these names only to refer to the specific products since there are two kinds of health pills. One health pill is orange color and the other is white. It is only for convenience in communication. There is no "meaning behind such product names," nor is there any "new matter." In the original specification, these names were introduced only to refer to specific products and they were also used under the title of preparations or of the tables. *See Att. 12, p. 3, 20, 21.* These names were also used in applicants' amended claims in 2005. *See Att.5, p.1.*

It is obviously a faultfinding intention when this office questioned the content in the parenthesis (for 100 gram of tobacco, about 20 cigarettes x 6.667 packs) as "confusing." Since part of the preparation of the health pill is the amount of its ingredients, the amount of tobacco for health pills' protective effects should be specified for manufacture and packaging, as well as for biochemical science. It is ridiculous to think "the health pill ingredients are to be divided up into multiple pills for the numbers of cigarettes that would contain 100 grams of tobacco." *See Att. 14, p.7.* In the preparation, the applicants stated clearly that the dosage of the health pills is decided by the number of cigarettes the smoker consumes daily—4 orange pills and 2 white pills daily if the smokers consumes 20 cigarettes everyday. The dose is half if the number of cigarettes consumed is half. *See Att. 18, p. 21.*

Pursuant to Title 37 CFR .67 (a) (1) "Deficiencies or inaccuracies relating to all the inventors or applicants (§ § 1.42, 1.43, or § 1.47) may be corrected with a supplemental oath or declaration signed by all the inventors or applicants", applicants submit a supplemental declaration signed by those who want to authorize the major inventor Dehou Fei and applicant Faye Zhengxing to do all the necessary work on

their behalf to complete their application. *See att.19.* Applicants were not informed of their defects in their original application since they used an application data sheet and they received the receipt for the application from this office dated March 4, 2004. *See Att. 20; att. 1.*

## III.  **DAMAGES**:

As this invention was published in March 2005, the possible infringement of right might have been provoked to damage the whole patent. "A service provided by the United States Patent and Trademark Office (USPTO or Office) is the acceptance and preservation for two years of 'Disclosure Documents' as evidence of the date of conception of an invention." *See www.uspto.gov –General Information Concerning Patents.* The 2-year abandonment is very fatal to this invention. The more delay of the patent approval, the more possibility of infringement of right and the more damages.

Amendment XIV to the US Constitution clearly states the Equal Justice and Due Process for all US citizens: "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Pursuant to US Constitution (Article III, Section 2): "the judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution …to Controversies to which the United States shall be a Party," applicants of this invention urge this Court to render them justice by ordering Defendant to pay $450 million for their joint efforts and cost in their extensive research and intensive experiment over the past 20 odd years, for the punitive damages based on the outrageous deprivation of applicants' right to patent, which could be up to nine times of the real damages, and for the tremendous mental anguish and high stress inflicted on applicants after Defendant abandoned their application and further hasseled them with its restriction requirements. The punitive damages should be specially paid by Defendant for the 87-year-old major inventor who has been coughing blood while he had to work endlessly on the endless restriction

requirements. His death or loss of his ability to promote and sell this patent will completely ruin the patent and the sale of the invention.

We, the applicants, certify that this complaint is filed in good faith and the supporting data are accurate and complete to the best of our knowledge and belief, and that the amount requested accurately reflects the damages for which the claimants believe the Defendant is liable. Executed this     st day of Oct, 2007, in Washington, D.C.


Dated: Oct. 23, 2007.

Faye Zhengxing, Ph.D.
20 Chesapeake Street, SE
Apt. 33
Washington, DC 20032
Phone: 646-826-9930 OR
(212-567-2713)

## Attachments

1.  Receipt of application;

2.  Grant on speedy process;

3.  Notice of publication;

4.  Patent Office's first restriction requirements in 2005;

5.  Applicants' revised version of claims in 2005;

6.  Letter to primary examiner on July 11, 2005;

7.  Interview summary of 7/8/2005;

8.  Patent certification from China;

9.  Letter to NY Senator, summary of Faye Zhengxing's civil right case;

10. Letter from Dept. of Justice.

11. Letter to protest the abandonment of application in 2007;

12. Patent office's restriction requirement on May 31, 2007;

13. Applicant's letter to Patent Office on June 8, 2007;

14. Patent office's restriction requirement of June 7, 2007;

15. Applicant's letter to NYC Mayor for poison and pollution;

16. Denial of applicants' petition to Director;

17. Applicant's revised version of claims in 2007;

18. Specification;

19. Supplemental declaration;

20. Application data sheet;

21. Cover letter attached to the reply to the examiner on August 2, 2007.

22. Summary of the invention.

*A#. 1*

## UNITED STATES PATENT AND TRADEMARK OFFICE

| APPL. NO. | FILING OR 371 (c) DATE | ART UNIT | FIL FEE REC'D | ATTY DOCKET NO. | DRAWINGS | TOT CLMS | IND CLMS |
|---|---|---|---|---|---|---|---|
| 10/681,103 | 10/09/2003 | 1615 | 493 | | | 4 | 4 |

CONFIRMATION NO. 9125

**UPDATED FILING RECEIPT**

Dehou Fei
Apt. 2H
3736 10th Ave
New York, NY 10034

Date Mailed: 01/04/2004

Receipt is acknowledged of this regular Patent Application. It will be considered in its order and you will be notified as to the results of the examination. Be sure to provide the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION when inquiring about this application. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. If an **error is noted on this Filing Receipt, please write to the Office of Initial Patent Examination's Filing Receipt Corrections, facsimile number 703-746-9195. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections (if appropriate).**

**Applicant(s)**

  Dehou Fei, New York, NY;
  MingYan Hu, New York, NY;
  Faye Zhengxing, Washington, DC;
  Gina Fei, New York NY;
  Jolly Xing Zhou, New York, NY;

**Domestic Priority data as claimed by applicant**

**Foreign Applications**

  CHINA 03151012.4 09/17/2003

**If Required, Foreign Filing License Granted:** 01/09/2004

**Projected Publication Date:** 03/17/2005

**Non-Publication Request:** No

**Early Publication Request:** No

**\*\* SMALL ENTITY \*\***

**Title**

**07 1918**
**FILED**

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



UNITED STATES PATENT AND TRADEMARK OFFICE                    *Att. 2*

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

DEHOU FEI
3736 10TH AVENUE
APT. 2H
NEW YORK, NY 10034

In re Application of                          :
Dehou Fei et al.                             :
Serial No.: 10/681,103                        :    PETITION TO MAKE SPECIAL
Filed: October 29, 2003                       :
Attorney Docket No.: N/A                      :

This is in response to applicants' petition filed February 25, 2004, to make the above-identified application special under the provisions of 37 CFR 1.102(c), based on the age of the *applicant*. No fee is required for this petition. The delay in acting upon this petition is regretted.

Applicants have satisfied the provisions set forth in M.P.E.P. 708.02, IV. Therefore, the petition is **GRANTED**.

**The application will be forwarded to the examiner for action on the merits commensurate with this decision.**

Should there be any questions with regard to this letter please contact William R. Dixon, Jr. by letter addressed to the Director, Technology Center 1600, PO BOX 1450, ALEXANDRIA, VA 22313-1450, or by telephone at 571-272-0519 or by facsimile transmission to the general Office facsimile number.

William R. Dixon, Jr.
Special Program Examiner
Technology Center 1600

07 1918

**FILED**

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



UNITED STATES PATENT AND TRADEMARK OFFICE

*AH. 3*

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371 (c) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO. |
|---|---|---|---|
| 10/681,103 | 10/09/2003 | Dehou Fei | |

**CONFIRMATION NO. 8125**

Dehou Fei
Apt. 2H
3736 10th Ave.
New York, NY 10034

'OCC00000015488188'

**Title:** Preparations for cigarette toxicity reduction, health enhancement, and addiction elimination

**Publication No.** US-2005-0058718-A1
**Publication Date:** 03/17/2005

# NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be accessed through the USPTO's publically available Searchable Databases via the Internet at www.uspto.gov. The direct link to access the publication is currently http://www.uspto.gov/patft/.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Office of Public Records. The Office of Public Records can be reached by telephone at (703) 308-9726 or (800) 972-6382, by facsimile at (703) 305-8759, by mail addressed to the United States Patent and Trademark Office, Office of Public Records, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through the Patent Electronic Business Center at www.uspto.gov using the public side of the Patent Application Information and Retrieval (PAIR) system. The direct link to access this status information is currently http://pair.uspto.gov/. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of PAIR.

Further assistance in electronically accessing the publication, or about PAIR, is available by calling the Patent Electronic Business Center at (703) 305-3028.

Customer Service Center
Initial Patent Examination Division (703) 308-1202

**07 1918**
# FILED

OCT 2 4 2007

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

Case 1:07-cv-01918-RWR    Document 1-2    Filed 10/24/2007    Page 5 of 90



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/681,103 | 10/09/2003 | Dehou Fei | | 8125 |

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1616 | |

7590    06/20/2005

Dehou Fei
Apt. 2H
3736 10th Ave.
New York, NY   10034

DATE MAILED: 06/20/2005

7/21/05
6 Mos D-21

Please find below and/or attached an Office communication concerning this application or proceeding.

New petition for extension

---

Page 2

Application/Control Number: 10/681,103
Art Unit: 1616

07 1918

Claims 1-4 are pending in this application.

**Applicant is advised that a patent claim in U.S. practice must contain only 1
sentence.** All of applicant's claims contain many sentences.  This is improper.

FILED

An examination of this application reveals that applicant is unfamiliar with patent

OCT 2 4 200

prosecution procedure. While an inventor may prosecute the application, lack of skill in

NANCY MAYER WHITTINGTON

this field usually acts as a liability in affording the maximum protection for the invention

U.S. DISTRICT COURT

disclosed. Applicant is advised to secure the services of a registered patent attorney or

agent to prosecute the application, since the value of a patent is largely dependent upon

A listing of registered patent attorneys and agents is available on the USPTO
Internet web site http://www.uspto.gov in the Site Index under "Attorney and Agent
Roster." Applicants may also obtain a list of registered patent attorneys and agents
located in their area by writing to the Mail Stop OED, Director of the U. S. Patent and
Trademark Office, PO Box 1450, Alexandria, VA 22313-1450

Restriction to one of the following inventions is required under 35 U.S.C. 121:

I.      Claim 1, drawn to a liquid additive and a supplementary health pill,
        classified in multiple subclasses in classes 424 and 514, depending on the
        chemical structure of the component ingredients.

Application/Control Number: 10/681,103                                     Page 3
Art Unit: 1616

II.     Claim 2, drawn to "Reducing toxicity on a broader scale and by a larger
        margin: The liquid additive will reduce the toxicity in tobacco smoke such
        as nicotine, tar," classified in multiple subclasses in classes 424 and 514,
        depending on the chemical structure of the component ingredients.

III.    Claim 3, drawn to "Preventing more diseases and strengthening health
        more effectively: This health pill ..." It is noted that myriad diseases such
        as cancer, cardiovascular diseases and respiratory diseases are
        encompassed herein. This invention is classified in multiple subclasses in
        classes 424 and 514, depending on the chemical structure of the
        component ingredients.

IV.     Claim 4, drawn to "Eliminating addition safely and effectively," classified in
        multiple subclasses in classes 424 and 514, depending on the chemical
        structure of the component ingredients.

Application/Control Number: 10/681,103                                    Page 3
Art Unit: 1616

II.    Claim 2, drawn to "Reducing toxicity on a broader scale and by a larger
       margin: The liquid additive will reduce the toxicity in tobacco smoke such
       as nicotine, tar," classified in multiple subclasses in classes 424 and 514,
       depending on the chemical structure of the component ingredients.

III.   Claim 3, drawn to "Preventing more diseases and strengthening health
       more effectively: This health pill ..."  It is noted that myriad diseases such
       as cancer, cardiovascular diseases and respiratory diseases are
       encompassed herein.  This invention is classified in multiple subclasses in
       classes 424 and 514, depending on the chemical structure of the
       component ingredients.

IV.    Claim 4, drawn to "Eliminating addition safely and effectively," classified in
       multiple subclasses in classes 424 and 514, depending on the chemical
       structure of the component ingredients.

The four inventions as set forth above are distinct, each from the others, because
they are each directed to divergent compositions or methods, with different combination
of composition components.

The search for more than one invention group would place an undue burden on
the Examiner if the restriction requirement were not made, because each invention is
directed to the distinct combination of multiple substances, many of which are

Application/Control Number: 10/681,103                                    Page 4
Art Unit: 1616

unspecified in the present claim form, the search for which would not be coextensive

with search for the other inventions.

For the reasons of distinctness and undue burden, the restriction requirement as

set forth above is deemed to be proper.

A telephone call was made to Mr. Fei on 6/16/2005 to request an oral election to

the above restriction requirement, but did not result in an election being made. Mr. Fei's

answering machine (at 212-567-2713) indicated that the recording tape was full and

could not take any more messages.

Applicant is advised that the reply to this requirement to be complete must

include an election of the invention to be examined even though the requirement be

traversed (37 CFR 1.143).

Applicant is reminded that upon the cancellation of claims to a non-elected

invention, the inventorship must be amended in compliance with 37 CFR 1.48(b) if one

or more of the currently named inventors is no longer an inventor of at least one claim

remaining in the application. Any amendment of inventorship must be accompanied by

a request under 37 CFR 1.48(b) and by the fee required under 37 CFR 1.17(i).


For pro se applicant, the Examiner offers the following 3 recommendations.

(1) Elect one invention, and cancel claims directed to non-elected invention.

(2) For example purposes, if Group II were elected, then cancel claim 2 and resubmit it as a new claim – claim 2 is currently in such improper form that it cannot be easily amended.

Example: Elect Group II.  Cancel claims 1-4.  Submit new claim 5.

Claim 5.  (New)  A composition for reducing toxicity in tobacco smoke, including nicotine, tar, carbon monoxide, nitric oxide compound, hydrocyanic acid, cadmium, mercury, arsenic and nitrosamine, wherein for 100 grams of tobacco, the composition comprises:

| | |
|---|---|
| 0.7-15 ml | Polysorbate 80; |
| 50-100 ml | Hot water at 55 to 50°C; |
| 7-134 mg | Cerium dioxide; |
| 0.2-10 ml | Sulfuric acid, 5 to 20 % V/V; |
| 0.4-8 mg | Selenium dioxide; |

Application/Control Number: 10/681,103                                        Page 9
Art Unit: 1616

(3) The specification cannot have an "Appendix." It is either a part of the specification or it isn't. The appendix pages that are numbered as part of the specification, pages 19, 20, 21 and 22 are OK, because their page numberings indicate specification content.

However, those appendix pages that are not numbered (the four pages that make up Appendix 2), and in particular those pages in the Chinese language, must be deleted. If appropriate, applicant may add the content of those pages as new specification pages numbered 23, etc. Applicant should review 37 CFR 1.121 for rules on amending the claims and specification.

Alternatively, applicant may wish to provide instructions to cancel the two pages that are in the Chinese language. Then provide amendments of the last *four* pages of the specification, with the pages numbered 20, 21, 22 and 24, respectively.

Applicant is advised that the above examples that the Examiner has provided is not an indication of patentability. It is merely an example of how applicant may proceed to correct the claim language and specification problems and fully respond to this Restriction requirement.

The Examiner acknowledges the receipt of applicant's foreign priority document. The Examiner notes however that the foreign priority document consists of only one

Application/Control Number: 10/681,103                                    Page 7
Art Unit: 1616

page.  If there are more pages to this document, applicant is requested to provide
another full copy of this document.

Any inquiry concerning this communication or earlier communications from the
Examiner should be directed to JOHN PAK whose telephone number is **(571)272-0620.**
The Examiner can normally be reached on Monday to Friday from 8 AM to 4:30 PM.

If attempts to reach the Examiner by telephone are unsuccessful, the Examiner's
SPE, Gary Kunz, can be reached on **(571)272-0887.**

The fax phone number for the organization where this application or proceeding
is assigned is **(571)273-8300.**

Any inquiry of a general nature or relating to the status of this application or
proceeding should be directed to the receptionist whose telephone number is (571)272-
1600.

Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system.  Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free).

JOHN PAK
PRIMARY EXAMINER
GROUP 1600

*AH.5*

Application/Control Number: 10/681,103                    July 10, 2005.
Art Unit: 1616

     Pursuant to 35 U.S.C. 121, inventors of this patent application (10/681, 103), in

light of Examiner's advice, amend their claim as follows to meet the restriction

requirement:

     <u>Elect Group 3. Cancel Claims 1-4 and Additional Claim. Submit new Claim 5.</u>

**Claim 5:**

1.   A composition for preventing smoking related cancers, cardiovascular diseases,

    respiratory diseases, and other smoking caused physical problems, wherein for

    100 gram of tobacco (about 20 cigarettes x 6.667 packs), the composition, in oral

    dosage form, comprises:

| | |
|---|---|
| Sodium selenite | 0.2-14.6 mg |
| B-cyclodextrin (1.85%) | 3.5-67 ml |
| *Vitamin E | 0.2-10 g |
| *Vitamin A | 3-35 mg |
| Butylated hydroxytoluene | 0.3-27 mg |
| Riboflavin | 7-200 mg |
| *Nicotinic acid | 7-2000 mg |
| *Pyridoxine hydrochloride | 33-2000 mg |

2.   A composition supplemental to claim 1, wherein for 100 gram of tobacco (about

    20 cigarettes x 6.667 packs), the composition, in oral dosage form, comprises:

     *Ascorbic acid           0.07-6 g

3.   A composition supplemental to claim 1, for reducing the toxicity in tobacco

    smoke such as nicotine, tar (including polycyclic aromatic hydrocarbons

**07 1918**

**FILED**

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CL
U.S. DISTRICT COURT

represented by 3, 4 benzo(a)phrene), carbon monoxide, nitric oxide compound, hydro cyanic acid, cadmium, mercury, arsenic, nitrosamine, wherein for 100 grams of tobacco, the composition, in liquid additive form, comprises:

| | |
|---|---|
| Tween-80 | 0.7-15ml |
| Hot water (55-60°C) | 50-100 ml |
| Cerium dioxide | 7-134mg |
| Sulfuric acid (5%-20%) V/V | 0.2-10 ml |
| Selenium dioxide | 0.4-8mg |
| B-cyclodextrin | 0.1- 4 g |
| Hydrogen peroxide (3% or 6%) Potassium permanganate | 30-600 ml 15-150 mg |
| *Cupric Sulfate | 45--400 mg |
| Cupric Oxide | 20--270 mg |
| Activated Manganese dioxide | 10--100 mg |

4.  A method, according to claim 1, 2 and 3, for resuming the activity of glutathione peroxidase (GSH-PX) by applying a co-enzyme to guarantee its unfailing effect in reducing tobacco toxicity and preventing diseases.

5.  A method for eliminating smoker's addiction, wherein Nicotinic acid, Pyridoxine, Vitamin E, Vitamin A, hydrochloride Ascorbic acid, Cupric Sulfate, according to claim 1, 2, and 4, are designed to decrease dopamine and glutamic acid in the human brain through a) copper compound & manganese compound to strengthen MAO's activity; b) VB6 to turn glumatic acid to γ- aminobutyric acid (GABA); c) VA, VE, VC and other anti-oxidants to prevent excessive iron in the body from releasing glutamic acid in the brain.

2

*Att. 6*

**To:** Examiner John Pak at (Phone: 571-272-0620; Fax: 703-872-9306) *571-273-8300*

**From:** Dr. Faye Zhengxing (Phone: 202-562-4429; Cell Phone: 917-536-7983)

**Address:** 20 Chesapeake Street, SE, Apt. 33, Washington, DC 20032

**Re:** Application/Control Number 10/681,103

**Date:** 7/11/05

Dear Examiner Pak:

Thank you so much for advising us on the amendment of our application to meet the restriction requirement. While I am taking care of other requirements, I am faxing to you the 2-page amended version of our claim for your comment.

I will be most grateful if you could review this amended version and call me to express your opinion. I will submit our amended application as soon as possible to meet the deadline.

Sincerely,

Faye Zhengxing, Ph.D.

07 1918

**FILED**

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLE
U.S. DISTRICT COURT

*AH. 7*

Continuation of Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: Applicant, Ms. Zhengxing, asked how to respond to the restriction requirement.  The Examiner answered that applicant would have to elect one of the invention groups as explained in the previous Offce action and then submit new claims directed to the elected invention and cancel all of the original claims (to make it easier for the pro se applicant than amending original claims).  Ms. Zhengxing asked how she could also have the other inventive concepts, and the Examiner replied that the restriction requirement must be maintained.  Ms. Zhengxing also asked about the response time.  The Examiner replied that the reply was due by 7/21/2005.  Applicant can petition for an extension of time, with the appropriate extension of time fee, after that date, but the reply must be received by the PTO no later than 12/21/2005 (with the appropriate extension of time + extension of time fee).  Applicant was advised to check in www.uspto.gov site for the relevant fee information.  The Examiner discussed that he cannot possibly advise the applicant on all the procedural and substantive issues that may come up in the prosecution of this application .

07 1918

**FILED**

OCT 2 4 2007

**NANCY** MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

AH.8

# 发明专利证书

发明名称：具有保健作用的香烟滤嘴、膜滤嘴剂

发明人：袁雄厚，廖开元，廖文礼，袁号先，袁文官，胡明言，袁正行，周行，袁正平

专利号：ZL 03 1 51012.4　　国际专利主分类号：A24B 15/00

专利申请日：2003 年 9 月 17 日

专利权人：袁雄厚，廖开元，廖文礼，袁号先，袁文官，胡明言，袁正行，周行，袁正平

授权公告日：2005 年 9 月 14 日

第 1 页（共 1 页）

证书号　　　第 226808 号

07 1918

本发明经过本局依照中华人民共和国专利法进行审查，决定授予专利权，颁发本证书并在专利登记簿上予以登记。专利权自授权公告之日起生效。

本专利的专利权期限为二十年，自申请日起算。专利权人应当依照专利法及其实施细则规定缴纳年费。缴纳本年度年费的期限是每年09月17日前一个月内。未按照规定缴纳年费的，专利权自应当缴纳年费期满之日起终止。

专利证书记载专利权登记时的法律状况。专利权的转让、质押、无效以及专利权人的姓名、国籍、地址变更等事项记载在专利登记簿上。

专利号　ZL 03 1 51012.4

局长 [签名]

[印章]

**FILED**

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



*Att. 9*

6/12/07

3736 10th Ave. Apt. 2H
New York, NY 10034
Phone & Fax 212-567-2713
Cell Phone: 646-826-9930
Social Security No: 601-28-995

Dear Senator Clinton:

No matter how the real US Supreme Court's ruling on my case (02-10717) issued in 2005 protected my right and proved the top legal frauds committed by Department of Justice, and no matter how much compensation President Bush approved to settle my case (04-119 & 05-532 filed at US Court of Federal Claims) as a non-prosecution plea deal in 2005 and 2006, we have not received one penny of justice yet. We are still suffering from the federal biochemical terror without any medical treatment. At this moment when I am writing this letter, toxic gas is still being pumped into our home to cause pain all over my body, especially in my back and in my eyes. My father is coughing blood everyday and I am facing the danger of getting cancers after being repeatedly poisoned by dioxin. We are still living in a highly polluted home and having no income whatsoever. Could you believe this is happening in the United States which used to boast about its best human rights for its citizens in the world?

**Now another tremendous loss for this country and another heavy blow to us: Our right to patent for our invention (application No: 10/681,103) was deprived of by Department of Justice through the US Patent and Trademark Office.** On June 7, 2007, Examiner John Pak formally informed us that our patent application, which had been illegally abandoned and concealed for two years by the patent office, would be rejected. This patent application based on our extensive research and intensive experiment over the past 20-odd years is for our invention to enhance the health of 45 million smokers in the United States and 1.3 billion smokers worldwide[1] through reducing tobacco toxins, strengthening smokers' immunity and eliminating nicotine addiction. Our health pills could also benefit 9.7 million users of other tobacco products[2] and 29-43 percent of the US population who are second-hand smokers[3]. Ironically, the same patent application was approved in 2005 by China, whom the United States is suing for its violation of intellectual property.

Obviously, the 2-year-abandonment of and finally the rejection of our patent application are related to my litigation against this administration and it is another means of retaliation for the federal crimes I disclosed to the US Supreme Court and Congress. In 2003 when my then 82-year-old father, the major inventor, requested a speedy process because of his age, the patent office granted my father's petition. When examiners advised us to amend our Claims and Specification in 2005, we followed their suggestions meticulously. Our amended version was sent to the patent office in July 2005. In my follow-up phone call, a woman examiner informed me that

---

[1] See "Tobacco's Stigma Aside, Wall Street Finds a Lot to Like" in The New York Times on Jan. 31, 2007.
[2] See "Institute Urges Extensive Smoking Deterrents." in The Washington Post on May 25, 2007. The data are from Institute of Medicine, a branch of the National Academies, a scientific organization chartered by Congress to advise the government on scientific and technical issues.

[3] See "Researchers: Heart deaths would plunge without passive smoking" from National Health and Nutrition Examination Survey published by Reuters on May 11, 2006

our amended application passed the examination. We cheered and celebrated for this big progress. Up to that point, the patent office handled our application properly and professionally. After that, however, we suddenly never heard of anything about our application no matter how many phone inquiries we made.

On March 19, 2007, when I made another inquiry in writing regarding the status of our application, Examiner Pak, to our surprise, told us to make more changes in our claims and specification. According to 37 CFR 1.134, 1.135 and 1.136, if our application had not passed the examination as we were informed in 2005, this office should have informed us of further changes or should have rejected our application within 6 months after we submitted our amended version in July 2005. When Examiner Mr. Pak revealed to us recently on the phone that he was only a small employee in the government and he could not explain the groundless abandonment, we further sensed the abused power behind the scene to deprive us of our patent right in retaliation.

It was definitely not a coincident that abandoning the process of our patent application took place exactly in the same period of time when I informed all the justices of the US Supreme Court that Department of Justice falsified the high court ruling on my case and US Supreme Court later reversed the lower court's ruling to protect my legal rights and to prove the top legal fraud. Since the illegal surveillance on me and all of my family members has been going on for years, Department of Justice knew our patent application from the very beginning. Of course, it was the real high court ruling issued in 2005 that posed a prosecution threat and triggered deep embarrassment and strong determination to retaliate against me and my family by all means and in all ways.

As recently as last month, Congress and health community nationwide were still urging extensive smoking deterrents to drive down tobacco use. In view of the statistics that there are 440,000 deaths a year from tobacco use and $89 billion annually in smoking-related health costs, Institute of Medicine, a branch of the National Academies, a scientific organization chartered by Congress to advise the government on scientific and technical issues, called on new measures including gradually reducing "the amount of nicotine in cigarettes so that they are no longer addictive."[4] This is exactly the unique feature of our invention. In addition to reducing toxins by adding a liquid additive to the tobacco, our invention will also greatly strengthen the immunity of smokers by providing them with health pills enclosed in the cigarette pack. The most amazing feature of our invention is to gradually eliminate smokers' addiction to nicotine and help them eventually quit smoking.

A recent legislation based on IOM's report, "which has bipartisan support, would also give the FDA power to end vending-machine and self-service sales of tobacco, prohibit tobacco advertising near schools, ban fruit- or candy-flavored cigarettes and stop cigarette makers from using claims such as "light" or "low-tar" unless they are scientifically proved." Matthew L. Myers, president of the Campaign for Tobacco-Free Kids, stated, "And even if the states do so, we won't achieve our major

---

[4] See Footnote 2 on Page 2.

2

public health goal unless the federal government enters the fray."[5]

However, this administration did just the opposite by killing our invention in its patent application process. More reprehensibly, Department of Justice ruined our invention in 2005, the year, according to the federal Centers for Disease Control and Prevention in Atlanta, when the smoking rate stopped dropping and the proportion of adults who smoke held steady at 20.9 percent of the population. It was the first time the rate did not fall from one year to the next since 1997 and it was the time new and effective measures were most needed to assist smokers to quit.[6]

In terms of the quality of our invention, the federal poisons, which injured my family, unexpectedly proved the power or effect of our health pills in strengthening human immunity. Taking the medicines similar to our health pills, my 86-year-old father, is still alive after being diagnosed with lung cancer two years ago while the average survival period for male lung cancer patients is only 8 months. Moreover, after being repeatedly poisoned by dioxin over the past two and half years, I have pain in my back, muscle and lymph nodes and my dioxin level has reached nearly 80,000 as opposed to the normal range 10-20, but our health pills prevented me from immediate death caused by cancers.

**Since Senate Judiciary Committee has the jurisdiction over claims against the United States and over patents, please urge this committee to take over my case and evaluate the tremendous damages on us victims and on this country.** The investigation or hearing will not cost Senate Judiciary Committee much of its time and energy if the committee subpoenas the following documents to find out the truth: 1) the US Supreme Court's ruling on my case (02-10717) issued in 2005; 2) President Bush's approval of the relief to settle my case as a non-prosecution plea deal he signed in 2005 and 2006 ( for case 04-119 & 05-532 filed at US Court of Federal Claims); 3) my blood test reports on dioxin conducted from 2005-2007; 4) the record and witness testimony from the US Patent and Trademark Office; 5) water quality test reports from New York City government on the pollution of the environment and soymilk test report on contamination of the food market from NYPD and the federal payment to cover the damages in NYC. If Senate Judiciary Committee recommends a jury trial based on the high court ruling on my case and prosecution of federal criminals to render us justice, please urge the committee and federal prosecutors to follow through for the rule of law in this country.

**I will be most grateful if you could also forward a copy of this letter to the White House for President Bush to find out why the relief he approved in 2005 and 2006 has not rendered us justice at all.** Why are we still subject to federal poison in our water and in the air and still suffering and struggling for survival? I have had no income whatsoever for 5 years and 10 months after being wrongfully terminated in 2001 and unlawfully labeled as an independent contractor. Who in Department of Justice actually caused the damages on our patent and on our public health cause since tobacco is the leading cause in preventable diseases and tobacco control will greatly reduce our health cost and make universal health care possible?

---

[5] See Footnote 2 on Page 2
[6] See "Drop in Smoking Rates Stalls," The Washington Post, Oct. 27, 2006.

**Would you please also make an inquiry for us at the US Patent and Trademark Office for a formal investigation and damage evaluation**? We stated our key positions in our letter to patent office on June 8, 2007 as follows after we were asked to make more changes in our application:

1. "If we decide to make some changes as you suggested for your further processing of our application, it does not mean we can deny the fact that your examiner (a woman employee) informed us in 2005 that our application, amended in accordance with your initial advices, had passed the examination. Your record and your internal investigation should have proved the truth. If we had not passed the examination, you would not have waited for two years to repeatedly give us more opportunities to modify our claims and specifications. Our application deserves speedy processing, especially after you granted the petition of my father, the 86-year-old major inventor, "to make special" on Oct. 29, 2003 under the provision set forth in M. P. E. P. 708.02, IV.

2. "If we decide to make some changes as you suggested for your further processing of our application, it does not mean we will not pursue the tremendous damages caused by the intentional and "illegal" abandonment of your normal process over the past two years. The US Patent law (overview) specifically emphasizes the importance of timeliness in patent application. "Patents grant an inventor the right to exclude others from producing or using the inventor's discovery or invention for a limited period of time. U.S. patent laws were enacted by Congress under its Constitutional grant of authority to protect the discoveries of inventors. *See U.S. Constitution, Article I, Section 8*. More specifically, the law states, "Patents were normally issued for a non-renewable period of seventeen years, measured from the date of issuance." *See [[USC: 35: 154][§ 154 of Title 35.]* Under the amended provision (which took effect June 8, 1995) the term will be twenty years measured from the date of application. In order to be patented an invention must be novel, useful, and not of an obvious nature. *See §§ 101-103 of Title 35*." **Note: This intentional and illegal abandonment of our patent application process took place after our invention was published in March 2005, which might have caused infringement of right.**

**In short, please urge the federal government to 1) issue the already approved compensation immediately to protect our human rights and to uphold the rule of law in this country; 2) protect our lives from any further harm by the federal poison and pollution; 3) evaluate and approve more damages for our ruined patent on our invention as stated above.**

Thank you very much again for working consistently and effectively for your constituents and the American people. Please feel free to contact us if you need further information. We will be looking forward to hearing from you.

Sincerely,

Faye Zhengxing, Ph.D.

P.S. The following is a chronicle[7] on how this administration violated the law and escalated various damages to a skyrocketing level over the past 6 years by fatally injuring me (including my family) physically, mentally, financially and by harming other innocent people, polluting our environment and contaminating our market:

1) **2001 and 2002**: terminating me unlawfully in retaliation after I filed a complaint against discrimination; illegally searching my home several times and damaging my property (house, car, and artifacts); bribing numerous lawyers and other people to deprive me of my legal representation and rights for obstruction of justice; starting to keep me under illegal surveillance which has lasted for 6 years;

2) **2003**: falsifying an unconstitutional ruling to frame the US Supreme Court, cheat the public and deprive me of my protection by Title VII; stealing my letter from the then Chief Justice to avoid an investigation on judicial independence;

3) **2004**: poisoning me with dioxin and other toxins; repeatedly altering my medical records to cover up federal crimes; ordering the police not to protect me; inflicting a stroke on my mother and manipulating the medical treatment to shorten her life (my mother died in Dec. 2004); starting to poison my whole family; my daughter, 22, may never bear a child to continue our family tree;

4) **2005**: ignoring and concealing the real US Supreme Court's ruling on my case, illegally detaining me as a "mental patient" twice to further poison me in the hospital; ordering to have our patent application process abandoned; inflicting lung cancer on my father, a non-smoker, with dioxin; poisoning my daughter and her roommates in the NYU dorm;

5) **2006**: detaining me illegally twice again as a "mental patient"; inviting, aiding and abetting international abductions of me by sending $27 million abroad ($7 million was meant for US attorney David Cohen himself) from the approved compensation to settle my case, further poisoning me on various occasions and hiding my blood test results; polluting the environment and contaminating the food market in New York City; poisoning my sister and her boy friend, my daughter and her housemates; our neighbor John Phillip in Apt. 2G died from liver diseases after our running water in the whole building was poisoned;

6) **2007**: driving my father and me out of our home by pumping toxic gas into our home and bribing one of our neighbors to force our door shut for Hitler's "gas chamber effect"; forcing me to live in shelters for homeless people for 6 months and further poisoning me and other innocent people in shelters; concealing my blood test report on dioxin ordered by the shelter doctor; ordering the rejection of our patent application.

---

[7] These are all uncontested facts presented at courts, or to NY Senators or at congressional committees over the past 6 years.



**U.S. Department of Justice**

Office of the Inspector General

*AH. 10.*

*Washington, D.C. 20530*

August 27, 2007

Faye Zhengzing, Ph.D
89-20 55th Avenue Apartment 5E
Elmhurst, New York 11373

Dear Faye Zhengzing:

The purpose of this letter is to acknowledge receipt of your correspondence dated April 18, 2007.  The matters which you raised have been reviewed by the staff of the Investigations Division, Office of the Inspector General.

This Office does not have jurisdiction to investigate allegations that a Department of Justice attorney has committed misconduct while exercising his or her litigation authority. Accordingly, your correspondence has been referred to:

U.S. Department of Justice
Office of Professional Responsibility
950 Pennsylvania Avenue, NW
Washington, DC 20530

Any further correspondence regarding this matter should be directed to that office.

I hope this answers any questions regarding this matter.

Sincerely,

*Glenn G. Powell*
Glenn G. Powell
Special Agent in Charge
Special Operations
Investigations Division

07 1918

**FILED**

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

3/19/07

A H. 11

89-20 55th Ave. Apt. 5E
Elmhurst, NY 10373
Phone & Fax: 718-205-8095
Cell Phone: 646-826-9930

Director, Technology Center 1600
P. O. Box 1450
Alexandra, VA 22313-1450

Re: Serial No: 10/681,103

Dear Special Program Examiner:

It was more than three years ago your office granted the petition of my father Dehou Fei for a speedy process of his patent application in consideration of his age. Now he is 86 and he is still waiting for the further information from your office after our patent application passed the publication and examiners' evaluation. We called your office a few times before, but never got any reply to address the issue. It is so different from your normal practice. We have to think of any possible damaging influence from the federal government since the writer of this letter, one of Dehou Fei's daughters, filed a lawsuit against the government. Though this case of science has nothing to do with that case in law, but we have been through too much loss to neglect any other wrongdoings under this Administration. Please start an investigation on our case.

We used to think bureaucracy is serious in China, but it took us only two years (from Sept 2003 to Sept. 2005) to have our application approved.

As any invention's value is very much dependent on the time and an invention means "something new", your office should never fail to see how the delay has taken a toll on the market value of our patent. Moreover, since my father, the main inventor, is sick and weak at his age, further delay will mean the complete failure of this application at a tremendous cost of our lives. We may also have to remind you that the application fee will rise with the lapse of the time. Should we pay for your bureaucracy or inefficiency?

Finally, if you realize the true social value of this invention is to reduce the toxin in cigarettes, to strengthen the health of millions of smokers, and to help them quit smoking, each day of delay means the loss of many lives. We are very sad to think of the consequence when we are raising this issue to you.

We will appreciate it very much if you explain to us immediately why or what has caused the delay of our application and how you will make up for the loss. Please feel free to contact us at this address above.

Sincerely,

Faye Zhengxing, Ph.D. (writing for Dehou Fei)

07 1918

**FILED**

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



AH.12

# Patent Technology Centers

## Facsimile Transmission

To:    **Name:**                        Faye Zhengxing and inventors of 10/681103
       **Company:**
       **Fax Number:**                  912125672713
       **Voice Phone:**

From:  **Name:**                        Examiner John Pak
       **Official Fax Number:**         (571) 273-8300
       **Official After Final Fax Number:**  (571) 273-8300
       **Voice Phone:**                 571-272-0620

**37 C.F.R. 1.6 sets forth the types of correspondence that can be communicated to the Patent and Trademark Office via facsimile transmissions. Applicants are advised to use the certificate of facsimile transmission procedures when submitting a reply to a non-final or final Office action by facsimile (37 CFR 1.8(a)).**

## Fax Notes:

You asked me to fax to 212-567-2713, so here it is.

Please review and let me know if you can reply in writing (as discussed on the next page) at your earliest convenience.

John Pak
Primary Examiner
Art Unit 1616
Tel: 571-272-0620
Fax: 571-273-0620

Date and time of transmission: **Thursday, May 31, 2007 6:06:32 PM**      07 1918
Number of pages including this cover sheet: 09

# FILED

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Application/Control Number: 10/681,103

Art Unit: 1616

Please review the changes set forth herein.  If you agree to these changes, you **must state (via reply fax, preferably) In writing**, if accurate:

(1) all inventors agree to authorize the changes to the claims and changes to the specification, as set forth in this communication; and

(2) provide signatures of authorization of as many inventors as possible.

Note, claims 5-6 are identical to the version I sent you earlier (3/29/2007).  Reciting proprietary names such as ACA-104 2A or ACA-104 2B does not add anything more to what you already have.  You are free to call the composition whatever you want in commercial settings, but these names do not belong in the claims.  The claim is defined by what it contains.  I removed the * marks next to many ingredients because it is confusing to have them there.

Note, the fifth inventor did <u>not sign</u> the declaration.  This makes the declaration defective.  I can allow the case, but you must <u>timely</u> file a supplemental declaration that has the fifth inventor's signature.

Note, we only have on file the <u>first page</u> of the certified copy of the Chinese priority application.  You must <u>timely</u> file a fully copy to be granted the foreign priority.

I reserve an opportunity to make further changes (<u>only with your additional authorization</u>), if such further changes are deemed necessary upon carrying out final preparations for allowance.

If you have any questions, I can try to answer them.  Also, I refer you again to page 2 of the Office action of 6/21/2005, which provides information about securing the services of a registered patent attorney or agent.

Application/Control Number: 10/681,103
Art Unit: 1616

## Amendment to the Claims

Cancel claims 7, 8 and 9.

Rewrite claims 5 and 6 as set forth below.

Claim 5. (Currently amended) A health pill for reducing the harmful effects of cigarette smoking comprising:

0.2 to 14.6 mg of sodium selenite;

3.5 to 67 ml of 1.85% β-cyclodextrin;

0.2 to 10 g of Vitamin E;

3 to 35 mg of Vitamin A;

0.3 to 27 mg of butylated hydroxytoluene;

7 to 200 mg of riboflavin;

7 to 200 mg of nicotinic acid; and

33 to 2000 mg of pyridoxine hydrochloride.

Claim 6. (Currently amended) The health pill of claim 5, further comprising 0.07 to 6 g of ascorbic acid.

## Amendment to the Specification

Amend pages 7, 13-15, 19 and 21 as shown on the following pages.

Delete all four pages of Appendix 2.

Selenium and other anti-oxidants also have excellent effect on respiratory diseases. An expert at Connell University and a Chinese scholar point out that a diet rich in anti-oxidants will strengthen lung functions and prevent respiratory diseases such as asthma, pulmonary emphysema and chronic bronchitis. The effect of these anti-oxidants on the lung has a lot to do with smoking. The experts also state that taking in B-carotin with selenium and high dosage anti-oxidants is a very good way to prevent cells from damages by hazardous biochemical elements (28). A medical study took 18,162 adults as their samples to examine the relationship between the ingredients (we adopted in our health pill) of their diet and their blood and their lung functions in a period of six years. The experts found strong evidence to prove, through comparing the variables such as gender, age, bodily fat, race, income, and smoking or non-smoking behavior, that these ingredients are closely related to these adults' lung functions. Their findings also indicate that those natural ingredients in food are not as effective on smokers' lung functions as that of their chemical counterparts (such as vitmin C and E) on both smokers and non-smokers (28).

d) Selenium and Other Smoking Related Diseases:

In addition, this health pill also prevents other smoking related diseases such as premature aging, weak immunity, tobacco amblyopia, mouth leukoderma and other diseases caused by harmful radioactive material in tobacco smoke.

e) Our Creative Invention:

Over the past 30 years selenium and its compound GSH-PX have displayed wonderful performances in animal and clinic experiments in various countries, but the activity of GSH-PX decreases because of oxidization other factors. Even with the supplement of selenium, GSH-PX will not resume its activity due to a series of chemical reactions such as oxidization, replacement, resolve, and counteraction. GSH especially loses its function as an anti-oxidant after it is changed into an oxidant GSSG.

We tackled the essential problem: how to reduce GSSG back to GSH. We believe we could not just mix more GSH with glutamic acid, ~~cysteine~~ and glycine. Instead,

*[handwritten annotation: Spelling error, Correct to "Cysteine"]*

13

we must find a synthetase and reduce the oxidized GSSG in the human body. GSSG is an oxidized enzyme protein, a complicated complex. Though we knew there is GSSG-R (GSSG's reductase) in the human body, it is not active enough. We knew we were in need of a strong co-enzyme as catalyst to reduce GSSG back to GSH.

After a long search and study, we finally found a co-enzyme to reduce GSSG back to GSH. We were greatly encouraged by this finding. With this co-enzyme, we could resume the activity of GSH in every way. Moreover, in case GSSG-R is insufficient, the two components in riboflavin in the health pill – flavin mononucleotide (FMN) and flavin adenine dinucleotide (FAD) – will resume the activity of GSSG-R to the normal level. We believe this is a breakthrough in generating an unfailing effect to prevent smokers from getting various smoking related diseases. For the preparation for the health pills, see ██████ *Table 2.* ←

3.  The Causes of Addiction and Our Invention in Smoking Cessation:

It is a consensus of medical experts that when nicotine enters the human brain, brain cells will release a great deal of dopamine and glutamic acid, the major causes of addiction to cigarette (or addiction to other drugs) (22, 23, 24). An expert from Virginia Institute of Technology reports that they have separated a compound from tobacco, which will inhibit monoamine oxidase (MAO), a major enzyme in the brain to resolve dopamine (27); another series of research papers from a state lab in New York City indicate that the MAO concentration in a smoker's brain is 40 percent lower than that of a non-smoker. This is the reason why a smoker has higher dopamine content in the brain than a non-smoker (27). Some researchers from Columbia University state in "Science" magazine that when nicotine enters the brain, it greatly increases the release of glutamic acid in the brain. They detailed the reasons why it is an accomplice in causing nicotine addiction (24).

The United States and Canada are doing clinic experiments on γ- VINYL GABA, GVG, a medicine produced by Aventis in Europe for children's epilepsy, to see if it could be used to detoxicate tobacco smoke and facilitate smoking cessation. GVG may reduce the dopamine in the smoker's brain and thus help him/her break the

14

Part of Table

*to dopamine*

addiction ~~to nicotine~~. We believe, however, that it will not be enough to only reduce dopamine in the brain, because glutamic acid, through decreasing MAO's activity, makes it harder to resolve and inactivate dopamine. Glutamic acid might be one of the causes that stabilizes the addiction to nicotine and other drugs. Furthermore, glutamic acid will also damage brain cells and cause the death of brain cells. In addition, iron, if over taken or stored in the human body, will also release glutamic acid in the brain. Excessive iron may be stored in the body for many reasons: Some people tend to supplement too much iron to cure anemia. Some people cook in pots or pans made of iron, drink too much beer or grape wine, or who have iron residue caused by excessive blood transfusions, or indigestion by intestine. Furthermore, there are other factors causing the release of glutamic acid. For instance, lack of vitamin B6 and nicotinic acid will increase the pathologic absorption of iron; lack of vitamin E and other anti-oxidants will cause iron chronic poisoning. Not only will these factors cause more glutamic acid in the brain, they will also cause other diseases. To eliminate the addiction to nicotine, therefore, we must appropriately reduce dopamine, glutamic acid, and at the same time reduce the excessive iron in the human body. We adopted the following three methods:

(a) Strengthening MAO's activity with Copper Compound and Enhancing Copper's function with Manganese Compound:

Since glutamic acid lowers the copper content in the brain and copper is an important component of MAO, glutamic acid, therefore, may decrease the activity of MAO. [Kong Xiangrui reports that glutamic acid injection will lower the copper content in human blood serum (6. p. 173)].

To supplement copper and manganese compound, however, is not easy, because they are metal oxidants, which may counteract with the majority of the anti-oxidants in the health pill. Furthermore, several hours after copper compound enters the human body, it will compound into ceruloplasmin in the liver. This ceruloplasmin, however, cannot go through the blood-brain barrier to increase copper. Later we came up with the idea of adding copper and manganese into the cut tobacco. When the smoker lights up, he/she will absorb the metals through

15

# Table 1



## PRESCRIPTION, PREPARATION & USE
## OF THE LIQUID ADDITIVE TO TOBACCO
### (ACA-104-1)

| Order of Sprinkle | Components & Concentration of Ingredients | Quantity (3) Content Range % (Per 100g Tobacco) | Preparation |
|---|---|---|---|
| | Tween-80 | 0.7-15ml | Dissolve them for use later; label the solution as A. |
| | Hot water (55-60°C) | 50-100 ml | |
| (1) | Cerium dioxide | 7-134mg | Dilute sulfuric acid to 20% solution, take out 6.665ml solution ($H_2SO_4$1.333ml), into which put 44.45mg of $CeO_2$, stir them for use later; label this solution as B; |
| | Sulfuric acid (5%-20%) V/V | 0.2-10 ml | |
| | Selenium dioxide | 0.4-8mg | Dissolve 2mg selenium dioxide into 1ml water; |
| | B-cyclodextrin | 0.1- 4 g | Put 1.85g B-Cyd into 100ml water at 50-60°C; Take out 12.973 ml (which equals B-Cyd 0.24g) to mix the $SeO_2$ sol. above; stir till all dissolved; label it as Solution C; Put the A, B, C three solutions above together, stir them thoroughly; sprinkle them onto 100 g tobacco; blend them thoroughly and put it aside for 30 minutes; |
| (2) | Hydrogen peroxide (3% or 6%) | 30-600 ml | Sprinkle 3% Hydrogen peroxide 167 ml onto 100 g tobacco above, blend them thoroughly and stir it for 30 minutes; |
| (3) | *Potassium permanganate | 15-150 mg | Dissolve $KMnO_4$ to 1% solution; take out 4.445 ml (which equals 44.45 mg $KMnO_4$); Dilute Sulfuric acid to 5% solution; take out 6.66 ml (which equals 0.333 ml $H_2SO_4$); label this solution as D; |
| | *Cupric Sulfate | 45--400 mg | Dilute $CuSO_4$ to 5% solution; take out 2.666ml (which equals 133.33 mg $CuSO_4$); label this solution as E; Mix D with E; and stir them thoroughly for use later; |
| | Cupric Oxide B-cyclo-dextrin | 20--270 mg 0.1-4 g | Grind fine CuO (66.67mg) and activated $MnO_2$ (33.335mg); Dissolve 1.333 g B-Cyd into 72.054 ml hot water, into which put the above CuO and |

19

# Table 2

~~APPENDIX 3~~

### PRESCRIPTION, PREPARATION & USE
### OF THE HEALTH PILL ENCLOSED IN CIGARETTE PACK
### (ACA-104-2A, B)



— Part of Interview Summary —

| Kind | Name of Components | Quantity — Content (per 100g tobacco) Range % | Preparation | Signature (Sig.) |
|---|---|---|---|---|
| (A) | •Sodium selenite | 0.2- 14.6 mg | Dissolve Na₂SeO₃ (3.65 mg) in 1 ml water; | |
| | B-cyclodextrin (1.85%) | 0.5-30 ml | Add 2 ml B-Cyd (1.85%) to the above solution; stir them thoroughly; | Dose of orange pill: For those who smoke 20 cigs daily, take 2 pills before eating in the morning or half an hour before smoking; Take 2 pills one hour after lunch; |
| | •Vitamin E | 0.2 –10 g | Grind them fine | |
| | •Vitamin A | 3-35 mg | | |
| | Butylated hydroxytoluene | 0.3 –27 mg | | |
| | Riboflavin | 7-200 mg | | |
| | Nicotinic acid | 7-2000 mg | Mix them; | |
| | Pyridoxine hydrochloride | 33-2000 mg | | |
| | | | Mix all the above thoroughly and make four orange coated pills. | For those who smoke 10 cigs daily, take 1 pill twice a day at the same time as stated above. |
| (B) | •Ascorbic acid | 0.07-6 g | Make two white-coated pills with 400 mg ascorbic acid.. | Dose of the white pill: For those who smoke 20 cigs daily, take 2 pills one hour after the last cig before the bedtime. For those who smoke 10 cigs, take 1 pill at the time stated above. |

21

*Att. 13*

6/8/07

3736 10th Ave. Apt 2H
New York, NY 10034
Phone & Fax: 212-567-2713
Cell Phone 646-826-9930

Primary Examiner John Pak
Art Unit 1616
Patent Technology Centers
U.S. Patent and Trademark Office
Tel: 571-272-0620
Fax: 571-273-0620

Re: patent application 10/681103

Dear Mr. Pak:

Thank you for your recent unusual attention to our patent application, which has been obviously stalled for two years. Before we respond specifically to the changes you suggested in our claims and specification, we must point out our stance on the current status of our application as follows:

1. If we decide to make some changes as you suggested for your further processing of our application, it does not mean we can deny the fact that your examiner (a woman employee) informed us in 2005 that our application, amended in accordance with your initial advices, had passed the examination. Your record and your internal investigation should have proved the truth. If we had not passed the examination, you would not have waited for two years to repeatedly give us more opportunities to modify our claims and specifications. Our application deserves speedy processing, especially after you granted the petition of my father, the 86-year-old major inventor, "to make special" on Oct. 29, 2003 under the provision set forth in M. P. E. P. 708.02, IV.

2. If we decide to make some changes as you suggested for your further processing of our application, it does not mean we will not pursue the tremendous damages caused by the intentional and "illegal" abandonment of your normal process over the past two years. The US Patent law (overview) specifically emphasizes the importance of timeliness in patent application, "Patents grant an inventor the right to exclude others from producing or using the inventor's discovery or invention **for a limited period of time.** U.S. patent laws were enacted by Congress under its Constitutional grant of authority to protect the discoveries of inventors. See *U.S. Constitution, Article I, Section 8.* More specifically, the law states, "Patents were <u>normally issued for a non-renewable period of **seventeen** years, measured from the date of issuance.</u>" See *[[USC: 35:154 § 154 of Title 35.]* Under the amended provision (which took effect June 8, 1995) the term will be **twenty years** measured from the date of application. In order to be patented an invention must be **novel,** useful, and not of an obvious nature. See *§§ 101-103 of Title 35*

3. We cannot cancel Claim 7, 8, and 9 to reduce the value of our patent for the following reasons. a) our patent belongs to utility patents issued for four general types of

07 1918

**FILED**

OCT 2 4 2007

**NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT**

inventions/discoveries, machines, human made products, compositions of matter, and processing methods. *See § 101 of Title 35.* More specifically, the value of our patent lies in the composition of matter or ingredients of the health pills and liquid additive, as well as in the processing methods or the prescription, preparation, and use of liquid additive and health pills. *See Table 1 and Table 2* as you named. The components of the health pills and the liquid additive are interactive and supplemental to each other. Therefore, these components are inseparable from each other to form the unity of our patent and to render the value of our patent – health enhancement through reduced toxins, strengthened immunity and smoking cessation; 2) we revised our claims in accordance with your advice and your office passed our amended version of claims in 2005. *See our amended claims dated July 20, 2005;* 3) our patent with the same claims was approved in China in 2005, which professionally proved our success in application. *See copy of patent certification issued in China.*

The following is our response to your specific suggestions or messages:

A. Please use our major inventor's name (Dehou Fei) on your future mails, not only because it was based on the major inventor's age that you granted the petition to "make it special" in 2003, but also because inventors are different in their contribution to this project and in our distribution of patent sale value.

B. We can only secure the signatures of inventors in this country if we need to submit this amended version as soon as you requested. What is the deadline for filing a supplemental declaration that has the fifth inventor's signature?

C. The proprietary names are for convenience in identifying health pills, but we can remove the names as you suggested.

D. The mark * is to indicate the ingredients that also serve the function of addiction elimination. In the original version of the Specification, there is a footnote to illustrate the function of the mark *. Should we add a similar footnote to the amended claims?

E. The certified copy of the Chinese priority application contains only one page. We do not fully understand the document you refer to in the letter.

F. We knew the existence of registered patent attorney or agent from the very beginning of our application. However, limited by our budget, we had to apply for patent ourselves. Since we were informed that we had passed your examination by amending our first version of application in accordance with your examiner's suggestions in 2005, we, at this point, see no necessity to hire an attorney on the almost finished application.

G. We are not sure of the content of the four pages of Appendix 2. Could you remind us of the content of the four pages?

H. We agree to make some changes on page 7, 13-15, 19, and 21 as you suggested.

Please send us your advice or feedback as soon as possible. Let's unite under the law to protect the interest of the United States and of patent applicants. Please feel free to contact us at the address above if you have any questions or need further information. Thank you.

Sincerely,

*Dehou Fei*

Dehou Fei, Major Inventor (written by Faye Zhengxing, Ph.D.)

| ***Examiner-Initiated Interview Summary*** | Application No | Applicant(s) |
|---|---|---|
| | 10/681,103 | FEI ET AL. *Att. 14* |
| | Examiner | Art Unit |
| | JOHN PAK | 1616 |

**All Participants:**

Status of Application: <u>*Now Under Final Rejection*</u> *NON-* *6/1*

(1) *John Pak.*

(3) *Dehou Fei (via fax communication, see below).*

(2) *Fay Zhengxing.*

(4) _____.

**Date of Interview:** *7 June 2007*                    **Time:** _____

**Type of Interview:**
☒ Telephonic
☐ Video Conference
☐ Personal (Copy given to: ☐ Applicant    ☐ Applicant's representative)

Exhibit Shown or Demonstrated:  ☒ Yes    ☐ No
    If Yes, provide a brief description: *Ms. Zhengxing and Mr. Fei responded to the Examiner's earlier fax communication via fax. A follow-up telephone conversation was also conducted between the Examiner and Ms. Zhengxing. A copy of applicant's fax of 6/7/2007 is attached hereto.*

**Part I.**

Rejection(s) discussed:

Claims discussed:
*See applicant's fax, attached hereto.*

Prior art documents discussed:

**Part II.**

SUBSTANCE OF INTERVIEW DESCRIBING THE GENERAL NATURE OF WHAT WAS DISCUSSED:
*See Continuation Sheet*

**Part III.**

☐ It is not necessary for applicant to provide a separate record of the substance of the interview, since the interview directly resulted in the allowance of the application. The examiner will provide a written summary of the substance of the interview in the Notice of Allowability.
☒ It is not necessary for applicant to provide a separate record of the substance of the interview, since the interview did not result in resolution of all issues. A brief summary by the examiner appears in Part II above.

07 1918

# FILED

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

_____
(Examiner/SPE Signature)

_____
(Applicant/Applicant's Representative Signature – if appropriate)

Application/Control Number: 10/681,103                                                    Page 2
Art Unit: 1616

This Office action is in response to applicant's reply of 4/20/2007.  Claims 1-4
have been canceled and claims 5-9 have been added.

**Applicant is advised that this Office action is being made non-final.**  The
Examiner stated during a telephone interview (see Interview Summary record of
6/7/2007) that this Office action would be made Final.  Upon reconsideration, in view of
the restriction requirement of record, it is believed that Finality would have been
premature.

Applicant's election with traverse of the invention of Group III in the reply filed on
4/20/2007 is acknowledged.  It is noted that Group IIII, as exactly set forth in the
restriction requirement of 6/21/2005, is as follows:

> III.   Claim 3, drawn to "Preventing more diseases and strengthening health
>        more effectively: This health pill ..."  It is noted that myriad diseases such
>        as cancer, cardiovascular diseases and respiratory diseases are
>        encompassed herein.  This invention is classified in multiple subclasses in
>        classes 424 and 514, depending on the chemical structure of the
>        component ingredients.

Although claim 3 has been canceled due to multiple informalities (e.g. contains 3
sentences), the health pill is now claimed in new claims 5-6.  Therefore, applicant's
election is directed to Group III, claims 5-6.

Application/Control Number: 10/681,103                                    Page 3
Art Unit: 1616

The traversal is on the ground(s) that the liquid additive and the health pill are
inseparable and interactive in rendering their functions. This is not found persuasive
because of the following reasons.

(1) The health pill and liquid additive are claimed separately. See claims 5-6
(health pill) and claim 7 (liquid additive). There is nothing indicated in those claims that
require a combination of the health pill and liquid additive. Pro se applicant is advised
that it is the claims that get examined for patentability, not some unstated and/or
unclaimed belief held by applicant.

(2) As currently and formerly claimed, the health pill and the liquid additive
contain materially different ingredients. Some of the differences are noted below:

| Content | Health Pill (elected) | Liquid Additive (non-elected) |
|---|---|---|
| Cerium dioxide | No | Yes |
| Sulfuric acid | No | Yes |
| Hydrogen peroxide | No | Yes |
| Potassium permanganate | No | Yes |
| Cupric sulfate | No | Yes |
| Cupric oxide | No | Yes |
| Activated Manganese dioxide | No | Yes |
| Vitamin E | Yes | No |
| Vitamin A | Yes | No |
| BHT | Yes | No |
| Riboflavin | Yes | No |
| Nicotinic acid | Yes | No |
| Pyridoxine hydrochloride | Yes | No |

Therefore, as <u>claimed</u> by applicant originally and currently, the health pill and liquid additive are directed to independent and distinct inventions.  The restriction between the two inventions is therefore proper.

(3) It is recognized that <u>one</u> aspect of applicant's invention is that the liquid additive and the health pill can work together to produce beneficial results.  However, what applicant fails to appreciate is that the instant specification and claims have been written so that <u>another</u> aspect of the invention can be that the liquid additive and the health pill can be stand-alone inventions.

Assume that a hypothetical inventor invented a car with a novel and unobvious car engine and a novel and unobvious brake system.  Suppose the hypothetical inventor filed a patent application in which a car is disclosed with the invention engine and invention brake system, but also suppose that patent application claims were filed with separate claims to the engine and separate claims to the brake system.  In such a situation, since the engine and the brake system are not being claimed in one single claim together <u>and</u> there is nothing preventing the engine and brake system from being separately used, they can and would be considered separate inventions, which separate inventions are subject to a restriction requirement.

Applicant's situation here is <u>analogous.</u>  It is applicant who presented claims, originally and currently, wherein the liquid additive and health pill are separately and

Application/Control Number: 10/681,103                                    Page 5
Art Unit: 1616

claimed[1].  Further, a health pill (elected invention) containing ingredients such as

riboflavin, selenium and vitamins A, $B_6$ and E would be expected by the skilled artisan to

have its own separate use, i.e. it does not <u>necessarily</u> require the use of the liquid pill in

order to have some of its beneficial effects.  That is sufficient to consider the health pill

separately from the liquid additive under the facts of this case.

        It is noted in this regard that the liquid additive claim 7 depends on the health pill

claim 5.  However, this is an improper claim dependency because those are two

different compositions.

        (4) As for claims 8 and 9, these claims are method claims that have absolutely no

relationship between the health pill or the liquid additive of claims 5-7.  In other words,

claims 8 and 9 do not require the particulars of claims 5, 6 or 7.  Therefore, the

inventions of claims 8 and 9 are unrelated inventions and the unrelated inventions are

properly restricted from the health pill and liquid additive inventions.

        For these reasons, the requirement is still deemed proper and is therefore made

FINAL.  Accordingly, claims 7-9 are withdrawn from further consideration.  Claims 5-6

will presently be examined.

        The following is a quotation of the first paragraph of 35 U.S.C. 112:

The specification shall contain a written description of the invention, and of the manner and process of
making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the

---

[1] It is recognized that original claim 1 was drawn to a "liquid additive and a supplementary pill" but that
claim did <u>not</u> specify any ingredients.  As such, the invention of original claim 1 was independent and
distinct from the inventions of original claims 2, 3 and 4.

Application/Control Number: 10/681,103                           Page 6

Art Unit: 1616

> art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Claim 5 is rejected under 35 U.S.C. 112, first paragraph, as failing to comply with the written description requirement. The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention.

New claim 5 recites "(ACA-1-4 2A)". This specific terminology was never before described in the originally filed disclosure. In view of the fact that applicant seems to associate certain meanings behind such product names, the new terminology is deemed to constitute new matter, which fails to find adequate written descriptive support from the originally filed disclosure.

The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claims 5-6 rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

(1) The term "(ACA-1-4 2A)" is confusing. No person skilled in the art would recognize what this term means.

(2) The parenthetical phrase, "(for 100 gram of tobacco, about 20 cigarettes x 6.667 packs)" is confusing. Keeping in mind that the independent claim 5 is claimed as "A health pill," it is confusing to further recite such parenthetical phrase.

It cannot be understood whether said parenthetical phrase means that the health pill is good for protective effects against 100 grams of tobacco or whether the health pill ingredients are to be divided up into multiple pills for the numbers of cigarettes that would contain 100 grams of tobacco.

If applicant intends that the ingredients and the amounts listed in the claims are meant to make, for example 4 pills, then such critical information should be expressly recited in the claims and the claim language modified to incorporate such inventive concept.

Also, "20 cigarettes x 6.667 packs" is a vague and imprecise terminology. It could mean 6.667 packs of cigarettes, each pack containing 20 cigarettes, but the language does not make it so clear.

(3) The " * " marks next to some of the ingredients in claims 5 and 6 render the claims indefinite. If applicant intends that ingredients with the * mark are to be considered to have certain properties, then applicant should positively recite that in the claims (without raising additional claim language problems).

(4) There should be an "and" after "Nicotinic acid" in claim 5.

Application/Control Number: 10/681,103                                    Page 8
Art Unit: 1616

(5) In claim 6, it is confusing to refer to the health pill of claim 5 and immediately thereafter recite a different product name, "(ACA-104 2B)."

The oath or declaration is defective.  A new oath or declaration in compliance with 37 CFR 1.67(a) identifying this application by application number and filing date is required.  See MPEP §§ 602.01 and 602.02.

The oath or declaration is defective because the fifth inventor did not sign and date the oath.

Applicant is advised to amend the specification as discussed in the Examiner's fax communication of 5/31/2007, which is incorporated herein by reference.

Applicant asked several questions in the fax of 6/7/2007 (see the Interview Summary record of 6/7/2007).  Here are answers to applicant's questions that have not yet been addressed above.

(1) The deadline for filing a supplemental declaration with the fifth inventor's signature (and date of execution) is the time period for reply to this Office action.

(2) Footnotes cannot be part of any patent application claim language. Parenthetical information should also be avoided since all claim features must be positively recited.

Application/Control Number: 10/681,103                                        Page 9
Art Unit: 1616

(3) The content of the four pages of Appendix 2 should be in applicant's possession since these are pages from applicant's own specification. In the records before the USPTO, the four pages of Appendix 2 appear between pages 20 and 21 of the originally filed specification. Said four pages are in the Chinese language or contain English reference to tests disclosed in the Chinese language.

Any inquiry concerning this communication or earlier communications from the Examiner should be directed to JOHN PAK whose telephone number is **(571)272-0620.** The Examiner can normally be reached on Monday to Friday from 8 AM to 4:30 PM.

If attempts to reach the Examiner by telephone are unsuccessful, the Examiner's SPE, Johann Richter, can be reached on **(571)272-0646**.

The fax phone number for the organization where this application or proceeding is assigned is **(571)273-8300**.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the receptionist whose telephone number is (571)272-1600.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only.

Application/Control Number: 10/681,103                                   Page 10
Art Unit: 1616

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).

John Pak
Primary Examiner
Technology Center 1600

*Att . 15*

7/13/07

3736 10th Ave. Apt. 2H
New York, NY 10034
Cell Phone: 646-826-9930

Dear Mayor Bloomberg:

No matter how many times I reported to you about the poisoning of my family and the pollution of our environment, the federal biochemical terror is still going on. Last night the toxic gas was pumped into my home to cause more pain in my back and lymph nodes. My father has to sleep on my sister's couch to survive. I am writing this letter outside in the park of this community. Since I have to keep the door and windows open to survive, the toxic gas is coming into the whole building and this community, including the kindergarten downstairs. The residents need to be alarmed of the biochemical terror.

Last month one specialist Christopher Haas came from Environmental Compliance under NYCDEP to collect the air sample from the 8-foot-long crack on our wall. This crack was left by the toxic gas pumped into our home under high pressure. He told us it only took a few days to issue the test report. On June 27, 2007 two specialists from the same department V. Tiglao and J. Goldis came to collect the water sample from our kitchen. They told me it took a few days to issue the test report. But we never received any reports. I was informed that in fact both reports proved the high pollution in our home and the federal agents suppressed the truth as they did last year. Since we have been living under close but illegal surveillance for years, the federal abused power could obstruct justice any time and through all channels. Since I have informed you of the reason why I have been the target of killing, I am only focusing on the on-going biochemical terror.

Would you please urge NYCDEP to issue the true test reports to us and to the people in this community? We want to see your "Green Plan" to be carried out not only in this city but also in this country. It is so important that people need to take precaution and they need to protect their environment and homes. Our next door neighbor John Phillips in Apt. 2G died from liver disease not long ago, because he was not aware of the poison in our running water. My father, a non-smoker, was diagnosed with lung cancer after he was poisoned by the federal poison -- dioxin. Please protect our children in the kindergarten!!! Please urge NYC Housing Authority to find us a clean place to live while they clean up our home. The feds should pay for our living at an inexpensive motel or hotel.

Please forward this letter to Senate/House Homeland Security Committee, the White House and Department of Justice. Please ask the authority to track down to the specific federal terrorist who has been directing the poisoning and pollution and have him prosecuted. Otherwise it is not fair to the majority of federal employees who have been standing by the law, protecting our lives and our environment. We need the rule of law!!! Thank you for taking actions immediately to make this world a better place to live!!!

Sincerely,

Faye Zhengxing, Ph.D.

07 1918

**FILED**

OCT 2 4 2007

**NANCY** MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

7/19/07

3736 10th Ave. Apt. 2H
New York, NY 10034
Phone & Fax: 212-567-2713
Cell Phone: 646-826-9930

Dear Mayor Bloomberg:

Thank you very much for your attention to and actions on the federal biochemical terror I reported to you yesterday. Some NYPD officers talked to me for their future investigations and showed their concern. Though the toxic gas is not as visible as the steam burst we saw yesterday in NYC, it made me dizzy and caused pain all over my body. It was going to harm more innocent people in the whole building, especially the children in the kindergarten downstairs. To avoid being poisoned, I have been living like a homeless, roaming around on the street or staying in the public library. Now I am trying to finish this letter in the community park before my lap top runs out of its battery.

Please understand the huge crisis in our lives: After my mother died from federal persecution in 2004, my father was also poisoned by dioxin and was diagnosed with lung cancer in 2005. As he was hospitalized in China and could not come back as he had planned, he lost his Supplemental Social Income (SSI) and also his medical insurance when he needs it the most. According to Social Security Administration's regulation, after he came back to US and after living in this country for 30 consecutive days, he should be able to reapply for SSI, but his reapplication was denied without any reason. My father's initial SSI was approved on the legal ground that he came to the US before Aug. 22, 1996 and also based on his age (over 65), his disability and his legal status (a permanent resident).

Since this $ 700 SSI is the only income for my father's survival and his medical insurance is based on his SSI, we have to turn to you for help. Recently a caseworker Ludmila Dvorin from Adult Protective Services visited us and promised to help us out. She now told me another caseworker Florence Oyedeji is working on my father's case. I left messages for Florence twice, but she never called us back. I suspect the manipulation by a US attorney David Cohen who has been directing the surveillance and poisoning of my family for his own gain. Since he has been trying all means to force me to promise him a commission from the compensation ($90 million) President Bush approved to settle my legal case as a non-prosecution plea deal, he is abusing his power to make our life as miserable as possible. He believes poverty and poison ill bring us to our knees. He even gave me the hint that he could hold the relief as long as he wants, though he knows he is committing a serious crime since Title 18, part 1, chapter 13 § 246 states," Whoever directly or indirectly deprives, attempts to deprive, or threatens to deprive any person of any employment, position, work, compensation, or other benefit provided for or made possible in whole or in part by any Act of Congress appropriating funds for work relief or relief purposes, on account of political affiliation, race, color, sex, religion, or national origin, shall be fined under

this title, or imprisoned not more than one year, or both."

I will be most grateful if you could contact Ms. Florence Oyedeji (at 212-971-2775) or her supervisor (at 212-971-2862) of Adult Protective Services for their attention to our crisis in survival. They should be able to save my father's life by pushing his SSI and medical insurance approved.

Since specialists of NYC Department of Environmental Protection at 718-595-4664 (90-05 Horace Harding Expressway, 1st Floor, Low Rise, Elmhurst, NY 11368) Christopher Haas, V. Tiglao and J. Goldis came to collect the air and water sample from our home at the address above, they should have the test reports to prove the poison and pollution at our home. Please urge NYCDEP to issue the truth to us and to the people in this community. Please urge Attorney General of New York to prosecute the federal criminals to save our lives and our environment. NOBODY IS ABOVE THE LAW!

Would you please also urge NYCDEP and NYC Housing Authority to cooperate in cleaning up our highly polluted home? The polluted water is affecting the whole environment and the toxic gas will stay in the wall and fabric of our home for a long time. No matter who is going to live in this home, it needs to be cleaned up. Could you ask NYCHA to find a temporary clean place for us to survive? If nothing is available, is it possible the city government may find an inexpensive hotel or motel for our survival while our home is being cleaned up? The federal government should foot the bill for our lost income and increased living cost, let alone the tremendous mental anguish and psychological trauma.

As a responsible US citizen and a NYC resident, I have been trying my best not to increase the burden on the city. Though I have had no income for almost 6 years after the federal unlawful termination and wrongful label of "independent contractor," I have been living on my own without having any welfare benefits. The US Supreme Court's ruling should have rendered me justice in 2005, but Department of Justice has been concealing the ruling to obstruct justice and to increase the damages. The relief approved by President Bush was sent abroad several times, but not a penny of justice has been sent to the victim or the plaintive. Therefore, I will be very much appreciative if you can urge Attorney General or President Bush to issue the relief directly to me to settle my case and wipe out the poison and pollution completely.

If you need further information, please feel free to contact me at the address above. Thank you again for making this city "green" and our prospects "rosy." I will be looking forward to hearing from you.

Sincerely,

Faye Zhengxing, Ph.D.

UNITED STATES PATENT AND TRADEMARK OFFICE

*AH.16*

**SEP 2 8 2007**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

DEHOU FEI
APT. 2H
3736 10TH AVE.
NEW YORK NY 10034

In re Application of          :
Dehou Fei et al               :
Serial No.: 10/681,103      : PETITION DECISION
Filed: October 9, 2003      :
Attorney Docket No.:       :

This is in response to the petition under 37 CFR 1.144, filed August 6, 2007, requesting withdrawal of an improper restriction requirement.

BACKGROUND

A review of the file history shows that this application was filed under 35 U.S.C. 111 on September 29, 2004, and contained claims 1-4. Subsequent to acceptance of the application a petition to make the application special in view of the age of at least one of the inventors was filed and granted on March 30, 2005. Shortly thereafter in a first Office action, mailed June 21, 2005, the examiner assigned to the application required restriction between the inventions claimed by setting forth 4 groups of invention, as follows:

> Group I, claim 1, drawn to a liquid additive and supplementary health pill;
> Group II, claim 2, drawn to a method of reducing toxicity by applying a liquid additive to tobacco;
> Group III, claim 3, drawn to preventing diseases utilizing a health pill; and
> Group IV, claim 4, drawn to eliminating addiction safely and effectively.

The examiner expressed a number of reasons for requiring restriction including distinctness of each invention from the other and burden on the Office to examine all inventions in the same application. (That is to say that the inventions, while somewhat related to each other, would require different searches, search techniques and patentability considerations.)

**07 1918**

Following a telephonic interview on or about July 8, 2005, applicants replied on July 11, 2005, electing Group III and presenting a new claim 5 which was in reality five new claims under the heading of "Claim 5". Applicants did not specifically or formally traverse the restriction requirement at this time.

**FILED**

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

A Notice of Non-Compliant Amendment was mailed to applicants on August 2, 2005, to which reply was made on August 24, 2005. A second Notice of Non-Compliant amendment was mailed to applicants on August 31, 2005, but was eventually withdrawn on March 29, 2007, and a miscellaneous letter sent to applicants to show how the claims should be properly written. Applicants then submitted an acceptable amendment on April 20, 2007.

The examiner mailed a new Office action to applicants on June 15, 2007. In view of applicants' election of claim 3 of the original claims, which was now canceled, the examiner considered claims 5-6 which correspond to original claim 3 as the elected claims. The examiner again explained the reasons for restriction in detail and made the requirement for restriction Final. The examiner then rejected claims 5 and 6 under 35 U.S.C. 112, first paragraph, for lack of written description in the specification, and under 35 U.S.C. 112, second paragraph, as indefinite, giving reasons therefore. The examiner also conducted extensive telephone interviews with applicants on May 31, and June 7, 2007, in preparation for issuing the Office action.

Subsequent to the mailing of the Office action the examiner conducted additional telephonic interviews with applicants on July 11, and August 1, 2007 to give applicants further guidance in prosecuting their application.

On August 6, 2007, applicants filed this petition consisting of 10 pages with 80 pages of attachments, mostly copies of application papers already on file.

DISCUSSION

As noted, the petition is extensive and is directed to the propriety of the restriction requirement set forth by the examiner, but includes a great deal of material and argument which is not pertinent to the question of whether the requirement for restriction is proper. As applicants are prosecuting their own application some latitude with conformance to the rules of prosecution is permitted. However, it would be in applicants' best interests to employ the services of a patent attorney or agent to assist in the prosecution of this application and to minimize the delays occasioned by the Office mailing of Notices of Non-Compliance in the future.

A review of the restriction requirement set forth by the examiner with respect to claims 1-4 and now applied to claims 5-9, shows that it is proper and in accordance with the rules of prosecution of patent applications. Applicants' arguments have been considered carefully, however they are not persuasive of error on the examiner's part. A review of applicants two independent composition claims, currently claims 5 and 7 shows that the compositions have only one (of about ten) component in common, the cyclodextrin. Thus the compositions are two separate compositions of matter each of which may be separably patentable. Thus they are properly examined separately in two different applications since the Patent Statute (Law) strongly suggests and has been interpreted as limiting each patent to one invention. Further, the two method claims, current claims 8 and 9, are considered a different statutory class of invention from compositions and are properly restricted from applications claiming compositions. It is frequently the case that the invention of a novel compound or composition of matter also involves a novel (and separately patentable) method of making or method of using the compound or composition. Applicants even quote 35 U.S.C. 101 as part of their argument which states:

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor," meaning that any new or useful process or machine or manufacture or composition of matter may be the subject of a (one) patent. That does not mean that a combination of these types of invention may all be the subject of the same patent.

For the above reasons the restriction requirement is considered proper and will not be withdrawn.

DECISION

The petition is **DENIED** for the reasons set forth above.

**Applicants remain under obligation to reply to the Office action mailed June 15, 2007, within the time period set therein or as extended under 37 CFR 1.136(a). The filing of a petition is not considered a reply to the Office action.**

ADDITIONAL COMMENTS

Applicants make a number of comments ancillary to the petition of the restriction requirement which it is thought should be addressed. For instance applicants appear to be of the belief that a telephone conversation with an unnamed Office employee shortly after the application was filed was an indication that the application would issue as a patent. What in all likelihood happened is that after filing the application applicants talked with an individual who indicated that the application had been received and had been initially reviewed for compliance with the applicable filing requirements and had met them and that the application was, therefore, ready for examination by a qualified examiner. No indication was given or should have been assumed that the application was ready to be issued as a patent. It is regretted that applicants misunderstood what was communicated to them at that time.

Applicants appear to believe that this application was at some time abandoned. No Notice of Abandonment was ever mailed to applicants, thus no abandonment of the application has ever taken place. Prosecution of this application, which was advanced out of turn due the granting of a petition to make special, has proceded in a normal manner along with the prosecution of approximately 1,000,000 other pending applications. Unfortunately, due to the large number of active applications, prosecution within the Office is sometimes slowed by this and other factors. It is noted that the examiner of this application has tried to assist applicants as much as possible as evidenced by the numerous telephone interviews. In view of this, it is again urged that applicants strongly consider consultation with, or employment of, a registered patent attorney or agent in order to bring prosecution of this application to a conclusion.

Applicants also make allegations that the actions of this agency have or can be influenced by other agencies (such as Department of Justice). Nothing could be further from the truth. This agency administers the Patent Laws, Title 35 U.S.C., and the agency is independent of any other agency of the government. The Patent Laws set forth the specific criteria for granting of a patent and the agency issues more than 100,000 patents each year which meet these criteria. Applications which do not meet these criteria do not issue as patents. Nor can congressional

influence cause the issuance of a patent which does not meet these criteria. Employees of the Office must meet and maintain the highest ethical standards as do any attorneys or agents who desire to practice before the Office. Thus any allegations of wrong-doing or impropriety are without merit.

Should there be any questions about this decision please contact William R. Dixon, Jr., by letter addressed to Director, TC 1600, at the address listed above, or by telephone at 571-272-0519 or by facsimile sent to the general Office facsimile number, 571-273-8300.

Bruce M. Kishuk
Director, Technology Center 1600

AMENDMENTS TO CLAIMS                    *Att. 17*

Application/Control Number: 10/681,103                    April 15, 2007.

Examiner: John Pak                    Art Unit: 1616

> In response to the Restriction requirement of June 21, 2005, I elect Group III--
> enhancing smokers' health – as the invention for this application.

Since the essence of this invention is to strengthen smokers' health through three channels -- reducing the toxicity in tobacco smoke, offering extra nutrition to enhance the immunity of smokers, and eliminating the addiction in smokers' brains – and since the component ingredients in the liquid additive and the health pills are inseparable and interactive in rendering their functions, it is appropriate to choose Group 3 to demonstrate the fundamental thrust of this invention and regard other original claims as indispensable and supplemental compositions to Group 3. For instance, the health pill will not achieve the effect calculated in this invention without reducing the toxicity in the tobacco smoke to the extent designed. Another example is the benefit expressed in the original Claim 4 "eliminating addiction safely and effectively" which relies on nothing independent but on the component ingredients in both the liquid additive and the health pills. In other words, it is impossible to achieve the patentable novelty without the claims on both products.

07 1918

**FILED**

OCT 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE CLAIMS:

**Claim 1-4 (canceled)**.

**Claim 5. (New)** A health pill to prevent smoking related diseases and to eliminate addiction comprising:

    0.2-14.6 mg of Sodium selenite

    3.5-67 ml of B-cyclodextrin (1.85%)

    0.2-10 g of *Vitamin E

    3-35 mg of *Vitamin A

    BHT, 0.15% of the weight of health pill

    7-200 mg of Riboflavin

    7-2000 mg of *Nicotinic acid, and

    33-2000 mg of*Pyridoxine hydrochloride

**Claim 6. (New)** The use of health pill comprising 0.07-6g of *Ascorbic acid to avoid mixing with sodium and riboflavin.

**Claim 7. (New)** A liquid additive supplemental to claim 5, comprising (for 100 grams of tobacco):

    0.7-15ml of Tween-80

    50-100 ml of Hot water (55-60°C)

    7-134mg of Cerium dioxide

    0.2-10 ml of Sulfuric acid (5%-20%) V/V

    0.4-8mg of Selenium dioxide

    0.1- 4 g of B-cyclodextrin

30-600 ml of Hydrogen peroxide (3% or 6%)

15-150 mg of Potassium permanganate

45--400 mg of*Cupric Sulfate

20--270 mg of Cupric Oxide

10--100 mg of Activated Manganese dioxide

**Claim 8. (New)** A method for resuming the activity of glut athione peroxidase (GSH-PX) by applying a co-enzyme to guarantee its unfailing effect.

**Claim 9. (New)** A method for eliminating smoker's addiction by reducing dopamine and glutamic acid in the human brain.

3

# SPECIFICATION

*Att. 18*

TITLE OF INVENTION:

Preparations for Cigarette Toxicity Reduction, Health Enhancement, and Addiction Elimination

CROSS-REFERENCE TO RELATED APPLICATIONS:

Not Applicable

STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT:

Not Applicable

REFERENCE TO SEQUENCE LISTING, A TABLE, OR A COMPUTER PROGRAM LISTING COMPACT DISC APPENDIX:

Not Applicable

BACKGROUND OF THE INVENTION:

This invention is grounded in biochemistry, medicine, pharmacy, nutriology and other related fields

Presently, about 28 percent of men and 24 percent of women are smoking in the United States. Twenty-five percent of pregnant women who smoke quit during pregnancy; yet 80 percent resume smoking after childbirth. Tobacco smoking is responsible for 1 of every 5 deaths and is the most common cause of cancer-related deaths in this country (1).

Internationally, about 1.1 billion people smoke. Smoking is especially prevalent in developing countries and is continuing to increase. The health consequences of this addiction are severe. Children smoke 1.1 billion packs of cigarettes yearly, which accounts for more than $200 billion in future health care costs (1).

Over the past 30 years, the health communities at home and abroad have been working continuously to reduce the toxicity of tobacco smoke and assist smoking cessation. Some inventions did come out, but the effects were not comparable with the widespread harm of smoking. Our thorough searches throughout the world have shed light on the following issues: 1) Many inventions were limited to only reducing th

07 1918

**FILED**

OCT 2 4 2007

1

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

toxicity of one or a few harmful chemicals. They provide no good solutions to the pressing problems caused by smoking; 2) some partially or completely depending on plants or herbs, even if effective, are not stable in their properties or have no secured sources of raw material for mass production and marketing. Recently the European Union drafted a bill to strictly control the import of plants. It will strike a heavy blow to those inventions when the law becomes effective not only in Europe but also in other countries; 3) some popular nicotine replacement products such as patches, chewing pieces, nasal sprays, inhalers and tobacco-infused drink are dangerous, because they only increase the intake of nicotine, a major causative factor of cancer, cardiovascular disease, respiratory illnesses and other diseases. As we know, nicotine releases a great deal of dopamine and glutamic acid in the brain. It is these two substances that caused addiction (including addiction to drugs). No wonder the mass media questioned the effect of using nicotine replacement products; 4) another challenge is an opinion in the legal battle against the tobacco industry that some "light" or "safe" cigarettes are deceptive, because people smoking such brands are likely to inhale more deeply and smoke more cigarettes to satiate their nicotine fix (2). This point of view only illustrates that toxicity reduction must be supported by gradual elimination of addiction to nicotine.

In view of the situation stated above and in answer to the call on banning tobacco from the World Health Organization, we are applying for a patent for our invention with the confidence that our additive will satisfy the health community, smokers, the tobacco industry, the government, or the whole society, because of its comprehensive multi-functions -- reducing the toxicity in cigarettes, enhancing the health of smokers, and eventually eliminating the addiction. This is a scientific, safe, and effective invention based on our over 20 years of studies and experiments in medical science, biochemistry and other related subjects.

Over the past 20 years, we have studied a great deal of information in related fields through various books, journals, and internet. We especially referred ourselves to the sources in the "References" attached to following Detailed Description of the Invention.

BRIEF SUMMARY OF THE INVENTION:

2

This invention consists of two parts -- a liquid additive and a supplementary health pill for tobacco industry and health communities to solve smoking related physical, social and psychological problems. This invention, proved unprecedented by our thorough search throughout the world, performs three major functions – toxicity reduction, health enhancement, and addiction elimination. The ingredients of the liquid additive and health pills are all within the scope of FDA's "Conventional Foods and Dietary Supplements."

The liquid additive put into the cut tobacco in the process of cigarette production to reduce the toxins in cigarette smoke is called "ACA-104-1 and the health pills enclosed in the cigarette pack to prevent smokers from getting almost all smoking related diseases are called "ACA104-2A and ACA104-2B". For a pharmaceutical reason, those ingredients designed for smoke cessation are conveniently included in either ACA-104-1 or ACA-104-2A/B.

The major advantages of this invention are as follows:

1.  The liquid additive will effectively reduce or dissolve the toxins in more chemicals in tobacco smoke and by a bigger margin:
    Among the 4000-odd compounds in tobacco smoke, forty are harmful to the human body. The seven most hazardous chemicals, however, are tar, nicotine (including its derivatives), carbon monoxide, nitric oxide compound, cyanhydric acid, radioactive material, and heavy metals such as cadmium, mercury, and arsenic.[1] For instance, our liquid additive will reduce the toxicity in tar by 75%-85%, 25% more reduction than that in a well-known brand of light cigarettes; some ingredients in the health pill will dissolve almost completely the carcinogenic polyene hydrocarbon epoxides left in the rest of tar. This liquid additive will also reduce nicotine by 90% to 97% and change it into nicotinic acid (VB3). This is a great creative step with respect to the toxicity reduction in

---

[1] . See Imperial Cancer Research Fund web site: "The Safer Cigarettes: what the Tobacco Industry Could Do…and Why It hasn't done It," March 3, 1999.

3

cigarettes. Moreover, our health pill will also dissolve the toxicity in nitrosamine, a potent carcinogen before or after it is formed in the human body.

2. <u>Our health pill will effectively prevent almost all kinds of smoking related diseases:</u>

   In selecting the ingredients for the health pill, we referred ourselves to a great deal of data drawn from all kinds of experiments, studies or clinic researches, as well as to our own experiences. Under the guidance of the theory of free radical, we based our selections on the effect of these ingredients on human cells and genes, on human nutrition levels, on strengthening the immune system, and on related clinic results. To ensure the unfailing effect of the health pill, we creatively adopted a co-enzyme to revitalize those oxidized ingredients and resume their important activity in preventing diseases.

   In packaging, we enclosed the health pills in the cigarette pack for consumers to take in the anti-smoking ingredients in the right time and right dosage.

3. <u>Our invention will eventually facilitate smoking cessation.</u>

   Since nicotine releases a great deal of dopamine and glutamic acid in the brain to cause smokers' addiction, our invention includes a set of effective ways to appropriately catabolize and inactivate dopamine and glutamic acid through transformation of enzymes and other biochemical changes.

4. <u>Other advantages of this invention:</u>

   a) guaranteed sources of raw materials; b) cost of production is relatively low and thus competitive; c) no need to change the major equipment of cigarette production; d) though there will be a short-term training for operators and a workshop for making health pills, the process of sprinkling liquid additive to the tobacco is simple.

BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING:

4

Not Applicable.

DETAILED DESCRIPTION OF THE INVENTION:

Our invention consists of two parts: 1) a liquid additive spread into the cut tobacco in the process of cigarette production to reduce the toxicity (the so-called "ACA-104-1") in tobacco smoke; 2) a supplemental health pills enclosed in the cigarette pack to prevent smokers from getting smoking related diseases (the so-called "ACA104-2A and ACA104-2B"). These pills will timely provide smokers with sufficient nutrition to reduce the toxicity in cigarette smoke and enhance their health. For a pharmaceutical reason, those ingredients designed to remove the addiction in smokers are conveniently included in either ACA-104-1 or ACA-104-2A/B. The liquid additive and supplemental health pill are interrelated and work in coordination.

1.    Liquid Additive to Reduce Toxicity in Tobacco Smoke:

Among the 4000-odd compounds in tobacco smoke, over forty are harmful to the human body. The seven most hazardous chemicals, however, are tar, nicotine (including its derivatives), carbon monoxide, nitric oxide compound, cyanhydric acid, radioactive material, cadmium, mercury, and arsenic. They are regarded as the causes of smoking related diseases such as various cancers, cardiovascular disease, respiratory diseases, as well as other health problems -- premature aging, weak immunity, tobacco amblyopia, mouth leukoderma, as well as other diseases caused by harmful radioactive material in tobacco smoke.

Is reducing toxicity in tobacco smoke necessary? Some people believe that a "low tar" read-out on the Federal Trade Commission's automated testing machine does not mean the smoker may inhale less harm from the "light" or "safe" cigarettes, because the smoker will draw harder to satisfy his/her crave for nicotine. Some experts, however, believe that reducing the toxicity in tobacco smoke is still a necessary first step since smoking cessation is not a task to be accomplished overnight. It must go through a transitional period, during which scientific inventions, social education, governmental regulation should all work together. American Medicine Association (AMA) once called for removing nicotine from tobacco within 5 to 10 years. AMA

5

pointed out that since tobacco industry knows how to remove nicotine from tobacco as how to remove caffeine from coffee, the industry only needs to decide if nicotine should be removed all at once or gradually (3).

The all-or-nothing attitude toward reducing nicotine in cigarettes is not realistic if we admit that smokers need a transitional period to gradually get rid of his/her addiction. We therefore believe that the willpower to quit smoking should be supported by an invention to diminish and eventually break the addiction in the smoker's brain in the transitional period (We'll discuss this function of our invention later). Reasoning along this line, we hold that reducing toxicity including nicotine in tobacco smoke is a necessary first step.

We started detoxicating the major seven chemicals in tobacco smoke mainly through full oxidization. We found it easy to oxidize tar, carbon monoxide and nicotine effectively. It is also a cost-effective way to oxidize nicotine and transforming it into one type of vitamin B (nicotinic acid).With sufficient oxygen, tar will greatly lower its content, and the cancer-causing polycyclic aromatic hydrocarbons represented by 3, 4 benzo(a)pyrene in tar will also decrease. The rest of polycyclic aromatic hydrocarbons in tar will lose its carcinogenicity when it combines with our anti-oxidants in our health pills; carbon monoxide, after oxidization, also loses its toxicity after it is changed into carbon dioxide.

To deal with nitric oxide compound, we used rare earth cerium dioxide as catalyst to replace precious metal platinum, thus separating nitrogen and oxygen from nitric oxide compound (5). Not only is it effective, it costs only one several thousandth of that of platinum; we detoxicated hydrocyanic acid by combining it with cysteine contained in the selenium-GSH-PX in our health pill, leaving the dissolved resultant to be discharged through human urine or slaver; those hazardous metals such as cadmium, mercury and arsenic were counteracted or inactivated by the selenium dioxide in our liquid additive (6); we applied the selenium-GSH-PX, the mainstay of our anti-oxidant in the health pill, to prevent the radioactive material 210 polonium (often found in tobacco) from triggering a lipidic peroxide reaction through free radicals. As a result, 210 polonium was detoxicated.

Not only do our liquid additive and health pill reduce or inactivate the toxicity in the seven major hazardous chemicals in tobacco smoke, they also transform some of the hazardous chemicals into healthful vitamins. Similarly, our liquid additive and health pill work effectively on carcinogenic compounds such as nitrosamine and ammonia in tobacco smoke. Ammonia, after counteracted, will lose its chemical irritation. Even after some ammonia enters the human body and raises the level of ammonia in blood, the VB6 in our health pill will combine the ammonia with $\gamma$-aminobutyric acid transformed from decarboxylated glutamic acid and the resultant urea will be discharged out of the human body (7); nitrosamine can be inactivated by the anti-oxidants in the health pill before or after nitrosamine forms in the human body. For the preparation for liquid additive, see Table 1.

Eleven years ago, we started the experiments on toxicity reduction. The Test Report by Shanghai Institute for Toxicity Control of Chemical Products proves that we reduced tar by 61.02% and nicotine by 81.18%. With oxidants compound, catalysts, and full oxidization when necessary, we currently reduced nicotine by 90-97 percent and turned it into nicotinic acid (VB3); we reduced tar by 75 to 85 percent. Compared with some well-known "light" cigarettes, our cigarettes had 50 percent less nicotine and 25 percent less tar in tobacco smoke.

2. Health Pill to Enhance Smokers' Health and Prevent Diseases:

The components in tobacco smoke are very complicated and complex. They can invade all kinds of human systems and organs and cause various diseases. The most threatening and common are cancers, cardiovascular diseases and respiratory diseases. How to prevent these diseases effectively is our unprecedented challenge. The invention of our health pill was inspired by the theory of free radical, which states that free radicals are responsible for aging and degeneration of the human as well as other species (9). According to this theory, free radicals are the biochemical basis for many hazardous diseases such as cancers, cardiovascular disease, atherosclerosis, central nervous system, arthritis, muscle atrophy, and congenital malformation. With oxygen, free radicals' initiator will oxidize many biochemical elements inside and outside human cells. For instance, when the unsaturated fatty acid

7

on the cell membrane is oxidized, which is called "lipidic peroxide reaction," and if this kind of abnormal biological reaction is very strong, the structure and functions of human cells and cell membrane will be impaired, causing devious biochemical changes in DNA, RNA and enzymes. As damages vary in different systems, metabolic processes, and links, all kinds of biochemical deviations and diseases may occur. Free Radical Theory thus led us to believe that we could prevent and treat diseases more effectively if we zero in on human cells or molecules –the sources of diseases -- to repair damages.

Selenium, a mineral and the major substance of our health pill, can form glutathione peroxidase (GSH-PX) in the human body and GSH-PX blocks the lipidic peroxide reaction initiated by free radicals. This indicates the important functions of selenium compound (pure selenium almost cannot be absorbed) and GSH-PX in the process of life such as suppressing peroxidization, cleansing free radicals, resolving peroxide, and repairing damaged molecules and cells. In view of the mechanism stated above, we centered our anti-oxidant prescription on sodium selenite, aiming at repairing the damaged molecules and cells, removing free radicals, resolving peroxide -- the most fundamental way to prevent and cure diseases. These ingredients, within the scope of United States Recommended Dietary Allowance (RDA), will protect the structure and functions of cells and cell membranes to keep smokers in good health (10).

Since selenium is a necessary component of GSH-PX, its content is positively related to the activity of GSH-PX. So is the content of glutathione to the activity of GSH-PX. In the process of reducing the toxic peroxide and turning it into harmless hydroxy-compound, GSH-PX changes itself from a reductive GSH to an oxidative GSSG. At the same time, GSH-PX also resolves hydrogen peroxide in the human body, protecting the structure and functions of cell membranes from the impairment and interference by peroxide. Through the same GSH-PX, selenium can arrest the lipidic peroxide reaction caused by free radicals. All these functions to inhibit and prevent free radicals and their reactions are performed by either enzyme anti-oxidant

or non-enzyme anti-oxidant in the human body. Diseases occur only when the defensive system is weakened by aging or unhealthy behaviors.

a. Selenium and Cancers:

Schrauzer reports that the data from the blood banks in 22 countries indicate that the selenium content in blood is in inverse proportion to the mortality rate of cancer patients (11); related data from 19 states of U.S. offered similar findings; a report measuring the selenium intake from diet in 29 countries also found a significant inverse relationship between selenium intake and the mortality rate of the people who had suffered from colon cancer, prostate cancer, breast cancer, ovary cancer, lung cancer, and leukaemia. This report therefore predicts that if the intake of selenium is doubled, the mortality rate of cancer patients in the United States and other Western countries will remarkably decrease (11); there is an obvious disparity between the average selenium content (0.49±0.22 ug/g) in the tobacco grown in the area with high selenium soil and that (0.16±0.05ug/g) in the tobacco in the area with low selenium soil. While the former area had low tumor incidence, the latter presented high tumor incidence (11).

Various studies over the past 30 years also report that selenium, to some degree, checks all kinds of chemical causing cancers (including nitrosamine causing alimentary canal cancer). When 3ppm selenium was added to the drinking water for animals, it was effective on the leukoderma in their mouths and throats to the extent that it took two more weeks for cancers to form in the animals drinking water with selenium than that in the control group drinking water with no selenium. Two-week difference is statistically significant (12); other experiments also provide findings that selenium apparently inhibits the growth of spontaneous tumors, planted tumors, and tumors initiated by chemicals in different animals (12, 13).

In addition, selenium can prevent the growth of cancer-causing fungus and lower the toxicity of aflatoxin (12, p.8). A Japanese expert at Japan's Center for Cancer Studies believes that 60 percent of primary liver cancer incidences were caused by smoking and a smoker's liver starts to age 15 years earlier than that of a non-smoker;

9

among lung cancer patients 72 percent are smokers; a smoker consuming 30 cigarettes daily is three times more likely to get lung cancer than a non-smoker (15).

After over 10 years of research and experiment, Professor Yu Shuyu at the Tumor Studies Institute of China's Medical Science Academy put forth first in the world that sodium selenite affects cell's genetic express, recording system, energy metabolism, and the structure of cell membrane. He points out that sodium selenite will reverse the proliferation, division and vicious exterior of tumor cells. After treated by selenium, the cancer cells external of the human body will decrease its carcinogenicity by 60 percent. His view is different from most researchers' opinion that to treat cancer is only to remove the oxidants and protect cells in the human body (16). Apparently Professor Yu has created a new vision in this field.

Selenium also inhibits the cancers caused by virus. For instance, if rats drank the water with 2ppm and 6ppm selenium, their incidence of rat's breast cancer caused by external highly carcinogenic rat's breast cancer-causing virus will decrease by 50 to 80 percent. The tumors on the rats in the experimental group grew more slowly and were less vicious than that of the control group. The rats in the experimental group also lived longer than their counterparts in the control group (12).

Some experiments demonstrate that even if selenium was provided outside of a rat's intestines, it could still check the growth of cancer cells planted in the rat. Experiments on cancer-causing chemicals report that if rats eat the food with 1-2 ppm selenium, their cancer incidence will go down by 30 to 40 percent; little rats drinking the water with 1-2ppm sodium selenite, their tumor incidence will decrease by 70 percent (12).

The findings from "Thirty-Eight Cases on Selenium Content in the Hair of Leukaemia Patients": the selenium content in the hair of the control group (healthy people) is $0.762\pm0.279$; the selenium content in the hair of acute leukaemia patients is $0.515\pm0.216$, $P<0.001$. This disparity is significant. It shows that these patients had long been in the state of low selenium. This finding is also consistent with the clinic tests by Yu Daowen and others, which indicate that the selenium contents in the

10

marrow and blood of leukaemia patients are lower than that of the control group. Their findings further confirmed other reports that selenium can cure and check cancers (including leukaemia). The theory behind the findings is that when selenium content is insufficient, the human body tends to be more susceptive to cancer-causing factors (17).

More studies indicate that selenium will stimulate the growth of immunoglobulin and antibody and thus strengthens the human immune system against diseases. An experiment proves that the immunoglobulin content in the little rats fed with selenium is 20 to 30 times more than that of the control group fed no selenium (21).

An epidemiologist at the Arizona Cancer Center and a selenium scholar Larry Clark tested the anti-cancer effect of selenium additive in human body. Their clinic reports state that they collected statistics on 1300 people who took 200ug selenium daily for five years. Their incidence of lung cancer was reduced by 46 percent, large intestine and rectum by 58 percent, prostate cancer by 63 percent. Even if a selenium taker is sick from cancer, he or she has 50 percent more chance to survive (18).

The experiments above and the related data all illustrate the functions of selenium to inhibit cancers caused by chemicals, virus, fungus and other hazardous elements, its effect on the gene and the immune system, as well as the results of applying selenium and GSH-PX to clinic trials. Our studies further prove that with our extra adjuvant, the effect of the health pill will multiply.

b. Selenium-Antioxidant and Cardiovascular Disease:

The close correlations between selenium and the structure, functions and causes of cardiovascular disease have drawn the attention of the world. In the United States, Finland and other countries the incidences of coronary heart disease and hypertension in the area with high selenium are both lower than that in the area with low selenium (19). The same pattern was shown in the incidences of brain thrombus, rheumatic heart disease, chronic endocarditis, and the whole body arteriosclerosis. A report from Finland also proves that the selenium content in the blood and blood serum of

11

myocardial impaction patients are lower than that of healthy people; selenium is effective in treatment of cardiovascular disease (20).

Fleet points out that selenium and vitamin E are important to the structures and functions of myocardial fibrous, arterioles and capillaries of many animals (30). Huang Bixia and others report that selenium content affects the activity of the enzyme in the microsomes of the liver. It therefore directly affects the catabolism of cholesterol in the human body. Lack of selenium will decrease HDL-C, thus lowering the ratio of HDL-C to the total quantity of cholesterol. Furthermore, lack of selenium will decrease the activity of HDL-C and thus increase the content of lipidic peroxide. These are dangerous factors causing coronary atherosclerosis; if cerebral embolism occurs, the damage on nerve cells is related to free radicals and to the form of lipidic peroxide. Normally brain thrombus patients have lower level of selenium (25). Some Finnish medical experts found that taking the anti-oxidant vitamin C and vitamin E for at least three years will effectively prevent arteriosclerosis, especially the cervical vertebra arteriosclerosis, an important factor of stroke, for male smokers. Their experiments indicate that the arteriosclerosis level of those patients who took vitamin E and vitamin C is only 45 percent of that of those who did not; three quarters of men who took vitamin E and vitamin C eased their level of arteriosclerosis (29).

The studies by Dr. John Ots prove: A smoker's thrombocyte is more likely to coagulate, thus prompting the incidence of heart attack and stroke. This is because smoker's thrombocyte tends to discharge a sticky material that will block arteries. He also believes that VB6 affects the catabolism of fat. Lack of VB6 will cause atherosclerosis. The reason for VB6 to prevent thrombus is related to its special combination with the albumen on the surface of thrombocyte, its participation in the transformation with sugar, amino acid and catabolized enzyme, and its function to prevent thrombocyte from coagulating (26). The circle of medical science has generally recognized the contribution made by nicotinic acid to cardiovascular disease and has made it, with vitamin C or inositol, a patent medicine on the market.

c.  Selenium, Other Anti-Oxidants and Respiratory Diseases:

Selenium and other anti-oxidants also have excellent effect on respiratory diseases. An expert at Connell University and a Chinese scholar point out that a diet rich in anti-oxidants will strengthen lung functions and prevent respiratory diseases such as asthma, pulmonary emphysema and chronic bronchitis. The effect of these anti-oxidants on the lung has a lot to do with smoking. The experts also state that taking in B-carotin with selenium and high dosage anti-oxidants is a very good way to prevent cells from damages by hazardous biochemical elements (28). A medical study took 18,162 adults as their samples to examine the relationship between the ingredients (we adopted in our health pill) of their diet and their blood and their lung functions in a period of six years. The experts found strong evidence to prove, through comparing the variables such as gender, age, bodily fat, race, income, and smoking or non-smoking behavior, that these ingredients are closely related to these adults' lung functions. Their findings also indicate that those natural ingredients in food are not as effective on smokers' lung functions as that of their chemical counterparts (such as vitmin C and E) on both smokers and non-smokers (28).

d) Selenium and Other Smoking Related Diseases:

In addition, this health pill also prevents other smoking related diseases such as premature aging, weak immunity, tobacco amblyopia, mouth leukoderma and other diseases caused by harmful radioactive material in tobacco smoke.

e) Our Creative Invention:

Over the past 30 years selenium and its compound GSH-PX have displayed wonderful performances in animal and clinic experiments in various countries, but the activity of GSH-PX decreases because of oxidization other factors. Even with the supplement of selenium, GSH-PX will not resume its activity due to a series of chemical reactions such as oxidization, replacement, resolve, and counteraction. GSH especially loses its function as an anti-oxidant after it is changed into an oxidant GSSG.

We tackled the essential problem: how to reduce GSSG back to GSH. We believe we could not just mix more GSH with glutamic acid, cysteine and glycine. Instead,

13

we must find a synthetase and reduce the oxidized GSSG in the human body. GSSG is an oxidized enzyme protein, a complicated complex. Though we knew there is GSSG-R (GSSG's reductase) in the human body, it is not active enough. We knew we were in need of a strong co-enzyme as catalyst to reduce GSSG back to GSH.

After a long search and study, we finally found a co-enzyme to reduce GSSG back to GSH. We were greatly encouraged by this finding. With this co-enzyme, we could resume the activity of GSH in every way. Moreover, in case GSSG-R is insufficient, the two components in riboflavin in the health pill – flavin mononucleotide (FMN) and flavin adenine dinucleotide (FAD) – will resume the activity of GSSG-R to the normal level. We believe this is a breakthrough in generating an unfailing effect to prevent smokers from getting various smoking related diseases. For the preparation for the health pills, see Table 2

3. The Causes of Addiction and Our Invention in Smoking Cessation:

It is a consensus of medical experts that when nicotine enters the human brain, brain cells will release a great deal of dopamine and glutamic acid, the major causes of addiction to cigarettes (or addiction to other drugs) (22, 23, 24). An expert from Virginia Institute of Technology reports that they have separated a compound from tobacco, which will inhibit monoamine oxidase (MAO), a major enzyme in the brain to resolve dopamine (27); another series of research papers from a state lab in New York City indicate that the MAO concentration in a smoker's brain is 40 percent lower than that of a non-smoker. This is the reason why a smoker has higher dopamine content in the brain than a non-smoker (27). Some researchers from Columbia University state in "Science" magazine that when nicotine enters the brain, it greatly increases the release of glutamic acid in the brain. They detailed the reasons why it is an accomplice in causing nicotine addiction (24).

The United States and Canada are doing clinic experiments on γ- VINYL GABA, GVG, a medicine produced by Aventis in Europe for children's epilepsy, to see if it could be used to detoxicate tobacco smoke and facilitate smoking cessation. GVG may reduce the dopamine in the smoker's brain and thus help him/her break the

addiction to dopamine. We believe, however, that it will not be enough to only reduce dopamine in the brain, because glutamic acid, through decreasing MAO's activity, makes it harder to resolve and inactivate dopamine. Glutamic acid might be one of the causes that stabilize the addiction to dopamine and other drugs. Furthermore, glutamic acid will also damage brain cells and cause the death of brain cells. In addition, iron, if over taken or stored in the human body, will also release glutamic acid in the brain. Excessive iron may be stored in the body for many reasons: Some people tend to supplement too much iron to cure anemia. Some people cook in pots or pans made of iron, drink too much beer or grape wine, or who have iron residue caused by excessive blood transfusions, or indigestion by intestine. Furthermore, there are other factors causing the release of glutamic acid. For instance, lack of vitamin B6 and nicotinic acid will increase the pathologic absorption of iron; lack of vitamin E and other anti-oxidants will cause iron chronic poisoning. Not only will these factors cause more glutamic acid in the brain, they will also cause other diseases. To eliminate the addiction to nicotine, therefore, we must appropriately reduce dopamine, glutamic acid, and at the same time reduce the excessive iron in the human body. We adopted the following three methods:

(a) Strengthening MAO's activity with Copper Compound and Enhancing Copper's function with Manganese Compound:

Since glutamic acid lowers the copper content in the brain and copper is an important component of MAO, glutamic acid, therefore, may decrease the activity of MAO. [Kong Xiangrui reports that glutamic acid injection will lower the copper content in human blood serum (6. p. 173)].

To supplement copper and manganese compound, however, is not easy, because they are metal oxidants, which may counteract with the majority of the anti-oxidants in the health pill. Furthermore, several hours after copper compound enters the human body, it will compound into ceruloplasmin in the liver. This ceruloplasmin, however, cannot go through the blood-brain barrier to increase copper. Later we came up with the idea of adding copper and manganese into the cut tobacco. When the smoker lights up, he/she will absorb the metals through

his/her respiratory tract. Thanks to the minim quantity of the copper and manganese as catalysts, there is no problem in safety. Our design is based on the knowledge that dopamine could go through two paths of catabolism, but both need the decomposition of MAO and the ultimate outcomes of both is the same organic acid. We thus had a good grasp of the chemical formulas of their catabolism.

(b) Use Vitamin B6 (changed into pyridoxal 5 –phosphate in the human body) as the Co-Enzyme for Glutamic Acid's Decarboxylation:

The chemical formulas to decarboxylate glutamic acid and change it into γ-aminobutyric acid (GABA) are as follows:

$$
\begin{array}{ll}
\text{COOH} & \text{COOH} \\
| & | \\
\text{CH}_2 & \text{CH}_2 \\
| & | \\
\text{CH}_2 \xrightarrow[\text{(Pyridoxal 5-phosphate)}]{\text{GAD}} & \text{CH}_2 \quad +\text{CO}_2 \\
| & | \\
\text{H--C--NH}_2 & \text{CH}_2\text{NH}_2 \\
| & \\
\text{COOH} &
\end{array}
$$

Glutamic acid                    γ-Aminobutyric acid, GABA

The distribution of GAD in the nervous system parallels with the content of GABA. In other words, where GAD is active, so is GABA. With sufficient vitamin B6 taken in, the chemical reactions above will proceed smoothly. In this way, a dramatic situation thus occurs: The negative functions caused by glutamic acid—damaging brain cells to death, decreasing the activity of MAO, stabilizing the addiction to nicotine or drugs – will be changed into positive functions such as protecting brain cells and resuming their functions, sobering the patients from the faint caused by carbon monoxide or uremia. The main positive function, however, is the decrease of addiction. In addition, GABA also will combine with ammonia in the blood caused by smoking to form urea to be discharged out of the human body.

16

(c) Control the Iron Taken-In and Stored:

Since excessive iron will release glutamic acid in the human brain, we also had to control the iron content in the human body. Our healthy pill includes some ingredients to keep iron along its regular path of catabolism and prevent excessive iron from being stored in the human body; VA, VE, VC and a bit of copper and manganese compound will all turn iron into another type of iron easy tb be catabolized and discharged out of the human body while the nicotinic acid and VB6 in the health pill prevents pathological absorption of excessive iron.

## REFERENCES

(1) Sat Sharma, "Nicotine Addiction," University of Manitoba, www. Emedicine.com/med/topic1642.htm#section~bibliography, Jan. 21, 2003.

(2) Eric Lichtblau, "U.S. Seeks $289 Billion in Cigarette Makers' Profits," Washington Post, March 17, 2003.

(3) "AMA Calling for Eliminating Nicotine from Tobacco," World Daily, June 19, 1998.

(4) Xie Huimin, et al. "Knowledge on Vitamines," People's Health Publishing House, 1985, p.98.

(5) Intelligence Institute of Shanghai Chemical Industry, "Rare Earth Applied to Catalyst," 1982, p.7-9.

(6) Kong Xiangrui, "Essential Trace Element: Their Nutrition, Physiological and Clinic Significance," Anhui Science & Technology Publishing Society, 1982. p.296; p.300-301; p.173.

(7) Zhou Ziyong, et al. "A New Handbook on Common Medicines," Gold Shield Publishing House, 1995, p. 274.

(8) Shanghai First Academy of Medical Science, et al. "Biochemistry Applied to Medicine," First Vol, 1979, p.757.

(9) An Interview with Dr. Denham Harman – Father of the Free Radical Concept of Disease, Life Extension Magazine Jan. 1998 at http://www.lef.org/magazine/mag98/jan-interview98.html

(10) Armstrong, Clare "Recommended Dietary Allowance (RDA), " National Academy of Sciences; 10th ed., 1989.

(11) Bogen J.D. etal: JNCL, 66:27, 1981.

(12) Xue Junwu, "Foreign Medical Science," Edition on Ear, Nose and Throat, Vol. 1, 1987. p. 7, 8.

(13) Jocobs M,et al: "Inhibitory Efforts of Selenium on 1,2-Dimethyl-hydrazing and Methlazoxymthanol Acetate Industry of Colon Tumors, Cancer Hett," 2:133, 1977.

(14) Ip C.Factos: "Influencing the Anticarcinogenic Efficacy of Selenium in Dimethyl-Benz (a) Anthracene-Induced Mammry Tumorigensis in Rats, Cancer Res," 41:2683, 1981.

(15) Shanghai Broadcast Station: "Hygiene and Health," Jan. 3, 1990.

(16) Yu Shuyu, "Trace Element," 1989, Vol. 3, p. 27.

(17) Yu Daowen, "Trace Element," Vol. 4, 1988. p. 43.

(18) Larry Clark, "Selenium Reduces the Danger of Cancer," Journal of American Medical Association. Dec. 5, 1996.

(19) Robinson MF: Am J Clin Nutr. 32: 1477, 1979.

(20) Frost D V, et al: "Ann Rev Pharmacal," 15:259, 1976.

(21) George E. Berkley, "Cancer: How to Prevent It & How to Help Your Doctor Fight It," translated by Chen Zuhui, et al; Prentice-Hall, Inc., 1978. p. 65.

(22) Overseas Chinese, "The Substance Inducing Brain to Take Drugs," May 29, 1999.

(23) A Paper by Brooklyn State Lab republished by Xinming Evening Post, March 4, 1996, p.5.

(24) Chen Zonglun, "Uncover the Myth of Nicotine Addiction," Translated News in Science and Technology, Oct. 25, 1995.

(25) Huang Bixia, "Trace Element," Jan, 1989, p.18.

(26) Wu Qiushen, Xinming Evening Post, Aug. 17, 1988 (6).

(27) U.S.-Sino Medical Science Website @aol.com, " Tobacco and Chinese Medicine: A Compound against Parkinson's Disease," April, 2000.

(28) "Anti-Oxidant Diet Strengthens Lung Functions," World Daily, April 19, 1998, A 1.

(29) U.S.-Sino Medical Science Website @aol.com, "Vitamins Compound Prevents Arteriosclerosis," Feb.6, 2001.

(30) Fleet JF et al, Lab Invest, 37: 201. 1977.

18

**TABLE 1**
PRESCRIPTION, PREPARATION & USE
OF THE LIQUID ADDITIVE TO TOBACCO
(ACA-104-1)

| Order of Sprinkle | Components & Concentration of Ingredients | Quantity (3) Content Range % (Per 100g Tobacco) | Preparation |
|---|---|---|---|
| | Tween-80 | 0.7-15ml | Dissolve them for use later; label the solution as A. |
| | Hot water (55-60°C) | 50-100 ml | |
| (1) | Cerium dioxide | 7-134mg | Dilute sulfuric acid to 20% solution, take out 6.665ml solution ($H_2SO_4$1.333ml), into which put 44.45mg of $CeO_2$, stir them for use later; label this solution as B; |
| | Sulfuric acid (5%-20%) V/V | 0.2-10 ml | |
| | Selenium dioxide | 0.4-8mg | Dissolve 2mg selenium dioxide into 1ml water; |
| | B-cyclodextrin | 0.1- 4 g | Put 1.85g B-Cyd into 100ml water at 50-60°C; Take out 12.973 ml (which equals B-Cyd 0.24g) to mix the $SeO_2$ sol. above; stir till all dissolved; label it as Solution C; Put the A, B, C three solutions above together, stir them thoroughly; sprinkle them onto 100 g tobacco; blend them thoroughly and put it aside for 30 minutes; |
| (2) | Hydrogen peroxide (3% or 6%) | 30-600 ml | Sprinkle 3% Hydrogen peroxide 167 ml onto 100 g tobacco above, blend them thoroughly and stir it for 30 minutes; |
| (3) | *Potassium permanganate | 15-150 mg | Dissolve $KMnO_4$ to 1% solution; take out 4.445 ml (which equals 44.45 mg $KMnO_4$); Dilute Sulfuric acid to 5% solution; take out 6.66 ml (which equals 0.333 ml $H_2SO_4$); label this solution as D; |
| | *Cupric Sulfate | 45--400 mg | Dilute $CuSO_4$ to 5% solution; take out 2.666ml (which equals 133.33 mg $CuSO_4$); label this solution as E; Mix D with E; and stir them thoroughly for use later; |
| | Cupric Oxide B-cyclo-dextrin | 20--270 mg 0.1-4 g | Grind fine CuO (66.67mg) and activated $MnO_2$ (33.335mg); Dissolve 1.333 g B-Cyd into 72.054 ml hot water, into which put the above CuO and |

| | Activated Manganese dioxide | 10--100 mg | $MnO_2$; grind (with motor grinder) and stir them for an hour or more till it becomes a thin paste; label it as F; |
|---|---|---|---|
| | | | Mix D, E, F together and sprinkle it onto the 100 g tobacco above; stir them. ₁₂₄₄ₘₗ |
| (4) | 3% hydrogen peroxide | 30-600 ml | Directly sprinkle Hydrogen peroxide onto the tobacco above; blend them thoroughly at 40-45 °C for 2.5 hours; *<br>Add the essence and seasoning condiments for making cigarettes; stir it while baking till it reaches the moisture required. |

Note:

1. After this liquid additive is sprinkled onto the tobacco and is thoroughly mixed with tobacco, the PH value of the tobacco juice should be 5 to 7.

2. The ingredients marked by * are also part of the prescription to eliminate the smoking addiction. The rest for this function is listed in the prescription of the health pill.

3. We assume each cigarette contains 0.75g tobacco.

TABLE 2
PRESCRIPTION, PREPARATION & USE
OF THE HEALTH PILL ENCLOSED IN CIGARETTE PACK
(ACA-104-2A, B)

| Kind | Name of Components | Quantity Content (per 100g tobacco) Range % | Preparation | Signature (Sig.) |
|---|---|---|---|---|
| (A) | *Sodium selenite | 0.2- 14.6 mg | Dissolve $Na_2SeO_3$ (3.65 mg) in 1 ml water; | Dose of orange pill: For those who smoke 20 cigs daily, take 2 pills before eating in the morning or half an hour before smoking; Take 2 pills one hour after lunch; |
| | B-cyclodextrin (1.85%) | 0.5-30 ml | Add 2 ml B-Cyd (1.85%) to the above solution; stir them thoroughly; | |
| | *Vitamin E | 0.2 –10 g | | |
| | *Vitamin A | 3-35 mg | Grind them fine | |
| | Butylated hydroxytoluene | 0.3 –27 mg | | |
| | Riboflavin | 7-200 mg | | |
| | *Nicotinic acid | 7-2000 mg | Mix them; | |
| | *Pyridoxine hydrochloride | 33-2000 mg | | |
| | | | Mix all the above thoroughly and make four orange coated pills. | For those who smoke 10 cigs daily, take 1 pill twice a day at the same time as stated above. |
| (B) | *Ascorbic acid | 0.07-6 g | Make two white-coated pills with 400 mg ascorbic acid.. | Dose of the white pill: For those who smoke 20 cigs daily, take 2 pills one hour after the last cig before the bedtime. For those who smoke 10 cigs, take 1 pill at the time stated above. |

Appendix 2

# 上海市化学品毒性检定所

## 测 试 报 告

沪化毒检字（　　）第　　号

测试项目：模拟吸烟烟雾中生油和烟碱含量比较

送检单位：委托测试

送检日期：92-5-6　　测试日期：92-5-11　　报告日期：92-5-11

送检样品：加和不加 AC102 牡丹牌香烟

样品一般性状和用途：

试验方法：

　　将模拟吸烟烟雾溶于酒精溶剂中，分别直接或加入硅鹤酸后，用 UV240 ee 色计，在 λ=380 mm 条件下，以 ee 色法，测定加 AC102 和不加 AC102 香烟烟雾中生油和烟碱溶液的光密度。

*Appendix  2*

测试结果：

加和不加AC₁₀₂意义国烟气中焦油和烟碱含量比较 (COD)

|  | 不加AC₁₀₂ | 加AC₁₀₂ |
|---|---|---|
| 焦油 | 1.970 | 0.768 |
| 烟碱 | 1.908 | 0.359 |

结果评价：

经AC₁₀₂处理后意义烟 烟气中焦油含量较未经
AC₁₀₂处理意义国降低 61.02%

经AC₁₀₂处理意义烟 烟气中烟碱含量较未经
AC₁₀₂处理意义烟降低 81.18%

测试者：

审核者：



上海市化学品毒性验定所

92 年　月　日

注：1.本报告不作为产品广告的依据。
　　2.本报告仅为单项指标的测定结果，产品安全性尚需另作综合评价。
　　3.测试结果以送检样品为准。

2

**Note**:

The ingredients marked by * are also part of the prescription to eliminate addiction. Other ingredients for this function are listed in the prescription of the liquid additive.

**Contraindications**:

1) Pregnant women are inhibited from taking these pills;

2) While taking these pills, the smoker is inhibited from drinking alcohol, because alcohol will decrease the effect of the health pill or cause some physical discomfort. The smoker may drink one cup of light alcohol three hours before or after taking the pills, but drinking alcohol is allowed no more than one time a day. 但有肝病或胃病患者忌禁酒.

**Remarks**: With riboflavin in the pill, it is normal for the consumer to find his/her urine green-yellowish.

CLAIMS:

What we claim as our invention is as follows:

1.  A liquid additive and a supplementary health pill with comprehensive and multi-functions for making a new type of cigarette:

    The functions of the additive and health pill include reducing toxicity in tobacco smoke, strengthening the health of smokers, and gradually eliminate the addiction to nicotine to quit smoking. These functions are interrelated and work in coordination.

2.  Reducing toxicity on a broader scale and by a larger margin:

    The liquid additive will reduce the toxicity in tobacco smoke such as nicotine, tar (including polycyclic aromatic hydrocarbons represented by 3, 4 benzo(a)phrene), carbon monoxide, nitric oxide compound, hydro cyanic acid, cadmium, mercury, arsenic, as well as the particular nitrosamine in tobacco; For instance, this additive will reduce nicotine by 90% to 97% (50% more reduction than "light" cigarettes), tar by 75% to 85% (25% more reduction than "light" cigarettes).

    In light of the Claim 2 above, we designed the following compositions and contents of the liquid additive for 100 grams of tobacco:

| Components | Content |
| --- | --- |
| Tween-80 | 0.7-15ml |
| Hot water (55-60°C) | 50-100 ml |
| Cerium dioxide | 7-134mg |
| Sulfuric acid (5%-20%) V/V | 0.2-10 ml |
| Selenium dioxide | 0.4-8mg |
| B-cyclodextrin | 0.1- 4 g |
| Hydrogen peroxide (3% or 6%) | 30-600 ml |

23

| | | |
|---|---|---|
| ✳ | Potassium permanganate | 15-150 mg |
| ✳ | *Cupric Sulfate | 45--400 mg |
| | Cupric Oxide | 20--270 mg |
| | Activated Manganese dioxide | 10--100 mg |

Note: The components with * are those also for the function of eliminating smoking addiction.

3. Preventing more diseases and strengthening health more effectively:
   This health pill is designed to repair the damages at a molecule or cell level, wipe out free radicals, and resolve peroxide in order to protect the structures and functions of cell and cell membrane. It can prevent a broad scope of diseases including various cancers, cardiovascular diseases, respiratory diseases, and other smoking related diseases and problems. We creatively apply a co-enzyme to resuming the activity of glutathione peroxidase (GSH-PX) so as to guarantee its unfailing effect in reducing tobacco toxicity and preventing diseases.

   In light of the Claim 3 above, we designed the following components and contents of the health pills for 100 gram of tobacco (about 20 cigarettes x 6.667 packs):

| Components | Contents |
|---|---|
| Sodium selenite | 0.2-14.6 mg |
| B-cyclodextrin (1.85%) | 3.5-67 ml |
| *Vitamin E | 0.2-10 g |
| *Vitamin A | 3-35 mg |
| Butylated hydroxytoluene | 0.3-27 mg |
| Riboflavin | 7-200 mg |
| *Nicotinic acid | 7-2000 mg |

24

*Pyridoxine hydrochloride                    33-2000 mg

The components above are for coated pill ACA104-2A and the following is for coated pill ACA 104-2B:

Components                              Contents

*Ascorbic acid                          0.07-6 g

Note: The components with * are those also for the function of eliminating smoking addiction.

Dose: For those who smoke 20 cigs daily, take 2 pills before eating in the morning or half an hour before smoking; take 2 pills one hour after lunch.

For those who smoke 10 cigs daily, take 1 pill twice a day at the same time as stated above.

4.  Eliminating addiction safely and effectively:
    Since nicotine releases a great deal of dopamine and glutamic acid in the human brain, which are the major causes of addiction, we designed three channels to decrease dopamine and glutamic acid by using a) copper compound & manganese compound to strengthen MAO's activity; b) VB6 to turn glumatic acid to γ-aminobutyric acid (GABA); c) VA, VE, VC and other anti-oxidants to prevent excessive iron in the body from releasing glutamic acid in the brain. It is a more scientific, effective and safer way in smoking cessation than using nicotine replacement products.

ADDITIONAL CLAIM:  *(note)*:

When necessary, this invention can be divided into three parts -- toxicity reduction, health enhancement, and addiction elimination. Each part can be an independent claim.

ABSTRACT OF THE DISCLOSURE:

This invention is a preparation with comprehensive and multi-functions -- for reducing the toxicity in cigarette smoke, strengthening smokers' health and eliminating their addiction to smoking. More specifically, the liquid additive is designed to lower the toxin level in tobacco smoke on a broader scale and by a larger margin; the health pills, with their unfailing nutritious effect guaranteed, can fundamentally prevent smokers from getting various smoking related diseases; both the liquid additive and the health pills can also resolve and inactivate the addiction-causing substances in the human brain so as to help smokers quit smoking.

Att. 19

89-20 55TH Ave. Apt. 5E
Elmhurst, NY 11373
Phone: 718-205-8095
Cell Phone: 646-826-9930
U.S.A.

United States Patent and Trademark Office
Alexandria, VA 22313
U.S.A.

**Re: Application Number: 10/681,103**

This is to authorize the major inventor Dehou Fei and applicant Faye Zhengxing to complete the patent application as numbered above in the United States on behalf of the following inventors (Zhengping Fei, Lifan Fei[1] and Jolly Zhou).

Dehou Fei and Faye Zhengxing are entrusted to work through the application process and do whatever necessary or required to obtain the patent certification for this invention to enhance smokers' health through reducing tobacco toxins, strengthening smokers' immunity, and eliminating smokers' addiction.

Sincerely,

Zhengping Fei          Lifan Fei          Jolly X. Zhou

Date: 7/31/07

---

[1] Since Mingyan Hu passed away in December 2004, her son Lifan Fei replaced her as one of the applicants.

*Att. 20*     13 14

08-03)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

| **DECLARATION FOR UTILITY OR DESIGN PATENT APPLICATION (37 CFR 1.63)** | Attorney Docket Number | |
|---|---|---|
| | First Named Inventor | *DeHou Fei* |
| | *COMPLETE IF KNOWN* | |
| | Application Number | |
| ☑ Declaration Submitted With Initial Filing  **OR**  ☐ Declaration Submitted after Initial Filing (surcharge (37 CFR 1.16 (e)) required) | Filing Date | *10/9/03* |
| | Art Unit | |
| | Examiner Name | |

I hereby declare that:

Each inventor's residence, mailing address, and citizenship are as stated below next to their name

I believe the inventor(s) named below to be the original and first inventor(s) of the subject matter which is claimed and for which a patent is sought on the invention entitled

*Preparations for Cigarette Toxicity Reduction, Health Enhancement, and Addiction Elimination*

(Title of the Invention)

the specification of which

☑ is attached hereto

**OR**

☐ was filed on (MM/DD/YYYY) _____ as United States Application Number or PCT International

Application Number _____ and was amended on (MM/DD/YYYY) _____ (if applicable)

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment specifically referred to above.

I acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR 1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

I hereby claim foreign priority benefits under 35 U.S.C. 119(a)-(d) or (f), or 365(b) of any foreign application(s) for patent, inventor's or plant breeder's rights certificate(s), or 365(a) of any PCT international application which designated at least one country other than the United States of America, listed below and have also identified below, by checking the box, any foreign application for patent, inventor's or plant breeder's rights certificate(s), or any PCT international application having a filing date before that of the application on which priority is claimed

| Prior Foreign Application Number(s) | Country | Foreign Filing Date (MM/DD/YYYY) | Priority Not Claimed | Certified Copy Attached? Yes | No |
|---|---|---|---|---|---|
| *03151012.4* | *China* | *9/17/03* | ☑ | ☐ | ☐ |
| | | | ☐ | ☐ | ☐ |
| | | | ☐ | ☐ | ☐ |
| | | | ☐ | ☐ | ☐ |

☑ Additional foreign application numbers are listed on a supplemental priority data sheet PTO/SB/02B attached hereto.

[Page 1 of 2]

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 21 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2*

PTO/SB/05 (04-03)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## UTILITY PATENT APPLICATION TRANSMITTAL

*(Only for new nonprovisional applications under 37 CFR 1.53(b))*

| | |
|---|---|
| Attorney Docket No. | |
| First Inventor | *Dehou Fei* |
| Title | *pharmacist* |
| Express Mail Label No. | |

### APPLICATION ELEMENTS
See MPEP chapter 600 concerning utility patent application contents.

**ADDRESS TO:** Mail Stop Patent Application
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

1. ☑ Fee Transmittal Form (e.g., PTO/SB/17)
   *(Submit an original and a duplicate for fee processing)*
2. ☑ Applicant claims small entity status.
   See 37 CFR 1.27.
3. ☑ Specification    [Total Pages ___]
   *(preferred arrangement set forth below)*
   - Descriptive title of the invention
   - Cross Reference to Related Applications
   - Statement Regarding Fed sponsored R & D
   - Reference to sequence listing, a table, or a computer program listing appendix
   - Background of the Invention
   - Brief Summary of the Invention
   - Brief Description of the Drawings (if filed)
   - Detailed Description
   - Claim(s)
   - Abstract of the Disclosure
4. ☐ Drawing(s) (35 U.S.C. 113)    [Total Sheets ___]
5. Oath or Declaration    [Total Sheets 3]
   a. ☐ Newly executed (original or copy)
   b. ☐ Copy from a prior application (37 CFR 1.63(d))
      *(for continuation/divisional with Box 18 completed)*
      i. ☐ DELETION OF INVENTOR(S)
      Signed statement attached deleting inventor(s) name in the prior application, see 37 CFR 1.63(d)(2) and 1.33(b).
6. ☑ Application Data Sheet. See 37 CFR 1.76

7. ☐ CD-ROM or CD-R in duplicate, large table or Computer Program (Appendix)
8. Nucleotide and/or Amino Acid Sequence Submission:
   *(if applicable, all necessary)*
   a. ☐ Computer Readable Form (CRF)
   b. Specification Sequence Listing on:
      i. ☐ CD-ROM or CD-R (2 copies); or
      ii. ☐ Paper
   c. ☐ Statements verifying identity of above copies

### ACCOMPANYING APPLICATION PARTS
9. ☐ Assignment Papers (cover sheet & document(s))
10. ☐ 37 CFR 3.73(b) Statement    ☐ Power of
    *(when there is an assignee)*    Attorney
11. ☐ English Translation Document (if applicable)
12. ☐ Information Disclosure    ☐ Copies of IDS
    Statement (IDS)/PTO-1449    Citations
13. ☐ Preliminary Amendment
14. ☐ Return Receipt Postcard (MPEP 503)
    *(Should be specifically itemized)*
15. ☐ Certified Copy of Priority Document(s)
    *(if foreign priority is claimed)*
16. ☐ Nonpublication Request under 35 U.S.C. 122
    (b)(2)(B)(i). Applicant must attach form PTO/SB/35 or its equivalent.
17. ☑ Other: *Supplemental prior my Data sheet, Certified copy attached*

**18.** If a CONTINUING APPLICATION, check appropriate box, and supply the requisite information below and in the first sentence of the specification following the title, or in an Application Data Sheet under 37 CFR 1.76:

☐ Continuation    ☐ Divisional    ☐ Continuation-in-part (CIP)    of prior application No.: ___

Prior application information:    Examiner ___    Art Unit ___

For CONTINUATION OR DIVISIONAL APPS only: The entire disclosure of the prior application, from which an oath or declaration is supplied under Box 5b, is considered a part of the disclosure of the accompanying continuation or divisional application and is hereby incorporated by reference. The incorporation can only be relied upon when a portion has been inadvertently omitted from the submitted application parts.

### 19. CORRESPONDENCE ADDRESS

☐ Customer Number: ___    OR  ☑ Correspondence address below

| | |
|---|---|
| Name | *Dehou Fei* |
| Address | *2236 10th Ave. Apt. 5H* |
| City | *New York* |   State *N.Y.*   Zip Code *10034* |
| Country | *U.S.A* |   Telephone *212-567-2713*   Fax *212-567-2713* |
| Name (Print/Type) | *Dehou Fei* |
| Signature | *Dehou Fei* |   Registration No. (Attorney/Agent) ___   Date *10/9/03* |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stop Patent Application, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

8/2/07

3736 10th Ave. Apt. 2H
New York, NY 10034
Phone & Fax: 212-567-2713
Cell Phone: 646-826-9930

*Att. 21*

Re: Application No: 10/681103

Dear Examiner John Pak:

Since we included our position on your recent restriction requirements and our request for Director's actions in the Petition to Director, we decided to attach this Petition to Director as our reply to your last restriction requirement. We stand by our amended claims which passed your examination in 2005 and we offer two options to resolve this case.

We made a few minor changes in the Specification such as changing "Appendix" to "Table" and corrected the spelling of the word "cysteine" as you requested.

Let's unite to ensure that the US law and American science will serve our people and this country as effectively as the US Constitution defines. If you need further information, please feel free to contact us at the address above. Thank you.

Sincerely,

*Dehou Fei*
Dehou Fei, Major Inventor

*Faye Zhengxing*
Faye Zhengxing, Ph.D.

# SUMMARY OF THE INVENTION

Att. 22

## Preparations for Cigarette Toxicity Reduction, Health Enhancement & Addiction Elimination

### Major Inventor Dehou Fei (Pharmacist)
### Sept. 15, 2004

I.    Three Comprehensive Functions:

This invention consists of two parts: The first part is a liquid additive named "ACA-104-1." It is an additive sprinkled into the cut tobacco in the process of cigarette manufacture to reduce the toxins in tobacco smoke; the second part includes two kinds of health pills enclosed in a 20-cigarette pack – four red coated pills called "ACA-104-2A" and two white coated pills called "ACA-104-2B." Both pills can prevent smokers from getting all major smoking related diseases.

These preparations are designed to serve three comprehensive functions – **toxicity reduction, health enhancement, and addiction elimination**. While applying for a patent both in the United States and China, we proved our invention unprecedented through a thorough search throughout the world. Our invention has smoothly passed the preliminary examination at China's Patent Bureau. The US Patent and Trademark Office also has recognized our priority of foreign patent application by issuing us a license. Now the US Patent and Trademark Office is processing our application and has informed us of the date of publication.

The components of the liquid additive and the health pills are all within the scope of "Conventional Food and Dietary Supplements" defined by the US Food and Drug Administration since the cigarette falls into the category of food.

II.   Five Major Advantages:

1.  The liquid additive (ACA-104-1) will effectively reduce the toxins in more chemicals in tobacco smoke and by a bigger margin:
    Among the 4000-odd chemical compositions in tobacco smoke, 40 are obviously harmful to the human body. The 7 most hazardous ones, however, are tar, nicotine (including its derivatives), carbon monoxide, nitric oxide compound, cyanhydric acid, radioactive materials, and harmful metals and semi-metals such as cadmium, mercury, and arsenic.

    Our additive and health pills will reduce or dissolve the toxins at various degrees. For instance, while our liquid additive will reduce the toxicity in tar by 75-85% (25% more reduction than that in a well-known brand of light cigarettes), some ingredients in the health pill can dissolve almost completely the rest carcinogenic polyene hydrocarbon epoxides left in the tar. In addition, this liquid additive will also reduce nicotine by 90 to 97% and change it into a component good to human health, thus

1

preventing the occurrence of TSNA, a potent carcinogen formed by nicotine and nitrosamine.

2. <u>Our health pills will effectively prevent smokers from getting all major smoking related diseases</u>:
   In selecting the components for the health pills, we referred ourselves to a great deal of data drawn from various experiments, studies or clinic researches, as well as to our own experiences. We based our selections on the effect of these components on human cells and genes, human nutrition levels and immune systems, as well as on related clinic results, thus maximizing the preventive coverage of the health pills. To ensure the unfailing effect of the health pills, we creatively adopted a chemical compound to repair and revitalize the major components whose functions might be weakened during the extensive chemical changes.

   We enclose the health pills in the 20-cigarette pack to facilitate smokers' timely consumption of the right dosage.

3. <u>Our invention will reduce smoker's addiction for their final smoking cessation</u>:
   Since nicotine releases a great deal of components in the human brain that cause a smoker's addiction, our invention includes a set of effective ways to appropriately catabolize and inactivate these addictive components through transformation of enzymes and other biochemical changes in the human body. (We have a good grasp of the paths of the catabolism and chemical structures). With their determination or willpower, the smokers, after a period of using the new cigarette, will be able to quit smoking completely. We name the new cigarettes empowered by our invention "ACA-104-2."

4. <u>The functions of this invention can be separated and combined to fit special needs</u>. To cater to some smokers who do not intend to quit, we will also enhance their health by focusing on only two functions -- providing them with toxin reduced cigarettes and health pills. The new product is especially good for teenagers and youngsters, women or moderate smokers. With these double protections, this kind of new cigarette will greatly reduce the harm of smoking. We name it "AC-103."

5. <u>Advantages in the manufacture of the new cigarettes</u>:

   a). Guaranteed sources of raw materials;

   b). Cost of production is relatively low and thus competitive;

   c). No need to change the major equipment of cigarette-making;

   d). Though some special equipments and workshops are needed to make health pills and a short-term training is necessary for workers, it is not difficult for the general professionals to learn the skills. It is also relatively simple to prepare and use the

toxin-reduced liquid, but the process should be checked and supervised in accordance with the regulations.

III.    Market Analysis & Our Strategies:

The World Health Organization (WHO) has called on all countries to reduce the tar contained in each cigarette to no more than 15 milligrams. The required number could be even lower. The head of American Medical Doctors' Association cried out not long ago that we need to eliminate nicotine from the tobacco completely within 5 to 10 years. According to China's Medicine Guide web site, currently there are over 300 million smokers in China, of which 53.9% expressed their desire to give up smoking and 57.5 % wanted to use low-tar cigarettes and 66.7% wanted low-nicotine products. Smokers in other countries may also have the similar desires. We should never fail to see the tremendous market potential of our invention in view of consumers' demands, the pressure from health communities, and the indecision of the tobacco industries at home and abroad.

The health communities of the world have been working hard and some inventions did come out, but the effects were not comparable with the widespread harm of smoking. Our searches throughout the world have shed light on the following issues: 1) Many inventions were limited to only reducing the toxin of one or a few harmful chemicals. They provide no sound solutions to the pressing problems caused by smoking; 2) some inventions partially or completely depending on plants or herbs, even effective, may not be stable in their properties or have no secured sources of raw material for mass production and marketing. 3) Some popular nicotine replacement products such as patches, chewing pieces, nasal sprays, inhalers and tobacco-infused drinks are dangerous, because these products contain nicotine and it is a proved fact that nicotine causes cancers, cardiovascular diseases, and other diseases. Since nicotine releases a great deal of addictive components in the human brain, no wonder the mass media questioned the effectiveness of using nicotine replacement products.

Our mission to control smoking, therefore, demands a scientific, safe, and effective invention with comprehensive functions to reduce tobacco toxins, to enhance smokers' health and to eventually eliminate smokers' addiction. This invention, based on our over 20 years of studies and experiments in medical science, biochemistry and other related subjects, exactly meets the demands of the market by greatly reducing the major toxins in tobacco smoke, by preventing smokers from getting major smoking related diseases such as various cancers, cardiovascular diseases, respiratory illness and other diseases and defects including the harm caused by radioactive material 210 polonium, premature aging, weak immunity, as well as by gradually eliminating smokers' addiction and assisting their effort in smoking cessation.

Now the major policies adopted by various governments in their tobacco control include promoting related education, increasing cigarette's sale tax, and limiting smoking areas in society. These measures have achieved some success, but our invention will certainly

make their efforts more complete, more effective and more "focused on the value of human lives."

In view of World Trade Organization's mission to promote free trade in all fields, including tobacco industry, the intelligent and informed entrepreneurs, industrial groups or countries will take their initiative as soon as possible to open the world market widely with this trendy product and to enhance the health of the people throughout the world.

4

F
07-1918
RWR

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

## I (a) PLAINTIFFS

Faye Zhengxing

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _DC_
(EXCEPT IN U.S. PLAINTIFF CASES) _11001_

**DEFENDANTS** US Patent Office

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _VA_
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

20 Chesapeake St. Apt. 33
Washington, DC 20032

Case: 1:07-cv-01918
Assigned To : Roberts, Richard W.
Assign. Date : 10/24/2007
Description: Pro Se General Civil

IA 20?23?

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX

FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

☐ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☐ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

☐ **E. General Civil (Other)** OR ☒ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ G.  *Habeas Corpus/ 2255* | ☐ H.  *Employment Discrimination* | ☐ I.  *FOIA/PRIVACY ACT* | ☐ J.  *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K.  *Labor/ERISA (non-employment)* | ☐ L.  *Other Civil Rights (non-employment)* | ☐ M.  *Contract* | ☐ N.  *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (If not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (If Voting Rights Act) |

**V. ORIGIN**

Ⓟ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ Multi district Litigation    ☐ 7 Appeal to District Court from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*Case filed under 3) U.S.C for damages in patent Application* 1144

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint **JURY DEMAND:** ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction)   *No In The* ☐ YES ☐ NO   If yes, please complete related case form. *I filed high Court Ruling* *Case filed at US Supreme Court (02-10712)*

**DATE** *10/24/07*    **SIGNATURE OF ATTORNEY OF RECORD**

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

    I.         COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

    III.       CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

    IV.       CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint.  You may select only one category.  You must also select one corresponding nature of suit found under the category of case.

    VI.       CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

    VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd