CLERK
US DISTRICT &
BANKRUPTCY COURTS

The United States District Court for the District of Columbia

2008 JAN 24  AM 11: 54

RECEIVED

| | |
|---|---|
| **FAYE ZHENGXING**<br>3736 10th Ave.<br>Apt. 2H<br>New York, NY 10034<br>212-567-2713<br><br>        **Plaintiff**<br><br>V.<br><br>**THE US PATENT AND**<br>**TRADEMARK OFFICE**<br>Commissioner for Patents<br>P.O. Box. 1450<br>Alexandria, VA 22323-1450<br>571-272-0620<br><br>        **Defendant** | Case No: <u>07-1918</u><br><br>Judge: <u>RWR</u> |

### MEMORANDUM OF POINTS AND AUTHORITIES TO OPPOSE DEFENDANT'S MOTION TO DISMISS AND REPLY TO DEFENDNAT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT

Plaintiff filed this complaint numbered above pursuant to Title 28, Part IV, Chapter 85, Sec. 1338(a) "The district courts shall have <u>original jurisdiction</u> of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases."

This is not a tort case as Defendant alleged, which is caused by "negligent acts of agents of the United States. This is a case of intellectual property rather than a claim

1

focusing on "personal injuries". *See The Federal Tort Claim Act (FTCA) Overview*. The damages requested is grounded on Title 35, Part II, Chapter 12 Sec. 133 Time for prosecuting application: "Upon failure of the applicant to prosecute the application within six months after any action therein, of which notice has been given or mailed to the applicant, or within such shorter time, not less than thirty days, as fixed by the Director in such action, the application shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the Director that such delay was unavoidable." In this case, it is Defendant rather than the applicant who abandoned Plaintiff's application (no: 10/681,103).

Moreover, Plaintiff exhausted her administrative remedies by filing a petition with the Director of US Patent and Trademark Office pursuant to 37 CFR   § 1.181 to request damages rather than with the Director of Technology Center of USPTO pursuant to 37 CFR § 1.144, as alleged by Defendant, to dispute about restriction requirements, because Plaintiff passed the examination in 2005 and restriction requirements should not an issue any more.

Plaintiff presented the facts that the damages in Plaintiff's intellectual property or patent were caused by Defendant's intentional and unlawful abandonment of Plaintiff's application since 2005 and its further delay to cover up its wrongdoing in 2007 after the invention was published in March 2005, which might have caused reckless infringement of rights against applicants.

Plaintiff's summary judgment further pinpointed the nature of the argument and requested judicial economy according to LCvR 7.1 (h) of this court, because "there is no genuine issue as to any material fact and plaintiff is entitled to a judgment as a matter of law."

## I.    Factual and Procedure Background:

In Defendant's Motion to Dismiss, Defendant did not deny that Defendant granted the major inventor's petition for speedy processing, because he was then 83-year-old and he had been the mastermind of the invention. *See Motion to Dismiss, p. 3.* However, Defendant intentionally omitted the word "major" before the word "inventor" to mitigate its liability on damages, because the major inventor, an 87-year-old non-smoker but with lung cancer, has lost his ability to search infringement of rights, to promote and sell this patent even if it is granted now. The whole value of this invention was ruined already. Comparing the time Feb. 25, 2004 when the major inventor filed the petition to make the application special with the time March 30, 2005 when the petition was granted, Plaintiff was suspicious of the delay at that point. That is why the US Patent Office apologized: "The delay in acting upon this petition is regretted." *See compl. Att. 2.* Plaintiff was aware that they had been living under the federal surveillance and was worried about the impact of her civil right case on this patent application, though the legal case should have nothing to do with the scientific invention.

In amending their claims in 2005, Plaintiff meticulously followed examiner's requirement by reorganizing the claims in form, but Plaintiff did not change the essence of the claims -- the organic, inseparable and interactive relationships among the claims. Under one Claim 5, the major health pill is the main claim and another health pill became "supplemental" to the major one; the liquid additive also became "supplemental" for the health pills to achieve the designed benefit on smokers; the two methods both were indicated as related to the health pills and the liquid additive by the words "according to claim 1, 2, and 3" or "according to claim 1, 2, and 4" respectively. *See compl. Att. 5.*

In 2007 when Defendant tried to change the subject from its unlawful abandonment to a dispute on restriction requirement by asking Plaintiff to amend claims again, Plaintiff presented the same amended claims as that of 2005 for the same reasons. *See compl. Att. 17.* When Director of Technology Center[1] admitted the appropriateness of the amended claims in his decision on Plaintiff's petition by stating, "Applicants then submitted an acceptable amendment on April 20, 2007." *See compl. att.16, p. 2.* This statement further proved that the first amended application passed Defendant's examination in 2005 as applicants were informed.

In this Motion to Dismiss, Defendant only quoted Plaintiff's words on passing the examination in 2005 without denying the fact with any contrary evidence. In fact Defendant's phone record supports the truth as Plaintiff stated. *See Motion to Dismiss,*

---

[1] Plaintiff's Petition to Director was meant for the Director of the US Patent and Trademark Office rather than the Director of Technology Center. This argument will be presented on jurisdiction issue later.

*p. 5, 8, 9.* Pursuant to Federal Rule of Civil Procedure Rule 8 (6) "An allegation —

other than one relating to the amount of damages — is admitted if a responsive

pleading is required and the allegation is not denied."

With this fatal fact established, this Court can understand fully why Plaintiff

illustrated the background of her civil right case to prove only Dept. of Justice had the

motive and means to ruin Plaintiff's invention through US Patent Office. Defendant

tried to use one word "outlandish" to deny the allegations related to the huge damages

Defendant inflicted on Plaintiff, but it failed for the reasons 1) Plaintiff herself could

not start a formal criminal investigation or prosecution. It is US government's

function to start the law enforcement procedure. When Plaintiff offered Defendant

useful clues for investigation, Defendant refused to take actions. See *compl. Att. 10*;

2). Defendant did not present any contrary evidence to deny the allegations either,

because committing perjury is prohibited by the law and will be severely punished.

*See Title 18, Part I, CHapter 79, §1621.*

The most glaring fact or a historic issue Defendant has been trying to cover up is the

real US Supreme Court's ruling on Plaintiff's civil right case (02-10717). Department

of Justice not only falsified an unconstitutional ruling to frame the high court and to

deprive Plaintiff of her right, it also has been concealing the real high court ruling

since 2005 to fundamentally undermine the judicial independence and the rule of law

in this country.

When Defendant alleged that Plaintiff did not win any of her previous litigations (*See*

*Motion to Dismiss, p. 6, Note 5*), Defendant was repeating the history of obstruction of justice committed by Dept. of Justice. Note: When the judge at US Court of Federal Claims dismissed Plaintiff's case (o4-119 & 05-532) on jurisdiction, she had in her hand the US Supreme Court's ruling on the same issue. The real high court ruling not only protected Plaintiff's right, it also proved the top legal fraud. Fortunately President Bush, in light of the real high court ruling on Plaintiff's case, approved cash award to settle Plaintiff's cases in 2005 and 2006. Plaintiff only used the word "approved" (*See compl. P. 5*) rather the word "received" (*See Motion to Dismiss p. 6, Note 5*) to talk about her long-time-overdue relief, because not one penny of the approved relief has been issued to Plaintiff yet.

Moreover, Defendant carefully emphasized the word "delay" without mentioning the publication of this invention. For instance, Defendant said, "The value of which was allegedly harmed by the delay in prosecution" (*See Motion to Dismiss, P. 8, 12)*. Obviously Defendant's purpose is to mitigate its liability. However, Defendant did not deny that applicants' rights had been really infringed upon in light of its research.

## II.    Argument:

### 1. This is not a tort claim:

Defendant alleged that Plaintiff's claims "sound in tort and are thus subject to the provision of the FTCA" (*See Motion to Dismiss, p. 10*), but FTCA points out tort claims are "civil suits for actions arising out of negligent acts of agents of the United States." *See FTCA Overview.* In this complaint, Plaintiff presented the facts to prove Defendant abandoned their application intentionally rather than out of negligence

because the unlawful abandonment was related to the complicated background including the US Supreme Court's ruling on her civil right case and it was Defendant's retaliation. *See compl p. 4.*

More specifically, since Defendant granted the major inventor's petition for making it special because of his age and apologized for its delay in granting the petition, Defendant was fully aware of the importance in timely handling this application and also aware of the 6-month legal limit in application prosecution stated in 37 CFR §1.134, "An Office action will notify the applicant of any non-statutory or shortened statutory time period set for reply to an Office action. Unless the applicant is notified in writing that a reply is required in less than <u>six months</u>, a maximum period of six months is allowed."

37 CFR 1.135 states: "(a) If an applicant of a patent application fails to reply within the time period provided under <u>§ 1.134</u> and <u>§ 1.136</u>, the application will become <u>abandoned</u> unless an Office action indicates otherwise." In this specific case, however, it was Defendant rather than Plaintiff who abandoned this application.

When applicants demanded the explanation from Defendant for the abandoned application, the primary examiner John Pak stated that he could not explain the time wasted. *See compl. P. 7.* However, Defendant wasted more time by issuing more restriction requirements, though Defendant was fully aware that this application prosecution had long passed its legal time limit and this invention passed its examination in 2005. Obviously the purpose was for obstruction of justice by shifting

the responsibility to applicants. *See compl. P. 15-24*. The damages caused by the intentional retaliation and deliberate obstruction of justice were anything but negligence as required in a tort case.

By describing various kinds of damages and injuries Defendant (DOJ) inflicted on Plaintiff as background, Plaintiff emphasized that the loss of their patent rights was only "one dimension of their suffering and loss." *See compl. P. 7*. Though Plaintiff mentioned the tremendous mental anguish arising from Defendant's abandonment of this patent application and the later obstruction of justice, it did not change the nature of this claim – It is a claim in intellectual property.

Patent, under intellectual property, is vigorously protected by US laws. The US Constitution Article 1, Sec. 8, Clause 8 states that intellectual property must be protected "to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

The US Patent and Trademark Office's web site further states, "A successful right-holder can collect injunctive relief; monetary damages; or extraordinary remedies." "IP (Intellectual property) right must be enforced;" "Enforcement is the collective responsibility of IP owner and the federal government." *See www.uspto.gov/.../olia/ip_mrkt_place/09criminalenforcement.ppt;*

Intellectual property is also protected by Act of Congress. American Inventors Protection Act of 1999 based on Title IV of S. 1948, the "Intellectual Property and Communications Omnibus Reform Act of 1999" specifically protects inventors'

interest by stating "The Director is prohibited from entering into an agreement to provide copies of specifications and drawings of U.S. patents and applications to non-NAFTA or non-WTO member countries without the express authorization of the Secretary of Commerce."

In its Statement of Administration Policy on patent, the Executive Office of the President states, "The Administration strongly supports the passage of patent modernization legislation that fairly balances the interest of all innovators by improving patent quality and reducing patent litigation costs." Under Other Issues, the policy emphasized its position on patent examination, "The Administration supports the bill's provisions that affirm the authority of the United States Patent and Trademark Office (USPTO) to promulgate regulations to <u>ensure the quality and timeliness of application and their examination</u>" *See the publication of Office of Management and Budget under Executive Office of the President dated Sept. 6, 2007.*

Defendant's statement by Phillip J. Kauffman, an associate counsel, Office of General Law, Office of General Counsel, US Patent and Trademark Office, failed to label this complaint as a tort case, because Mr. Kauffman, who is "responsible for evaluation and processing of all Federal Tort Claims Act matters addressed to the Office of General Counsel," said (I) "have not received for processing, nor have I processed, any tort claim from plaintiff Zhengxing." His statement only proved that Plaintiff did not file this case as a tort claim. *See Motion to Dismiss attachment on Kauffman's Declaration.*

<u>2. Plaintiff exhausted her administrative remedies before bringing this suit:</u>

Still alleging that this claim is a tort case, Defendant continued, "Under the FTCA, a tort claim cannot be brought against an agency of the United States 'unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency. 28 U.S.C. §2675".

Again, Plaintiff denies that this is a tort claim. It, therefore, should not be governed by the procedure defined by FTC such as filing an administrative tort claim with the USPTO General Counsel and waiting for USPTO to deny her tort claim and then waiting for six months to transpire.

When Plaintiff filed the Petition to Director, the petition was meat for the Director of USPTO, because the petition was filed "in accordance with 37 CFR 1.181 (a) (1) and (c) since this application process is 'not subject to appeal to the Board of Patent Appeals and Interferences or to the court." *See Petition to Director attached.* [2]

When Plaintiff cited 37 CFR 1.181 as the legal ground, Plaintiff filed this petition with Director of USPTO rather than the Director of the Technology Center, because 37 CFR § 1.181 specifies the authority of Director of USPTO. 37 CFR § 1.181 (a) states, "Petition may be taken to the Director;" (1) From any action or requirement of any examiner in the *ex parte* prosecution of an application, or in *ex parte* or *inter parte* prosecution of a reexamination proceeding which is not subject to appeal to the Board of Patent Appeals and Interferences or to the court;" In other words, the authority of the Director of USPTO is an alternative to the Board of Patent Appeals

---

[2] The attachments included in Petition to Director are omitted, because all of them are presented in this complaint.

and Interferences. 37 CFR   § 1.181 (g) specifies the authority of the Director of

USPTO "The Director may delegate to appropriate Patent and Trademark Office

officials the determination of petitions." The Director defined in   § 1.181, of course,

refers to the Director of USPTO rather than the Director of Technology Center.

Since the Board of Patent Appeals and Interferences focuses only on disputes on

patent examination and infringement of rights *See 35 U.S.C. § 6(b)*, Plaintiff, accusing

Defendant of abandonment of their application and pursuing damages, had to file this

petition to the Director of USPTO to exhaust her administrative remedies in

compliance with 37 CFR 1.181 rather than 37 CFR 1.144.

As part of Defendant's strategy to change the subject from the unlawful abandonment

to restriction requirement dispute, the Director of Technology Center came to respond

to Plaintiff's petition. Sure enough, the Director of Technology did change the subject

and the filing legal ground in his opening statement: "This is a response to the petition

under 37 CFR 1.144, filed August 6, 2007, requesting withdrawal of an improper

restriction requirement." *See compl. Att. 16*. If Plaintiff had planned to file the petition

to the Director of the Technology Center for the matter of restriction requirement,

Plaintiff should have cited 37 CFR § 1.144, which states: "After a final requirement

for restriction, the applicant, in addition to making any reply due on the remainder of

the action, may petition the Director to review the requirement."

A close examination of the nature of the petition also proved the difference—While

Defendant wants to confuse Plaintiff and this Court by making it a dispute and appeal

on restriction requirements, Plaintiff was accusing Defendant of its unlawful abandonment and was pursuing damages. The content of Petition to Director is very similar to that of this complaint filed at this Court. In the Petition to Director Plaintiff focused on the abandonment and requested the damages $450 million to settle this claim. *See Petition to Director attached, p. 1, 11.*

Since Defendant was covering up the fact that this application had passed Defendant's examination in 2005, since two years had been wasted because of the abandonment, and since the Petition to Director was denied, Plaintiff filed this suit in accordance with Title 28, Part IV, Chapter 85, Sec. 1338(a) "The district courts shall have <u>original jurisdiction</u> of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks." The related Act of Congress in this case is S 1948 Title IV §316 "In an inter parte reexamination proceeding under this chapter, when the time for appeal has expired or any appeal proceeding has terminated, the Director shall issue and publish a certificate canceling any claim of the patent finally determined unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent any proposed amended or new claim determined to be patentable." This congressional act further proved Defendant's abandonment is unlawful and this Court has jurisdiction over this claim.

Title 35 Part II Chapter 13 §146 further specifies the remedy by civil action, "In such suits the record in the Patent and Trademark Office shall be admitted on motion of either party upon the terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court imposes, without prejudice to the right

of the parties to take further testimony. The testimony and exhibits of the record in the

Patent and Trademark Office when admitted shall have the same effect as if originally

taken and produced in the suit. Such suit may be instituted against the party in interest

as shown by the records of the Patent and Trademark Office at the time of the decision

complained of, but any party in interest may become a party to the action."

3. This non-tort claim should not be filed under Tucker Act:

Defendant further challenged the jurisdiction of this Court over Plaintiff's claim by

stating "To the extent that Plaintiff's claim for $450 million in damages can be read to

be a non-tort claim, the Tucker Act, which is a limited waiver of sovereign immunity

for certain non-tort claims, would have given the United States Court of Federal

Claims exclusive jurisdiction over the claim. 28 U.S.C. §1491 (a); United States v.

Hohri, 482 U.S.64 (1987)."

The suits filed under Tucker Act, according to 28 U.S.C. §1491 (a), are those claims

related to "any express or implied contract with the United States, or for liquidated or

unliquidated damages in cases not sounding in tort." Since this claim is not a claim

based on a breached contract, this Tucker Act does not apply to this case and Plaintiff

did not file at US Court of Federal Claims where there is no jury trial.[3]

4. Plaintiff's Motion of Summary Judgment is justified:

In addition to Defendant's fallacy on jurisdiction to confuse Plaintiff and this Court,

Defendant's Opposition to Plaintiff's Motion for Summary Judgment is groundless,

---

[3] The Seventh Amendment to the US Constitution states, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

because it "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex. 477 U.S. at 322.* The key fact Defendant failed to deny is that Plaintiff's application passed its examination in 2005, which proves that Defendant's abandonment of Plaintiff's application was unlawful and its repeated restriction requirements were designed to obstruct justice.

In order to closely comply with Federal Rules of Civil Procedure Rule 56 (c) stating "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Plaintiff sets forth a statement of material facts or the proposed finding of uncontroverted facts as follows:

1. Plaintiff filed an application (no 10/681,103) for patent on Oct. 9, 2003. *See Compl. Att. 1.*

2. Defendant granted the major inventor's petition to make it special in consideration of his age.[4] *See compl. Att. 2.*

3. Defendant published Plaintiff's invention on March 17, 2005. *See compl. 3*

4. Plaintiff followed Defendant's restriction requirements to amend their claim in 2005. *See compl. Att. 4-6.*

5. Defendant passed Plaintiff's amended claims in 2005. Since Defendant

---

[4] There is no date on the date of grant; but Defendant admitted it was on March 30, 2005.

keeps the phone record on this key issue and did not deny the fact in its pleading that there is such a record, Defendant admitted the truth. Federal Rule on Civil Procedure Rule 8 (6) states, "An allegation — other than one relating to the amount of damages — is admitted if a responsive pleading is required and the allegation is not denied."

6. Defendant admitted in 2007 that the amended claims was "acceptable," which was the same as that submitted in 2005. *See compl. Att. 16, p. 2, att. 5.* This admission further proved that Plaintiff's first amended claims did pass Defendant's examination in 2005.

7. Defendant thus unlawfully abandoned Plaintiff's application in violation of Title 35, Part II, Chapter 12 Sec. 133 on time for prosecuting application: "Upon failure of the applicant to prosecute the application within six months after any action therein, of which notice has been given or mailed to the applicant, or within such shorter time, not less than thirty days, as fixed by the Director in such action, the application shall be regarded as <u>abandoned</u> by the parties thereto, unless it be shown to the satisfaction of the Director that such delay was unavoidable." In this case it was Defendant rather than Plaintiff who abandoned this application.

8. Since Defendant abandoned Plaintiff's application after this invention was published in March 2005, reckless infringement of rights might have occurred and Defendant did not deny that the possibility might have become a fact. *See Defendant's Motion to Dismiss.*

*9.* After Defendant's long abandonment of Plaintiff's application and its
further delay to cover up its unlawful practice in 2007, the 87-year-old
major inventor with lung cancer and other diseases has lost his physical
ability to pursue the infringement of rights or the ability to promote or sell
the value of the patent even it is granted now. *See major inventor's
diagnosis of lung cancer and other diseases attached.*

10. Defendant's Opposition to Plaintiff's Motion for Summary Judgment did
not "set out specific facts showing a genuine issue for trial." "When a
motion for summary judgment is properly made and supported, an
opposing party may not rely merely on allegations or denials in its own
pleading; rather, its response must — by affidavits or as otherwise
provided in this rule — set out specific facts showing a genuine issue for
trial. If the opposing party does not so respond, summary judgment should,
if appropriate, be entered against that party." *See Federal Rule of Civil
Procedure Rule 56 (e) (2).*

In view of all the above, Plaintiff requests respectfully that Defendant's
Motion to Dismiss be denied and Plaintiff's Motion for Summary Judgment be
granted.

Note: If Defendant's time limit to respond to Plaintiff's complaint is 60 days,
then Defendant's Motion to Dismiss and Opposition to Plaintiff's Motion for
Summary Judgment had passed its deadline when it was issued on Jan. 14,

2008.[5] *See the date on the receipt card.*

Dated: Jan. 23, 2008.

Faye Zhengxing, Ph.D.
3736 10th Ave. Apt. 2H
New York, NY 10034
Phone & Fax: 212-567-2713
Cell Phone: 646-826-9930

---

[5] Defendant received this complaint on Nov. 13, 2007. See the date on Defendant's signature card.

## PETITION TO THE DIRECTOR

Pursuant to Patent Law (An Overview): "Patents grant an inventor the right to exclude others from producing or using the inventor's discovery or invention for a limited period of time. U.S. patent laws were enacted by Congress under its Constitutional grant of authority to protect the discoveries of inventors. See *U.S. Constitution, Article I, Section 8*," inventors Dehou Fei, et, al. move for this Petition to The Director for their abandoned and then troubled patent application (10/681,103) in accordance with 37 CFR 1.181 (a) (1) and (c) since this application process is "not subject to appeal to the Board of Patent Appeals and Interferences or to the court," but "there have been a proper request for reconsideration (§ 1.111) and a repeated action by the examiner." The examiner defined its recent restriction requirements as "proper and is therefore made FINAL" *See Attachment 11, p.5.*

The focus of the petition is that the US Patent Office, manipulated by Department of Justice, unlawfully abandoned the process of this application for two years after this invention passed its examination in 2005, and then wasted more time by issuing more unacceptable restriction requirements. This unlawful abandonment and uncharacteristic or unprofessional restriction requirements have inflicted tremendous damages on the applicants and on the value of the invention, because 1) the value of an invention lies mainly in its novelty; 2) the 86-year-old major inventor, whose petition for speedy process was granted by this office in 2004, was diagnosed with lung cancer and his death will cause the complete loss of the patent; 3) the abandonment of application took place after the invention was published in 2005, which might have incurred infringement of right. .

Applicants, therefore, urge the Director to thoroughly review their application and investigate this case, promptly confirm the approval of this application, and consult with the US government in order to pay inventors the damages caused by the unlawful abandonment, by the recent unjustified further delay, as well as by the possible infringement of rights. Applicants, in light of 37 CFR 1.181 (b), thus specify the factual background, list the points to be reviewed, and request the actions by Director to settle this case as follows:

## I.     **FACTS:**

This patent application was filed on Oct. 9, 2003. This invention, aimed at enhancing the health of smokers through reducing tobacco toxins, strengthening smokers' immunity and eliminating smokers' addiction, is based on applicants' extensive research and intensive experiment over the past 20-odd years. It will benefit 45 million smokers in the United States and 1.3 billion smokers worldwide[1]. The health pills could also benefit 9.7 million users of other tobacco products[2] and 29-43 percent

---

[1] See "Tobacco's Stigma Aside, Wall Street Finds a Lot to Like" in The New York Times on Jan. 31, 2007.
[2] See "Institute Urges Extensive Smoking Deterrents," in The Washington Post on May 25, 2007. The data are

of the US population who are second-hand smokers[3].

After submitting this application, the major inventor Dehou Fei filed a petition for speedy processing based on his age (then 82 years old) on Feb. 25, 2004 and this office granted his petition. *See attachment 1.* This invention was published on March 17, 2005. *See attachment 2.*

After receiving the restriction requirements on claims from this office, applicants revised their claims in accordance with the suggestions of this office in July 2005. One of the applicants Faye Zhengxing asked the examiner a few questions on the phone to make sure the restriction requirements were fully understood and meticulously followed. The amended version on claims was sent around July 20, 2005. *See attachment 3.*

A few weeks later, Faye Zhengxing called this office to ask the status quo of the application. A woman examiner took a few minutes to check the record and informed Faye Zhengxing that this application passed the examination. More specifically, she said (to the effect), "To say your application did not pass the examination is a mistake." Delighted by the success, Faye Zhengxing told the good news to the major inventor. Both cheered and Faye Zhengxing celebrated the success with her friends. By the way, the same patent application was also filed in China about one month earlier and was approved in September 2005, about the same time it passed the examination by this office in the United States. *See attachment 4.*

Up to that point, the patent office handled this application properly or professionally. This office even apologized for taking more time than necessary to grant the major inventor's petition for speedy process by stating "The delay in acting upon this petition is regretted." *See Attachment 1.* This document proves that this office was fully aware of the age of the major inventor and would not have abandoned the application without any abused power to manipulate its process. After that, however, applicants never heard of anything beyond the remarks "It is going through the process" when they made phone inquires.

As applicant Faye Zhengxing stated in her letter to NY senators, "It was definitely not a coincident that abandoning the process of our patent application took place exactly in the same period of time when I informed all the justices of the US Supreme Court that Department of Justice falsified the high court ruling on my case and US Supreme Court later reversed the lower court's ruling to protect my legal rights and to prove the top legal fraud. Since the illegal surveillance on me and all of my family members has been going on for years, Department of Justice knew our patent application from the

---

from Institute of Medicine, a branch of the National Academies, a scientific organization chartered by Congress to advise the government on scientific and technical issues.

[3] See "Researchers: Heart deaths would plunge without passive smoking" from National Health and Nutrition Examination Survey published by Reuters on May 11, 2006.

very beginning. Of course, it was the real high court ruling issued in 2005 that posed a prosecution threat and triggered deep embarrassment and strong determination to retaliate against me and my family by all means and in all ways." *See attachment 5*, p. 2. The chronicle of the federal crimes and damages gives a full picture of the destructive force and all-dimensional damages. The ordered abandonment of this patent application is only one aspect of the retaliation. Note: All the allegations in this chronicle are uncontested facts either presented at courts or Senate Judiciary Committee.

On March 19, 2007, applicant Faye Zhengxing sent the patent office a letter to protest the abandonment. *See attachment 6.* When Examiner Jon Pak said on the phone that he was only a small government employee and he could not explain the time wasted, applicant Faye Zhengxing immediately sensed the abused power behind, which had damaged her life in every way such as her career, her property, her health and her family.

This time, instead of apologizing to applicants for its unlawful abandonment of this application and promptly issuing the certification of this patent to reduce the damages, the patent office responded by making some unacceptable, uncharacteristic, and self-contradictory restriction requirements on claims and on other minor issues of the application, further delaying the approval of the patent which should have benefited the American smokers on a large scale and further increasing the pressure and the damages on applicants. *See attachment 7.* When applicant Zhengxing pointed out that the woman examiner informed her that this application had passed the examination, Mr. Pak said (to the effect), "She did not make the final decision. I do." This remarks proved that there are two contradictory decisions and Mr. Pak did not deny the fact that this application passed the examination in 2005. The record in this office should have supported the truth on applicants' side.

As applicants pointed out in the letter dated June 8, 2007, "Your record and your internal investigation should have proved the truth. If we had not passed the examination, you would not have waited for two years to repeatedly give us more opportunities to modify our claims and specifications." This assumption is based on 37 CFR **1.105** governed by 37 CFR **1.135** and **1.136**. See MEPE § **710** *et seq.* "Requirements for information under 37 CFR **1.105** made without an action on the merits should set a shortened statutory period of two months for reply. Applicant may extend the time period for reply up to six months in accordance with 37 CFR **1.136(a).**" Applicants further stated, "Our application deserves speedy processing, especially after you granted the petition of my father, the 86-year-old major inventor, "to make special" on Oct. 29, 2003 under the provision set forth in M. P. E. P. 708.02, IV." *See Attachment 8, p. 1.*

Applicants' current position on their claims is consistent with their amendment in 2005. In her letter dated June 8, 2007, the major inventor pointed out that if they agreed to make some changes, it did not mean this office could deny the fact that this

application passed the examination in 2005; and it did not mean they would not pursue the damages caused by the unlawful abandonment. More specifically, applicants insisted that they refused to cancel claim 7, 8 and 9 to reduce the value of the invention. *See attachment 8, p.1-2.*

In their amended claims, applicants insisted that the central claim on the health pills is to enhance the health of smokers. Therefore, in addition to the claims on two health pills, the liquid additive to reduce the toxins in tobacco is a supplemental claim, because the effect to strengthen the immunity of smokers and gradually eliminate smokers' addiction can only be achieved when the use of liquid additive in tobacco is combined with taking the health pills by smokers. The two methods to resume the activity of glut athione peroxidase and to eliminate smoker's addiction are inventors' inseparable discoveries which must be protected by the US patent law.

The uncharacteristic or unprofessional uncertainty and self-contradiction of this patent office can also be seen in its decisions. Examiner Jon Pak recently said on the phone this office would take final action to reject this application if applicants refuse to make changes on claims. Later in its letter dated June 12, 2007, this office said: "Upon reconsideration, in view of the restriction requirement of record, it is believed that Finality would have been premature." *See Attachment 11, p. 2.*

Not only did the abandonment of the application tremendously damage the value of this invention, the further unjustified restriction requirements also took a heavy toll on the applicants, especially on the old, sick and weak major inventor, who was diagnosed with lung cancer caused by a federal poison (dioxin). Even applicant Zhengxing has to bear the pain all over her body since she had to work in a highly polluted home where the water was poisoned and the air was polluted. A few federal agents have been pumping toxic gas into their home through walls, the ventilation system, and cooking gas pipes. The letters she sent to NYC Mayor give more details about the pollution and poisoning. *See Attachment 9.* It is a torture to work in such an environment for an application which had passed the examination. Apparently, Department of Justice is not only concealing the real ruling by the US Supreme Court on Faye Zhengxing's case (02-10717), it is also covering up its retaliation against her family's patent application.

## II.    POINTS TO BE REVIEWED:

While this patent office is making more restriction requirements to contradict its own decision which made the amended claims allowable in 2005, applicants of this invention have not changed their position on claims. Comparing the 2005 amended claims and the 2007 modified claims, they are almost the same: two claims on health pills, one supplemental claim for the liquid additive, and two claims on methods. *See attachment 3, 10.*

4

On the whole, these claims are the inseparable patentable discoveries working together to achieve the designed beneficial effect on smokers and to form an organic unity to enhance smokers' health through reducing the toxins in tobacco, strengthening the immunity of smokers and eliminating smokers' addiction. The applicants listed these claims in one application because a) they "set forth the best mode contemplated by the inventor of carrying out his invention" *See the first paragraph of 35 U.S.C. 112.* The best mode in this invention is to use the two health pills when smokers consume the toxin reduced tobacco; b) one application or specification can "conclude with one or more claims, particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *See Second paragraph of 35 U.S.C. 112.* Accordingly, the inventors concluded more than one claim in this application and these five claims are the subject matters the applicants regard as their discoveries or invention.

In addition to the legal ground for their claims as stated above, applicants need to state their scientific ground as follows:

1. *The health pill and liquid additive are inseparable from each other and interactive with each other to exert the beneficial effect on smokers.*

In response to applicants' recently amended claims, this office stated, "The health pill and liquid additive are claimed separately. See claims 5-6 (health pill) and claim 7 (liquid additive). There is nothing indicated in those claims that require a combination of the health pill and liquid additive." *See Attachment 11, p. 3.*Though the health pills and the liquid additive are two separate claims because of their different patentable preparations and functions, the designed beneficial effect on smokers depends on the chemical interaction between the two. In this office's restriction requirement of 6/21/2005, the examiner clearly admitted, "This invention is classified in multiple subclasses in classes 424 and 514, depending on the chemical structure of the component ingredients." *See Attachment 11, p.2.* Of the four types of utility patents, this invention falls in the category of compositions of matter defined by the patent law: "Such 'utility' patents are issued for four general types of inventions/discoveries: machines, human made products, compositions of matter, and processing methods." *See § 101 of Title 35.* "The term 'composition of matter' relates to chemical compositions and may include mixtures of ingredients as well as new chemical compounds." *See www.uspto.gov--General Information Concerning Patent.*

Another example in the Specification to prove that the value of this invention hinges on the chemical structure of the component ingredients: "These ingredients, within the scope of United States Recommended Dietary Allowance (RDA), will protect the structure and functions of cells and cell membranes to keep smokers in good health (10)." *See Attachment 12, p. 8.* Again it is the effect of chemical reaction of the component ingredients of the health pill and liquid additive on human body that fundamentally repairs the damages in human cells and cell membranes and strengthens the immunity of smokers.

The following paragraph in Specification describes why reducing toxins in tobacco must be combined with taking health pills. "We started detoxicating the major seven chemicals in tobacco smoke mainly through full oxidization. We found it easy to oxidize tar, carbon monoxide and nicotine effectively. It is also a cost-effective way to oxidize nicotine and transforming it into one type of vitamin B (nicotinic acid). With sufficient oxygen, tar will greatly lower its content, and the cancer-causing polycyclic aromatic hydrocarbons represented by 3, 4 benzo(a)prene in tar will also decrease. The rest of polycyclic aromatic hydrocarbons in tar will lose its carcinogenicity when it combines with our anti-oxidants in our health pills; carbon monoxide, after oxidization, also loses its toxicity after it is changed into carbon dioxide. See Attachment 12, p. 6. In other words, only by reducing the toxins in tobacco will the health pills benefit smokers as designed. By the same token, smokers still need to take health pills to eliminate the rest of harm from carcinogenicity even after the toxins in tobacco were greatly reduced by the liquid additive.

The examiner's suggestion that the health pills and the liquid additive, with their different ingredients, "are directed to independent and distinct inventions" (See Attachment 12, p.4) will prevent this invention from achieving its designed beneficial effect on smokers and from realizing its value, especially the value to gradually eliminate smokers' addiction, which can be achieved only through using the ingredients in the health pills and in the liquid additive at the same time. There is not an independent group of ingredients for the function to eliminate smokers' addiction. That is why applicants, in response to this office's restriction requirement, pointed out, "The mark * is to indicate the ingredients that also serve the function of addiction elimination. In the original version of the Specification, there is a footnote to illustrate the function of the mark *." See Attachment 8, p. 2.

The inseparable relationship between the health pills and the liquid additive is also shown by the key word "supplemental" in applicant's claim on the liquid additive. See Attachment 3, p.5 and Attachment 10, p. 2. In short, the liquid additive is supplemental to health pills and the claim on the liquid additive is an inseparable supplemental claim.

The examiner's analogy comparing a novel and unobvious car engine and brake system with the relationship between this invention's liquid additive and health pills is not analogous here, because the presumption that "there is nothing preventing the engine and brake system from being separately used" (See Attachment 11, p. 4) does not exist in this invention. As stated above, the liquid additive has to function with health pills to achieve the designed beneficial effect on smokers.

2. *Claim 8 and claim 9 are inventors' methods designed to trigger the biochemical reactions for the beneficial effect on smokers. They are scientific discoveries and inseparable part of the value of the invention.*

While claim 8 is for a method to resume the activity of glutathione peroxidase (GSH-PX) by applying a co-enzyme to guarantee its unfailing effect, claim 9 is a method for eliminating smoker's addiction by reducing dopamine and glutamic acid in the human brain. Both claims play an essential role in the biochemical reactions to achieve the beneficial effect on the smoker and both are breakthroughs in this field. They belong to the patentable "new and useful process" defined "by law as a process, act or method, and primarily includes industrial or technical processes". *See* www.uspto.gov – *General Information Concerning Patents.*

In Specification, the inventors describe why the method was an inseparable discovery of the biochemical reaction: "After a long search and study, we finally found a co-enzyme to reduce GSSG back to GSH. We were greatly encouraged by this finding. With this co-enzyme, we could resume the activity of GSH in every way. Moreover, in case GSSG-R is insufficient, the two components in riboflavin in the health pill – flavin mononucleotide (FMN) and flavin adenine dinucleotide (FAD) – will resume the activity of GSSG-R to the normal level. We believe this is a breakthrough in generating an unfailing effect to prevent smokers from getting various smoking related diseases." *See Attachment 12, P. 14.*

Similarly, in Claim 9 the method to eliminate smokers' addiction through three channels also fully presents itself as part of the biochemical reactions in human body or part of the invention. "To eliminate the addiction to nicotine, therefore, we must appropriately reduce dopamine, glutamic acid, and at the same time reduce the excessive iron in the human body." Applicants illustrated the following three methods: a) strengthening MAO's activity with copper compound and enhancing copper's function with manganese compound; b) use vitamin B6 (changed into pyridoxal 5 –phosphate in the human body) as the co-Enzyme for glutamic acid's decarboxylation (GAD); c) control the iron taken-in and stored. *See Attachment 12, p. 15-17.*

Applicants also would like to use an analogy to state why the methods are inseparable parts of the invention. For instance, the same ingredients such as salt, sugar, water or flour could be made into different kinds of food if the amount of the ingredients is different, or the combination of the ingredients is different, or the temperature of the oven is different. In short, the methods must be carefully designed and applied for the ingredients of chemical compound to interact with each other to achieve the designed result. Since these methods are unprecedented and creative, they must be regarded as part of the invention.

3. *Some restriction requirements on minor issues are so nit-picking or fault-finding that they only proved that this office was manipulated by Department of Justice to cover up the unlawful abandonment and shift the responsibility to applicants.*

In addition to the restriction requirements on claims, this office also made suggestions on some insignificant issues which were not mentioned in its previous restriction

requirement in 2005 and contradicted the fact that this application passed its examination in 2005.

While applications agreed to make some corrections on page 7, 13-15, 19 and 21 in Specification, applicants pointed out some restriction requirements are not acceptable. For instance, this office should have used the name Dehou Fei of the major inventor to contact applicants as it used to, because the major inventor is the mastermind of this invention and it was based on the major inventor's age that this office granted his petition to "make it special." Furthermore, applicants are different in their contribution to this project and in the distribution of patent sale value." *See Attachment 8, p. 2.* This office used the name of applicant Faye Zhengxing rather than the major inventor's to mitigate its guilt caused by the unlawful abandonment and further delay.

Reviewing Title 35, Part 2, Chapter 10, sec. 101 which states, "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title," applicants found the assertion of this office groundless when it said, "The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention." *See attachment 7. p. 3.* Not only do the claims belong to "new and useful process" and "composition of matter" as defined by the law above on patentable inventions, applicants have actually used something similar to health pills on themselves and proved their high value in strengthening the human immunity.

In her letter to NY senators, applicant Zhengxing described the effect of their health pills on themselves, "In terms of the quality of our invention, the federal poisons, which injured my family, unexpectedly proved the power or effect of our health pills in strengthening human immunity. Taking the medicines similar to our health pills, my 86-year-old father, is still alive after being diagnosed with lung cancer two years ago while the average survival period for male lung cancer patients is only 8 months. Moreover, after being repeatedly poisoned by dioxin over the past two and half years, I have pain in my back, muscle and lymph nodes and my dioxin level has reached nearly 80,000 as opposed to the normal range 10-20, but our health pills prevented me from immediate death caused by cancers." *See Attachment 5, p.3.*

It is not true that the name such as ACA-1-4 2A of the health pill was "never before described in the originally filed disclosure." It is not true again when this office said, "In view of the fact that applicant seems to associate certain meanings behind such product names, the new terminology is deemed to constitute new matter, which fails to find adequate written descriptive support from the originally filed disclosure." *See Attachment 11, p.6.* Applicants used these names only to refer to the specific products since there are two kinds of health pills. One health pill is in orange color and the

other is white. To use these names is only for convenience in communication. There is no "meaning behind such product names," nor is there any "new matter." In the original specification, these names were introduced only to refer to specific products and they were also used under the title of preparations or of the tables. *See Attachment 12, p. 3, 20, 21*. These names were also used in applicants' amended claims in 2005. *See Attachment 3, p.1*.

It is obviously fault-finding when this office questioned the content in the parenthesis (for 100 gram of tobacco, about 20 cigarettes x 6.667 packs) as "confusing." Since part of the preparation of the health pills is the amount of its ingredients, the amount of tobacco for health pills' protective effects should be specified for manufacture and packaging, as well as for biochemical science. It is ridiculous to think "the health pill ingredients are to be divided up into multiple pills for the numbers of cigarettes that would contain 100 grams of tobacco." *See Attachment 11, p.7*. In the preparation, the applicants stated clearly that the dose of the health pills is decided by the number of cigarettes the smoker consumes daily -- 4 orange pills and 2 white pills daily if the smokers consumes 20 cigarettes everyday. The dose is half if the number of cigarettes consumed is half. *See Attachment 12, P. 21*.

Pursuant to Title 37 CFR .67 (a) (1) "Deficiencies or inaccuracies relating to all the inventors or applicants (§ § 1.42, 1.43, or § 1.47) may be corrected with a supplemental oath or declaration signed by all the inventors or applicants," applicants submit a supplemental declaration signed by applicants in the US to authorize the major inventor Dehou Fei and inventor Faye Zhengxing to do all the necessary work on their behalf to complete their application. *See attachment 13*. Applicants were not informed of any defects in their oath or declaration since they used an application data sheet and they received the receipt from this office dated March 4, 2004. *See Attachment 14, 15*. As the receipt states, "Receipt is acknowledged of this regular Patent Application. It will be considered in its order and you will be notified as to the results of the examination," applicants were waiting for the result of examination rather than any correction of the defect in their oath or declaration.

In sum, applicants' five claims are inseparable from each other to form the organic entity -- this invention. They are inventors' creative discoveries or patentable novel "composition of matter" and "process." Scientifically, the health pill (in claim 5) is the foundation of health pill (in claim 6), whose claim is more based on the novel usage of rather than the ingredients of the health pill; the liquid additive (in claim 7) is supplemental to health pills in its use and claim; the two methods (in claim 8, and 9) are designed to function with the ingredients of the health pills and the liquid additive to achieve the beneficial effect on smokers. Legally, one application is allowed to contain 'more than one claim" and the five claimed items "set forth the best mode contemplated by the inventor of carrying out his invention." The recent restriction requirements from this office are basically fault-finding, nit-picking, uncharacteristic, and self-contradictory which proved its intention to cover up its unlawful

abandonment and to shift the responsibility to applicants rather than to Department of
Justice who damages applicants' lives in all dimensions. This patent application is
only one of the aspects of its retaliation. *See Attachment 5.*

## III.   **ACTIONS TO BE TAKEN**:

The US Patent law (overview) specifically emphasizes the time or timeliness on the value
of a patent, "Patents grant an inventor the right to exclude others from producing or
using the inventor's discovery or invention **for a limited period of time.** U.S. patent
laws were enacted by Congress under its Constitutional grant of authority to protect
the discoveries of inventors. *See U.S. Constitution, Article I, Section 8.* More
specifically, the law states, "Patents were normally issued for a non-renewable period
of **seventeen years**, measured from the date of issuance." *See [[USC: 35: 154][§ 154 of*
*Title 35.]* Under the amended provision (which took effect June 8, 1995) the term will
be **twenty years** measured from the date of application. In order to be patented an
invention must **be novel**, useful, and not of an obvious nature. *See §§ 101-103 of Title*
*35.*

Applicants, therefore, request the Director to resolve the case in two ways:

1. Issue the patent certification immediately, apologize for the unlawful abandonment
   and the further delay, cover all kinds of damages, and urge federal prosecution.

Since Amendment XIV to the US Constitution clearly states, "nor shall any State
deprive any person of life, liberty, or property, without due process of law; nor deny to
any person within its jurisdiction the equal protection of the laws," and the US
Constitution (Article III, Section 2) points out: "the judicial Power shall extend to all
Cases, in Law and Equity, arising under this Constitution ... to Controversies to which
the United States shall be a Party," applicants of this invention urge the US Patent
Office to render them justice immediately by upholding the law and respecting the
facts rather than obstructing justice.

More specially, applicants want this office to issue the patent certification to
applicants immediately, apologize for the unlawful 2-year abandonment of this
application and the further delay by its recent unacceptable restriction requirements,
pay applicants $ 50 million to cover the tremendous financial loss, the mental anguish
applicants have suffered, and the punitive damages (which could be as high as 9 times
of the real damages as defined by the US Supreme Court. *See Phillip Morris USA v.*
*Williams*), and help applicants sell its patent to benefit the American smokers and
second-hand smokers as soon as possible. At the same time, this office should also
urge federal prosecution of the criminals who inflicted all the damages on this country,
on the American people and the applicants.

2. Or pay applicants $450 million in total to cover all kinds of damages and urge federal prosecution of the criminal(s).

As this invention was published in March 2005, the possible infringement of right might have damaged the whole patent. The more delay of the patent approval, the more possibility of infringement of right and the more damages.

If this office continues to force applicants to change their claims or force them to go through all the appeal procedure in violation of the patent law and the related scientific principles as stated above, it will be responsible for skyrocketing damages, including the loss of the sale value of this invention.

Professionally, the 86-year-old major inventor is the mastermind of this invention. He, a non-smoker, was diagnosed with lung cancer in 2005 caused by a federal poison dioxin. Now he is so weak that he cannot walk for long or fast. More delay may lead to his death which will completely ruin the patent. In this case, this office will have to pay $450 million to cover the whole loss of sale value of this invention, the tremendous mental anguish applicants have suffered during the unlawful abandonment and the current further delay, as well as the punitive damages (which could be as high as 9 times of the real damages defined by the US Supreme Court. *See Philip Morris USA v. Williams*). This office should also urge the federal prosecution of the criminal(s) who inflicted the damages the US government, on the American people, and on the applicants.

  In view of all the above, applicants request this petition be granted as the law and science demand.

Dated: July 31, 2007                    Major Inventor: *Dehou Fei*
                                                         Dehou Fei

                                        *Faye Zhengxing*
                                        Faye Zhengxing, Ph.D.

                                        Address: 3736 10th Ave.
                                        Apt. 2H
                                        New York, NY 10034
                                        Phone & Fax: 212-567-2713
                                        Cell Phone: 646-826-9930

## ATTACHMENTS TO PETITION TO DIRECTOR

1. Speedy process petition granted.

2. Notice on patent publication.

3. Amended version of claims in 2005.

4. Patent certification from China in 2005.

5. Letter to NY Senators on June 11, 2007.

6. Letter to Patent Office on March 19, 2007.

7. Patent Office's restriction requests dated May 31, 2007..

8. Letter to patent office on June 8, 2007.

9. Letters to NYC mayor.

10. Amendment to Claims dated April 15, 2007.

11. Patent Office's more restriction requirements dated June 12, 2007.

12. Specification.

13. Supplemental declaration.

14. Application data sheet.

15. Receipt of application from Patent Office.

December 20, 2006

**REFERRING PHYSICIAN:**
YILING HUANG , MD
86-15 QUEENS BLVD.2ND FLOOR
ELMHURST,  NY  11373

**PATIENT:**   FEI, DEHOU
**FILE NUMBER:**   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
**DATE OF BIRTH:**   10-14-20
**DATE OF STUDY:**   December 20, 2006
**MEDICAL RECORD #:**   123198
**ORDER #:**   78160

Dear Doctor Huang,

Following is a report of the examination performed on the above patient.

INDICATION: Right upper lobe pulmonary adenocarcinoma and status post gamma knife.

CT SCAN OF CHEST WITHOUT AND WITH CONTRAST:

CT imaging of the chest was performed with a helical multislice Aquilion Toshiba CT scanner. Serial axial scans were obtained from the lung apex to the base using spiral volume acquisition. Views were obtained before and after power infusion of 100 ml Ioversol, low osmolar contrast media (LOCM). 3D imaging was postprocessed on the computer workstation. The imaging was reviewed in lung, bone and soft tissue window technique. The prior study dated 3/6/06 was reviewed. The prior outside study dated 5/22/06 was provided for comparison.

The right upper lobe demonstrates a soft tissue density measuring 9.8 cm in AP x 5.8 cm in transverse 7.5 cm in CC. The right upper lobe bronchus is obliterated. There is no significant interval change. There are multiple new nodules measuring 1.0 x 1.0 cm in maximum length in the medial aspect of the superior segment right lower lobe. A new larger mass measuring 1.8 x 1.9 cm is seen in the posterior segment right lower lobe. There are multiple punctate calcifications in the peripheral aspect of the right upper lobe. There is a lymph node measuring 0.8 x 0.6 cm in the posterior diaphragm.

The left apex demonstrates an irregular density measuring 1.5 x 0.8 cm (image 8)compatible with scarring. The posterior aspect of the left upper lobe demonstrates multiple calcified nodules measuring 0.6 cm in maximum dimension, compatible with granulomas. The right middle lobe demonstrates a calcified granuloma measuring 0.4 cm(image 45).

There is no evidence of pneumothorax or pleural effusion. The trachea is deviated to the right.

Examination of the mediastinum demonstrates no significant lymphadenopathy. The heart is normal in size without evidence of a pericardial effusion. No coronary calcification is

identified. The aorta is normal in caliber. No osteoblastic or lytic bony lesion is identified.

The partial visualized liver demonstrates a mass measuring 3.8 x 3.7 cm which is enlarged compared to the prior study dated 3/6/06.

IMPRESSION:

1. Obliteration of the right upper lobe bronchus and soft tissue density of the right upper lobe compatible with history of adenocarcinoma with lobar atelectasis.
2. New masses in the right lower lobe suggestive of metastasis.
3. Enlarged liver mass highly suggestive of metastatic disease.

Thank you for the courtesy of this referral.

Sincerely yours,
Mary Hu, MD
Board Certified Radiologist
Document signed electronically

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

U.S. Attorney Office
501 3rd Street
Washington, DC 2000

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X
B. Received by (Printed Name)   NOV 13 2007
C. Date of Delivery
D. Is delivery address different from item 1? ☐ Yes  ☐ No
If YES, enter delivery address below:

3. Service Type: ☑ Certified Mail  ☐ Express Mail  ☐ Registered  ☐ Return Receipt for Merchandise  ☐ Insured Mail  ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Transfer from service label): 7007 1490 0003 6245 9636

PS Form 3811, February 2004   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The US Patent Office
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X
B. Received by (Printed Name)
C. Date of Delivery
D. Is delivery address different from item 1? ☐ Yes  ☐ No
If YES, enter delivery address below:
RECEIVED OCT 31 2007 CENTER

3. Service Type: ☑ Certified Mail  ☐ Express Mail  ☐ Registered  ☐ Return Receipt for Merchandise  ☐ Insured Mail  ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Transfer from service label): 7007 1490 0003 6245 9629

PS Form 3811, February 2004   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Attorney General
Dept. of Justice
950 Pennsylvania Av
Washington, DC 20530

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X
B. Received by (Printed Name)   NOV 0 6 2007
C. Date of Delivery
D. Is delivery address different from item 1? ☐ Yes  ☐ No
If YES, enter delivery address below:

3. Service Type: ☑ Certified Mail  ☐ Express Mail  ☐ Registered  ☐ Return Receipt for Merchandise  ☐ Insured Mail  ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Transfer from service label): 7007 1490 0003 6245 9582

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of January, 2008, a copy of the foregoing

MEMORANDUM OF POINTS AND AUTHORITIES TO OPPOSE

DEFENDANT'S MOTION TO DISMISS AND REPLY TO DEFENDNAT'S

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT was

mailed to Defendant at

Rhonda C. Fields

Civil Division

555 4th Street, NW

Washington, DC 20530

Faye Zhengxing, Ph.D.

3736 10th Ave. Apt. 2H

New York, NY 10034

Phone: 212-567-2713

: